ACCEPTED
01-14-00104-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
5/26/2015 8:21:49 PM
CHRISTOPHER PRINE
CLERK

IN THE COURT OF APPEALS
FIRST DISTRICT OF TEXAS AT HOUSTON

_____

NO. 01-14-00104-CV

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
5/26/2015 8:21:49 PM
CHRISTOPHER A. PRINE
~~Clerk~~

_____

WHITE LION HOLDINGS, L.L.C.

Appellant

vs.

THE STATE OF TEXAS

Appellee

_____

On Appeal from
The 98th District Court of Travis County, Texas
Trial Court No. D-1-GV-06-000627 and D-1-GV-13-001068

_____

**APPELLANT'S APPENDIX (Part 3) TO
MOTION TO SUPPLEMENT THE RECORD;
MOTION FOR REHEARING AND
MOTION FOR RECONSIDERATION *EN BANC***

Jacqueline Lucci Smith
TBA #: 00786073
LUCCI SMITH LAW PLLC
10575 Katy Freeway, Suite 470
Houston, Texas 77024
Tel.: 832-494-1700
Fax:
Email: JLS@LucciSmithLaw.com

Joan Lucci Bain
TBA #: 01548020
BAIN & BAIN PLLC
10575 Katy Freeway, Suite 405
Houston, Texas 77024
Tel.: 713-629-6222
Fax: 713-629-6226
JBain@BainandBainlaw.net

**Part 1**

**Appendix 1:** State of Texas Motion for Summary Judgment against Bernard Morello in Cause No. D-1-GV-06-000627 in the 353rd District Court of Travis County, Texas.

**Part 2**

**Appendix 2:** Morello's Response to Motion for Summary Judgment with Exhibits A-K in Cause No. D-1-GV-06-000627 in the 353rd District Court of Travis County, Texas.

**Appendix 3:** Order Granting Final Summary Judgment against Morello in Cause No. D-1-GV-06-000627 in the 353rd District Court of Travis County, Texas.

**Part 3**

**Appendix 4:** Morello's Motion for New Trial with Exhibits A-K in Cause No. D-1-GV-06-000627 in the 353rd District Court of Travis County, Texas.

**Appendix 4:** Morello's Motion for New Trial with Exhibits A-K in Cause No. D-1-GV-06-000627 in the 353rd District Court of Travis County, Texas.

| STATE OF TEXAS; | § | IN THE DISTRICT COURT |
| *PLAINTIFF* | § | |
| | § | |
| V. | § | OF TRAVIS COUNTY, TEXAS |
| | § | |
| BERNARD MORELLO, | § | |
| *DEFENDANT* | § | 353RD JUDICIAL DISTRICT |

## DEFENDANT'S MOTION FOR NEW TRIAL

Pursuant to Texas Rule of Civil Procedure 329(b), Defendant files this, his Motion for New Trial, and shows the following:

### I.   BACKGROUND

#### A.  THE HISTORY OF THE PROPERTY

This case is a statutory enforcement action originally filed jointly against Defendants White Lion Holdings, LLC ("White Lion") and Bernard Morello ("Morello") for violations of Texas Water Code section 7.101 relating to property located at 2010 Spur 529 in Rosenberg, Texas ("Property"). The Property was purchased out of bankruptcy by White Lion. The Property was originally owned by Vision Metals, Inc. ("Vision"). While the Property was owned by Vision, it became contaminated and, on January 12, 1988, Vision received a permit from the Texas Commission on Environmental Quality ("TCEQ") for an Industrial Waste Management Site (Permit No. HW-50129-001). A Compliance Plan (CP-50129) was issued on the same day to address the monitoring and cleanup of the contaminated groundwater at the Property.

Vision subsequently entered into modifications of the Compliance Plan (on March 15, 1995 and November 16, 1999) before filing for bankruptcy in 2000. (Ex. B.) For the three years prior to the bankruptcy, Vision was wholly noncompliant with its permit and the Compliance Plan. (Ex. A at 105:10-14.)

1

Morello does not own the Property nor has he agreed in his individual capacity to be responsible for the prior owner's contamination of the property or its clean up. Rather, White Lion is the sole owner of the Property and improvements and Morello's only connection to the Property is as the sole member of the LLC.

**B.** **MORELLO SUBSEQUENTLY OBTAINS THE PURCHASE RIGHTS FOR THE PROPERTY AND TRANSFERS SAME TO WHITE LION; WHITE LION PURCHASES THE PROPERTY IN APRIL 2004**

On February 27, 2004, after successfully bidding on the Property at a bankruptcy auction, Morello entered into a contract to purchase the Property (hereinafter referred to as the "Purchase Agreement"). (Exhibit C.) On April 5, 2004, Morello assigned any and all of his rights in the Purchase Agreement to White Lion. (Ex. D.) Closing on the sale of the Property occurred on April 6, 2004 between Vision and White Lion, with Vision conveying the property directly to White Lion via Special Warranty Deed recorded under Fort Bend County Clerk document number 2004042731. (Ex. E.) Therefore, **Morello was never the owner of the Property**, and White Lion is the only owner of the Property after Vision.

**C.** **WHITE LION SUBSEQUENTLY TAKES TRANSFER OF THE COMPLIANCE PLAN AND ITS OBLIGATIONS FROM VISION**

As mentioned supra, the Property was subject to a Compliance Plan (CP-50129) dating back to 1988 for contamination caused by Vision. Effective June 23, 2004, Plaintiff transferred CP-50129 and its rights and obligations from Vision to White Lion. (Ex. A at 32:11-17.) Moreover, and as part of the Purchase Agreement, the financial assurance provided to the TCEQ by Vision under CP-50129 was included in the purchase and assigned to White Lion. (Ex. A at 35:11-13.) The facts, therefore, clearly show that title to the Property transferred directly to White Lion from Vision and that White Lion, not Morello, was substituted as the sole obligor under the compliance plan.

**D. AFTER WHITE LION'S PURCHASE OF THE PROPERTY, MUCH OF THE INFRASTRUCTURE RELATED TO CP-50129 WAS REMOVED OR DESTROYED BY THIRD PARTIES**

The Purchase Agreement in bankruptcy specifically excluded personal property, such as pipe manufacturing machinery and other items. (Ex. A at 21-22.) This personal property was sold separately in the bankruptcy auction. (*Id*.) Accordingly, White Lion was required to allow thirty-eight independent, additional buyers of the personal property on site, to remove the personalty they had purchased. (*Id*. at 51:15-17.) Many of these buyers and their contractors caused major damage to the Property, particularly the electrical, water, air, and gas systems. (*Id*. at 107:13-21.) Although White Lion closely monitored the removal process and attempted to protect the Property as much as possible, (*Id*. at 56-57), extensive damage was done to the utilities and infrastructure:

> The Corrective Action System, the system itself, the functioning -- these are just fixtures here. This is just a pipe that runs into the ground. All the internet work that runs it is all gone. It was damaged at the time that the buyers were there. The equipment was gone. The pipes were cut. Electricity was cut. I've already went over all that. It was destroyed.

(*Id*. at 107:13-21.) Following the conclusion of the removal process, the Property resembled a "war zone." (*Id*. at 51:24-25.)

**E. GIVEN THE SCOPE AND COST OF REPAIRS, WHITE LION WAS UNABLE COMPLY WITH THE REMEDIAL ELEMENTS OF CP-50129 OR POST PROOF OF FINANCIAL ASSURANCE**

With repair estimates at over $1 million (*id.* at 53:18-21), White Lion did not have the financial ability to replace the utilities and remediation system that were destroyed by the personal property buyers, much less the additional funds to continue with the Compliance Plan. (*Id*. at 25-26, 48-49, 51-52, 55, 65-67, 70, 79-81, 93-94, 99-101, 103, and 107-108.) Moreover, White Lion was unable to afford the premium for financial assurance required under the Texas

Administrate Code. (*Id*. at 40:14-18.) Given that the damage to the remediation infrastructure was beyond White Lion's control and could not have been prevented by its due diligence, substantial compliance with C-50129 and the financial assurance requirement was impossible.

###### F. PLAINTIFF FILES SUIT AGAINST WHITE LION AND SUBSEQUENTLY ADDS MORELLO IN HIS INDIVIDUAL CAPACITY

Plaintiff filed suit against White Lion on April 14, 2006, seeking injunctive relief and statutory penalties related to White Lion's failure to comply with CP-50129 and the related financial assurance requirements. On January 22, 2007, Plaintiff joined Morello in his individual capacity. On August 23, 2013, the State obtained an interlocutory summary judgment against White Lion. As part of the Motion for Summary Judgment, the State asked the Court to sever White Lion as a party, thereby converting the interlocutory judgment into a final one. The Plaintiff waited until after that case was fully briefed and submitted on appeal, to seek a second summary judgment against Morello in his individual capacity for the same conduct. This Court granted said motion and entered a final summary judgment on April 14, 2015. It is now apparent that the State used an improper severance to lay a trap for this Court to enter a separate judgment against Morello in order to secure a double recovery. For the reasons set forth below, Morello now moves the Court for a new trial in this case.

## II. STANDARD ON MOTIONS FOR NEW TRIAL

The purpose of a motion for new trial is to give the trial court an opportunity to examine assigned errors, and allow those errors to be cured by granting a new trial. *Mushinski v. Mushinski*, 621 S.W.2d 669, 670-71 (Tex. Civ. App.—Waco 1981, no writ); *Townsend v. Collard*, 575 S.W.2d 422, 423-24 (Tex. Civ. App.—Fort Worth 1978, no writ).

Motions for new trials must identify specifically the action upon which the movant complains so that the objection can be clearly identified and understood by the court. TEX. R.

4

CIV. P. 321. As discussed below, Morello is moving for a new trial on the specific grounds, which include: (1) an improper application of the law resulting in entry of judgment against Morello in his individual capacity; (2) an improper application of the law granting the severance of White Lion, which led to a double recovery for the same acts; (3) an improper application of the law based on the State's judicial admission; and (4) newly discovered evidence requiring a new trial. Because the Court has no discretion in applying the law to the facts of the case, its prior rulings on the first three grounds constitute reversible error and for which no discretion exists to deny Morello a new trial. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex.1992) (orig.proceeding). As for Morello's newly-discovered evidence ground, the Court has discretion in its ruling on same. However, the facts demonstrate that a failure to grant the requested new trial would constitute and arbitrary and unreasonable ruling reversible on appeal. *See id*.

## III.     AUTHORITY AND ARGUMENT

### A.     THE COURT'S JUDGMENT AGAINST MORELLO IN HIS INDIVIDUAL CAPACITY CONSTITUTES REVERSIBLE ERROR UNDER TEXAS LAW

"Corporations, by their very nature, cannot function without human agents." *Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex. 1995). Therefore, and "[a]s a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts" so that no liability attaches to corporate officers and directors. *Id*. This same liability principle applies where managers or members act on behalf of limited liability companies. *See Shook v. Walden*, 368 S.W.3d 604, 621 (Tex. App.—Austin 2012, pet. denied).

One exception to this principle occurs where the plaintiff pierces the corporate veil based upon allegations that a defendant is the alter ego of the corporation. *See Karl and Kelly Co., Inc. v. McLerran*, 646 S.W.2d 174 (Tex. 1983) (per curiam). Plaintiff neither pleaded, argued, nor proved alter ego liability so that this exception does not apply. A second exception occurs where

5

the corporate agent engaged in fraudulent or tortious acts. *See Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). This is the exception on which Plaintiff relied, but the conduct complained of is effectively a breach of contract, and the State has failed to plead or prove of any tort or fraud committed by Morello. As discussed below, Plaintiff duped the Court into applying this exception and committing reversible error by granting summary judgment.

1. **BASED ON THE CASES CITED BY THE STATE, THE COURT'S GRANT OF SUMMARY JUDGMENT IMPOSING PERSONAL LIABILITY AGAINST MORELLO IS REVERSIBLE ERROR.**

Texas law recognizes that a corporate agent/officer may be liable for acts carried out on behalf of the corporation **only upon a showing that the individual was engaged in fraudulent or tortious acts**. Where there is no evidence that the corporate agent engaged in fraudulent or tortious acts there can be no liability imposed on the agent. Indeed, the Supreme Court has emphasized the importance of maintaining "a clear distinction . . . between individual liability as distinguished from that of the corporate employer." *Holloway v. Skinner*, 898 S.W.2d 795, 798 (Tex. 1995).

The State's conclusory interpretation of its cited cases on agent liability was misleading. (Pl's MSJ at p. 20-21.) The development of the applicable law is critical to the understanding of the limitation of agent liability, and, in an attempt to fully inform the Court, a full discussion of these cases follows.

a. *KARL AND KELLY COMPANY V. MCLERRAN*: **CORPORATE OFFICERS/AGENTS ONLY LIABLE UNDER ALTER EGO THEORY**

In *Karl and Kelly Company Inc. v. McLerran*, the Texas Supreme Court addressed the issue of personal liability of corporate officers. *See* 646 S.W.2d 174 (Tex. 1983) (per curiam). In that case, the plaintiffs purchased a new home from Karl and Kelly Company and subsequently sued both the company and its officers (Karl Simon and James Kelly) under the

6

DTPA for construction defects. *Id*. at 174. When defendants failed to appear for trial, the court entered a post-answer default judgment in favor of plaintiffs. *Id*.

Following affirmance by the Dallas Court of Appeals, the Supreme Court granted writ of error. In reversing, the Supreme Court impliedly held that liability as to corporate agents such Karl and Kelly was only proper upon pleading and proof that such agents were the alter ego of the corporation. *Id* at 174.

> **b.**      **_LIGHT V. WILSON_: IMPLIEDLY OVERRULING _MCLERRAN_ BY HOLDING THAT CORPORATE AGENTS MAY ALSO BE LIABLE FOR THEIR OWN TORTIOUS MISCONDUCT**

In *Light v. Wilson* the plaintiff contracted with Goldstar Builders for construction of a new home and deposited a substantial deposit with Goldstar for same. *See* 663 S.W.2d 813 (Tex. 1984). When Goldstar failed to take any action to begin construction, plaintiff sent a demand to Goldstar and its sole owner—Glen Light—for return of their money. *Id*. Light responded with a letter refusing to return the deposit. *Id*. Light's bases for refusing to return the deposit were that: (1) the delays in construction were due to the plaintiffs' inability to obtain financing and (2) Goldstar had spent too much money on the project to allow a refund. *Id*. at 814.

Plaintiffs subsequently filed suit against Goldstar and Light alleging fraud, conversion, and DTPA violations and obtained a verdict on the DTPA claim. *Id*. Following affirmance by the intermediate court of appeals, the Supreme Court granted writ of error and reversed as to liability against Light. *Id*. at 815. In so doing, the Court noted that the plaintiffs had not pleaded or proved alter ego and that "[t]herefore, there being no finding of fact that Light violated the Deceptive Trade Practices Act, cannot be personally liable." *Id*. Thus, the *Light* court impliedly overruled *McLerran* by holding that corporate agents could be found individually liable for their own tortious misconduct as well as under an alter ego finding.

### c. *LEYENDECKER & ASSOCIATES V. WECHTER*: AFFIRMING *LIGHT* AND UPHOLDING CORPORATE AGENT LIABILITY FOR HIS TORTIOUS ACTS

In *Leyendecker & Associates, Inc. v. Wechter*, plaintiffs contracted for the construction of a townhome in Houston. *See Leyendecker v. Wechter*, 683 S.W.2d 369, 371 (Tex. 1984). During negotiations for the home, a Leyendecker agent advised that the plaintiffs could buy a corner lot which was slightly larger (2,475 square foot) than the standard lot in the development. *Id*. at 372. Plaintiffs' subsequently paid Leyendecker additional money in exchange for such lot. Id. Following closing, however, plaintiffs discovered that the actual size of their lot did not include the 2,475 additional square foot. *Id*. Plaintiffs subsequently complained to the Greater Houston Builders Association regarding the lot size discrepancy as well as certain building defects. *Id*. Chris Hilliard later responded on behalf of Leyendecker by falsely accusing the Plaintiffs of urging Leyendecker to make fraudulent insurance claims. *Id*.

Plaintiffs subsequently sued Leyendecker for misrepresentation of the lot size and construction defects, and Leyendecker and Hillard for libel in connection with the false statement regarding insurance claims. *Id*. As to the libel claim, Plaintiff's obtained a judgment which the court of appeals affirmed. On writ of error, the Supreme Court considered Leyendecker's contention that "an employee who commits a tort while acting within the scope of his employment is not liable to the party injured." *Id*. at 375. Disagreeing, the Court cited to *Light* for the proposition that "[a] corporation's employee is personally liable **for tortious acts** which he **directs or participates in** during his employment." *Id*. (emphasis added). After noting Hilliard's affirmative and tortious act of "penn[ing] the libelous letter", the Court affirmed. Consistent with its decision in *Light*, the Court thus affirmed the individual liability of a corporate agent based on his active, tortious conduct.

d. ***WETZEL V. BARNES***: **REAFFIRMING THAT COURTS MAY IMPOSE PERSONAL LIABILITY ON CORPORATE AGENTS WHERE AGENT ENGAGES IN <u>AFFIRMATIVE TORTIOUS CONDUCT</u>**

In *Wetzel v. Barnes*, the Supreme Court again visited the issue of personal liability for corporate officers. *See* 691 S.W.2d 598 (Tex. 1985). In that case, the plaintiffs entered into a contract with Barnes/Seagraves Development Company for the purchase of a remodeled home. *See id.* at 599. In connection with the contract, Michael Barnes and Patrick Seagraves made affirmative representations that the plumbing and air conditioning complied with local building code specifications. *Id.* After plaintiffs purchased the home they discovered that these systems did not function properly and brought suit against the corporation and Barnes/Seagraves individually for making false and misleading representations in violation of the DTPA. *Id.* at 599-600.

Following a bench trial, the court found for plaintiffs with the court of appeals reversing and rendering judgment for defendants. *Id.* at 599. On writ of error, however, the Supreme Court reversed the court of appeals judgment and affirmed the judgment of the trial court. With respect to the individual liability of Barnes and Seagraves, the Supreme Court noted that the record "contain[ed] evidence as to statements of both men upon which the trial judge could have relied in concluding that they each made oral misrepresentations." *Id.* at 601. Citing to *Light*, the Court then held that "there can be individual liability on the part of a corporate representative for misrepresentations made by him." *Id.* Thus, and consistent with the precedent in *Light*, the Court again affirmed the individual liability of a corporate agent based on commission of ***tortious conduct***. *Id.*

9

e. ***MILLER V. KEYSER***: **REAFFIRMING LIGHT AND WEITZEL AND HOLDING THAT A CORPORATE AGENT IS PERSONALLY LIABLE ONLY FOR HIS OWN <u>FRAUDULENT OR TORTIOUS ACTS</u>**

*Miller v. Keyser* involved another case under the DTPA brought by plaintiffs against a home builder. *See* 90 S.W.3d 712, 717 (Tex. 2002). In that case, the plaintiffs purchased a home from D. B. Interests, Inc., a builder in Pearland, Texas. *Id*. at 715. DBI's sales agent handling all negotiations for the sale was Barry Keyser. *Id*. During negotiations, Keyser correctly represented to plaintiffs that the back 20 feet of the lot on which their home was to be built was encumbered by an easement. *Id*. However, Keyser concurrently misrepresented that this portion of the lot could be fenced in as part of the yard. *Id*. After plaintiff purchased the lot and constructing a home on same, they fenced in the entire tract including the easement. *Id*. Subsequently, the Brazoria County Drainage District enforced its easement rights and required plaintiffs to remove the infringing portions of the fence at their own cost. *Id*.

Plaintiff subsequently brought suit against DBI and Keyser for fraud and misrepresentations in violation of the DTPA. *Id*. The trial court later dismissed plaintiffs' claims against DBI as untimely so that plaintiffs' proceeded to trial against Keyser. *Id*. After the jury found Keyser liable for misrepresentations, the intermediate court of appeals relied upon the Court's previous decision in *McLerran* and held that a corporate agent acting within the scope of his employment could not be personally liable under the DTPA. *Id*.

On petition for review, the Supreme Court began by reviewing the *McLerran*, *Light*, and *Barnes* decisions. *Id* at 717. After considering the facts of each, the Court agreed that its decision in Light overruled McLerrran and held that "if there is evidence that the [corporate] agent personally made misrepresentations, then that agent can be held personally liable." *Id*. The Court then concluded as follows: "Our holdings in *Light* and *Weitzel* comport with Texas'

10

longstanding rule that ***a corporate agent is personally liable for his own fraudulent or tortious acts***." *Id.* (emphasis added). Based on this holding, the Court noted that Keyser had personally violated the DTPA through various false, misleading, and deceptive acts and remanded the case back to the court of appeals. *Id*. at 720.

### 2. BASED ON THE *KEYSER* LINE OF CASES, THE COURT'S GRANT OF SUMMARY JUDGMENT IMPOSING PERSONAL LIABILITY AGAINST MORELLO WAS REVERSIBLE ERROR

Applying these principles to the present case leads to the conclusion that summary judgment against Morello for White Lion's violations was error. First, Plaintiff neither alleges in its petition nor argues in its summary judgment motion that Morello committed any type of fraud in this matter. In order for Morello to be liable in his individual capacity, then, the acts forming the basis of Morello's alleged liability must sound in tort. But Plaintiff's own summary judgment motion forecloses this possibility. Specifically, Plaintiff states the following in its motion:

> Morello asserts that compliance with the Compliance Plan has been caused by or otherwise rendered impractical by third parties. ***This matter is not a tort action.*** This is a statutory enforcement action brought against Morello as operator and sole decision maker of White Lion . . . .

(Pl's MSJ at p. 29, emphasis added.) Based on the authorities cited above, this admission by the State conclusively establishes that summary judgment against Morello individually is improper and is reversible error.

In an attempt to avoid the requirement that Morello have committed fraud or a tort, Plaintiff argues that "the actions are viewed, not in the context of a tort, but in the context of whether such actions amount to causing, suffering, allowing, or permitting a violation of law" as set forth in Texas Water Code section 7.102. (Pl's MSJ Reply at 5.) But under *Keyser*, actual

11

tortious conduct is required to impose personal liability on a corporate agent. As noted by Texas courts, this is not an arbitrary requirement but one based on the policy of preventing tortious acts: "[t]he purpose of individual liability in the corporate setting is to prevent an individual from using the corporate structure or agency law as a blanket to insulate himself from liability from his otherwise tortious conduct." *See Physio GP, Inc. v. Naifeh*, 306 S.W.3d 886, 889 (Tex. App.—Houston [14th Dist.] 2010, no pet.). Holding Morello individually liable for White Lion's administrative code violations runs counter to this policy because such liability is not of a tortious character.

Moreover, Texas' cannons of construction prohibit the Court from construing the above-referenced language of the Water Code as imposing individual liability on corporate agents/officers such as Morello. Statutes that authorize a penalty are strictly construed. *In re Hecht*, 213 S.W.3d 547, 572 (Tex. Spec. Ct. Rev. 2006) (citing *Cain v. State*, 882 S.W.2d 515, 519 (Tex. App.—Austin 1994, no writ)). A civil statue that is penal in nature must be couched in such explicit terms that the party upon whom the statue is to operate may, with reasonable certainty, ascertain what the statue requires to be done and when it must be done. *Mo. K. & T. Ry. Co. of Texas v. State*, 100 S.W. 766, 767 (Tex. 1907). If such explicit terms are not present, there is no opportunity for a person charged with the duty to protect himself by the performance of it according to the law. *Id*.

In the present case, Texas Water Code § 7.102 is penal in nature as it authorizes civil penalties. But there is nothing in the wording or the legislative history of sections 7.101 and 7.102 of the Texas Water Code that changes the law on principal, agent liability. As such, the liability imposed by the statue must be strictly construed with the existing law (i.e., it did not create new liability for individuals acting in as an agent for a company). If the statutes are

interpreted, as the State wants this Court to interpret them, then Mr. Morello had no opportunity to protect himself when he acted as the agent of White Lion.

In conclusion, the trial court's imposition of personal liability against Morello constitutes a failure to analyze or apply the law correctly, which in turn constitutes an abuse of discretion. *See Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992) (orig. proceeding)). Accordingly, the Court should grant Morello a new trial in this matter.

### B. PLAINTIFF IS JUDICIALLY ESTOPPED FROM OPPOSING MORELLO'S MOTION FOR NEW TRIAL

Even assuming that individual liability against Morello was proper as Plaintiff contends, Plaintiff is nevertheless judicially estopped from taking the position that Morello (or White Lion for that matter) is liable for violations of the Water Code or non-compliance with the compliance plan. Judicial estoppel precludes a party from adopting a position inconsistent with one that was successfully maintained in an earlier proceeding. *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008). The elements of judicial estoppel in Texas are: (1) a prior inconsistent statement made in a judicial proceeding; (2) which was successfully maintained in the prior proceeding; (3) which was not made in advertently or by mistake, or pursuant to duress; and (4) which was deliberate, clear, and unequivocal. *Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d 646, 650 n. 2 (Tex. App.—El Paso 1997, writ denied). As discussed below, Morello has established each of these elements requiring a new trial.

In its Motion for Summary Judgment, Plaintiff took the following legal position:

> Morello's only means to defeat summary judgment in this matter is
> to demonstrate that he has taken steps to ensure compliance.

(MSJ at p. 24.)

At the time of the hearing, the State had convinced this Court to strike the affidavits of David Heslep (Ex. H), and Wayne Crouch (Ex. I) – a decision this Court has since reversed.

13

(Ex's J, K). Those affidavits contain evidence that White Lion (and Morello as its Member) did in fact take corrective action and that the TCEQ was aware of and approved of the action being taken. Because the State has judicially admitted that steps toward compliance defeated its motion, it is bound by that admission.[1] Further, because Morello presented uncontroverted evidence that White Lion had taken appropriate steps towards compliance, summary judgment should have been denied on the basis of the State's admission. This statement was successfully maintained by Plaintiff given that it obtained an order granting summary judgment. Moreover, the statement was not made by accident or mistake, and was deliberate, clear and equivocal.

Specifically, and in response to the motion, Morello submitted the affidavits of David Heslep (Morello's Resp., Ex. H) and Wayne Crouch (Morello's Resp., Ex. I), and both affidavits were admitted into evidence over the objections of the Plaintiff. The Heslep affidavit establishes that Heslep, on behalf of White Lion, forwarded to Ms. Elanor Wehner of the TCEQ a draft memo outlining steps that White Lion intended to implement to comply with CP-50129. *Id*. Attached to the affidavit is an email from Wehner acknowledging receipt of the plan and her statement that "[w]hat I can say is that overall I like the progression/sequencing of the tasks referenced in the memo." *Id*. The Crouch affidavit similarly shows steps taken by Morello to comply with CP-50129, including Crouch's statements and evidence showing that Morello had retained Crouch to perform groundwater testing, that Crouch had done such testing, and that the results showed that the Property was moving toward compliance with CP-50129. *Id*.

Given this proof, Morello clearly established that he had taken steps to ensure compliance with CP-50129. Plaintiff admitted in its summary judgment motion that Morello could defeat the motion by demonstrating that he had taken steps to ensure compliance. Accordingly, Plaintiff is now estopped from arguing otherwise. The uncontroverted evidence establishes that

---

[1] Presumably, this is why the Plainitff moved to strike the affidavits.

14

White Lion had in fact taken steps to ensure compliance, therefore summary judgment was improper and this Court should grant a new trial.

## C. THE COURT'S ORDER SEVERING PLAINTIFF'S CLAIMS AGAINST WHITE LION FROM THOSE AGAINST MORELLO WAS REVERSIBLE ERROR REQUIRING A NEW TRIAL

Texas Rule of Civil Procedure 41 governs a trial court's authority to sever claims. Rule 41 states that "[a]ny claim against a party may be severed and proceeded with separately." TEX. R. CIV. P. 41. It is significant that Rule 41 only allows severance of claims, not severance of parties. Rule 41 also requires that a trial court order severance before the controversy is submitted. Separate claims may be severed by order of the court on motion of any party or on its own initiative at any stage of the action, but before the time of submission to the trier of fact, on such terms as are just. TEX. R. CIV. P.41.

Severance of a claim is proper if (1) the controversy involves more than one cause of action; (2) the severed claim is properly the subject of a lawsuit; **and** (3) the severed claim is not so interwoven that it involves the same facts and issues. *Guar. Fed. Savs. Bank* v. *Horseshoe Operating Co.*, 793 S.W.2d 652, 658 (Tex. 1990) (emphasis added). If the claim a party seeks to sever does not meet all three prongs, then the claim may not be severed, and to do so amounts to an abuse of discretion. *Nicor Exploration Co. v. Florida Gas Transmission Co.*, 911 S.W.2d 479, 482 (Tex. App.– Corpus Christi 1995, writ denied) ("By severing [one plaintiff's action from the action of another plaintiff], the trial court effectively severed a party, instead of a cause of action.").

The controlling reasons to grant a severance are to do justice, avoid prejudice and to further convenience the parties. *Nicor Exploration Co.*, 911 S.W.2d at 482. If a claim against multiple parties involves the same facts and issues, none of these objectives are met – they are

15

thwarted. If a claim involving an indivisible injury is severed, the facts and issues relating to each particular entity's liability for their part in the injuries is the same. "[T]o divide [such a suit] into two suits would produce two trials focused on the same facts and same injury, and could potentially lead to undue repetition, confusion and prejudice to the interests of both the plaintiffs (who could be either over or under compensated) and the defendants (who could face unduly low or high fractional shares of the total liability for damages)." *Santos v. Holzman*, No. 13-02-662-CV, 2005 WL 167309, at *4 (Tex. App.-Corpus Christi Jan. 27, 2005, pet. denied) (mem. op.), *citing Jones v. Ray*, 886 S.W.2d 817, 822 (Tex. App. – Houston [1st Dist.] 1994, orig. proceeding). *See also*, *Levetz v. Sutton*, 404 S.W.3d 798, 801 (Tex. App. – Dallas, 2013, pet. denied) (reversing order of severance because the facts were interwoven and the severance did not avoid prejudice or further convenience.). Therefore, a trial court may not simply sever a party from the cause of action; it should sever only complete and discrete claims from one another. *Id.*

1. **THE TRIAL COURT IMPROPERLY SEVERED A PARTY—WHITE LION HOLDINGS—NOT A CAUSE OF ACTION, EXPOSING MORELLO AND WHITE LION TO DUPLICATE PENALTIES FOR THE IDENTICAL CONDUCT.**

In this case, the trial court abused its discretion by granting the State's Motion to Sever the summary judgment against White Lion Holdings when the State did not meet its burden of proof on summary judgment to demonstrate it was entitled to severance.

As noted by the Supreme Court in *Guranty Federal*, the third severance factor requires a showing that the severed claims are not so interwoven with the other claims that they involve the same facts. *See* 793 S.W.2d at 658. Among other reasons, the claims in a case are considered interwoven when their severance would result in two or more separate judgments that, taken in the abstract, would either: (1) undercompensate the plaintiff (because the respective juries could

16

each find the other defendant fully liable and thus each award plaintiff nothing), or (2) over compensate the plaintiff (because the respective juries could each find their respective defendant fully liable and enter two verdicts imposing a double recovery). In situations such as this presenting the prospect of double recovery for the plaintiff or double jeopardy for the defendant, severance is improper because the third *Guaranty Federal* factor cannot be met. *See Jones,* 886 S.W.2d at 821-22.

In the present case, Plaintiff's suit consisted of two claims. The first was that White Lion failed to comply with CP-50129 rendering it in violation of Texas Water Code section 7.102. Plaintiff's second claim was that White Lion failed to acquire financial assurance in the amount of $574,000 in violation of the Texas Administration Code. Plaintiff asserted the exact claims against Morello in his individual status and sought the exact amount of damages from both Defendants. In fact, the Court—in two separate and enforceable judgments (this cause and cause number D-1-FV-13-001068)—awarded Plaintiff the same damages against each defendant, thus allowing the Plaintiff a double recovery. (Ex. H.) Notably, the Plaintiff waited until its motion for summary was granted against White Lion and obtaining severance before filing an identical motion for summary judgment against Morello, individually. In short, the Plaintiff's actions make it clear that its intent all along was to place Morello in double jeopardy. Thus, and for the same reasons noted by the *Jones* court, severance of Plaintiff's claims against White Lion and Morello was an abuse of discretion.

### 2. IMPROPER SEVERANCE IN THIS CASE RESULTS IN AN EXCESSIVE FINE IN VIOLATION OF THE TEXAS AND UNITED STATES CONSTITUTIONS

Article I, section 13 of the Texas Constitution provides, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted." TEX. CONST. ART. I, § 13. The term "fines" has been defined as including civil penalties. *See Pennington v.*

17

*Singleton,* 606 S.W.2d 682, 690 (Tex. 1980). Generally, prescribing fines is a matter within the discretion of the legislature. A fine is not unconstitutionally excessive, and courts may not override the legislature's discretion, "except in extraordinary cases, where it becomes so manifestly violative of the constitutional inhibition as to shock the sense of mankind." *Id.* (quoting *State v. Laredo Ice Co.,* 96 Tex. 461, 73 S.W. 951, 953 (1903)).

Here, the State used the trial court's severance of the State's Claim's against Morello's company, White Lion Holding's LLC, as a mechanism to impose double liability for the same conduct on both Morello and White Lion. After the Court granted summary judgment against White Lion, it severed White Lion from the case in violation of Rule 41's prohibition against severing a party instead of a claim, and further in violation of the Rule's prohibition against severance after submission to the trier of fact. The State then sought a second summary judgment against Morello in his individual capacity for the identical conduct, thus accomplishing a double recovery for a single act through improper severance. The State even conceded in oral argument before the Court that Morello "is White Lion." (Ex. G at 10:14).

Assuming without conceding that any penalty is justified in this case, the State should have been limited to one penalty against the responsible party, whether it was White Lion or Morello. By severing White Lion, the State avoided a finding on a critical issue central to both motions – who is the responsible party? Even if the State could argue that the corporate veil should be pierced (which Morello denies), at most it would have been entitled to joint and several liability against Morello and White Lion, not a double recovery.

18

### 3. THE IMPROPER SEVERANCE VIOLATES THE EQUAL PROTECTION, AND DUE COURSE OF LAW PROVISIONS OF THE TEXAS CONSTITUTION, AND THE DUE PROCESS AND EQUAL PROTECTION PROVISIONS OF THE U.S. CONSTITUTION.

In its two judgments, the Court has now awarded over $760,494[2] in fines against Morello and White Lion after stipulating that the civil penalties should only be $50 per day (five times the purchase price of the Property). Yet, Morello and White Lion have both consistently maintained inability to pay the fine and to conduct the remediation the state is demanding. Furthermore, by denying the continuance requested by Morello and White Lion, the Court awarded a penalty that new evidence proves to be unjustified.

Where the amount of a penalty imposed by a State agency is so high that it effectively deprives a citizen of the ability to litigate his defense to such penalty, it is unconstitutional. *See R. Communications Inc. v. Sharp*, 875 S.W.2d 314, (Tex. 1994) (holding that conditioning a taxpayer's right to initiate judicial review on the payment of taxes or the posting of a bond equal to twice the alleged tax obligation violates the open courts mandate of the Texas Bill of Rights. TEX. CONST. art. I, § 13. Taxes cannot be raised by means that make meaningless our constitutional guarantees.). While this case does not present an open courts question, it does present an unconstitutional denial of due process and equal protection under state and federal law.

---

[2] The Court awarded Plaintiff $325,600 in civil penalties and $40,800 in attorneys' fees against White Lion in cause no D-1-FV-13-000627. (Ex. I.) The Court awarded Plaitniff $367,250 in civil penalties and $26,844 in attorneys' fees. Morello asks this Court to take judicial notice of the contents of its final judgment in this case.

**D.** **THE COURT SHOULD GRANT MORELLO A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE**

**1.** **THE GRANT OF A NEW TRIAL BASED ON NEWLY-DISCOVERED EVIDENCE IS WITHIN THE SOUND DISCRETION OF THE TRIAL COURT**

A party seeking a new trial on grounds of newly-discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Denial of a motion for new trial is reviewed for abuse of discretion.

**a.** **NEWLY-DISCOVERED EVIDENCE ESTABLISHES THAT CP-502129 AND ITS REMEDIATION OBLIGATIONS WAS BASED ON PLAINTIFF'S ERRONEOUS DETERMINATION OF THE AFFECTED AQUIFER**

Prior to White Lion's ownership of the Property, Vision utilized the premises as a steel tube manufacturing facility. (Pl's MSJ at 7.) This usage ultimately caused groundwater contamination at the premises due to elevated levels of heavy metals and other compounds. (*Id.* at 8.) Vision subsequently discovered the contamination and reported same to the State which then instituted CP-50129 to remediate same. (*Id.* at 8-9.) CP-50129 called for Vision to implement an extensive cleanup and monitoring system consisting of: (1) placing additives in the Property's wastewater impoundments; (2) capping such impoundments with four feet of clay and vegetative covering; (3) implementation and maintenance of a groundwater monitoring program and system to test the effectiveness of CP-50129, (4) installation of a network of wells (21 total) to monitor groundwater flow and contaminants; (5) installation of a network of recovery wells for extraction of contaminated groundwater; (6) submission of semi-annual and annual reports to Plaintiff, and other requirements. (*Id.* at 9-10.)

20

In short, CP-50129 created massive financial and regulatory obligations for Vision and subsequently, White Lion. These onerous remediation and monitoring requirements of CP-50129 were all premised on Plaintiff's error that the contaminated ground water plume beneath the Property potentially fed into the Upper Chicot aquifer—which is used for agricultural or human use. (Ex. F.)

In December 2014, White Lion retained David Heslep and his firm of WDIA Environmental Solutions, LLC, to assess the Property and prepare a proposal for modification of and compliance with CP-50129. (Ex. F.) Heslep is a licensed professional geologist for the State of Texas with significant project management experience and technical expertise in environmental matters. (*Id*.) In particular, Heslep has been involved with numerous groundwater remediation projects at sites in at least 8 states. (*Id*.) In his efforts to bring the Property into compliance with CP-50129, Heslep discovered that the aquifer beneath the Property is actually the Brazos River Alluvial Aquifer—a fact which greatly reduces any risk from the plume beneath White Lion's property. *Id*.

As noted by Heslep, had TCEQ's experts properly identified the aquifer at the time CP-50129 was renewed in 1999, "the current pump and treat system required by the Compliance Plan would not have been necessary and that a natural attenuation system would have been appropriate for remediating the contamination at the [Property]." *Id*. In short, the entire basis of the Compliance Plan, and the corresponding obligations, were "not necessary to protect the public health and environment." *Id*. Indeed, Mr. Heslep makes clear that ***"[h]ad this error not been perpetuated by the State, a less stringent, less expensive plume monitoring system would have been appropriate*.**" *Id*.

This evidence came to light after trial. Where a trial occurs by summary judgment,

courts hold that the evidence must not have been discovered prior to the ruling on summary judgment. *See Indus. Clearinghouse, Inc. v. Jackson Walker, L.L.P.*, 162 S.W.3d 384, 389 9Tex. App.—Dallas 2005, pet denied.). The Court issued its letter ruling on April 6, 2015. As noted supra, Heslep discovered the evidence on April 11, 2015. (Ex. F.) Morello discovered the evidence on that same day. (Ex. H.) Accordingly, the first requirement for a new trial based on newly-discovered evidence has been satisfied.

> **b.** **MORELLO'S FAILURE TO DISCOVER THE NEW EVIDENCE WAS NOT DUE TO LACK OF DILIGENCE ON HIS PART**

The second element that must be satisfied for a new trial based on newly discovered evidence is that the party's failure to discover the evidence sooner was not due to lack of diligence. *Waffle House*, 313 S.W.3d at 813. Evidence of a party's due diligence in procuring new evidence is properly adduced by affidavit or testimony. *See Edwards v. Edwards*, 418 S.W.3d 757, 761 (Tex. App.—El Paso 2013, no pet.) ("The trial court is not privy to a plaintiff's efforts at due diligence, and as such, it must be apprised of such by sworn affidavit or testimony . . . ."). Finally, whether a party acts with sufficient diligence in discovering the evidence in question is a matter left to the discretion of the court. *See Benz Group v. Barreto*, 404 S.W.3d 92, 97 (Tex. App.–Houston [1st Dist.] 2013, no pet.); *Allseas USA, Inc. v. PS Fabricators, L.L.C.*, 2012 WL 7849219. *9 (Tex. App.—Corpus Christi 2012, no pet.) ("Whether Allseas acted with sufficient diligence was a factual matter best left to the trial court's discretion."). Finally, and as noted by the Texas Supreme Court, diligence is defined as "such diligence that an ordinarily prudent and diligent person would exercise under similar circumstances." *Strickland v. Lake*, 163 Tex. 445, 357 S.W.2d 383, 384 (1962).

Applying this definition of diligence, it becomes clear that Morello satisfies the second prong of the inquiry. The evidence in question involves the underground aquifer potentially

22

affected by the plume under White Lion's Property which was misidentified by at least two sets of experts in this case. Specifically, Plaintiff's and Vision's environmental experts mistakenly identified the aquifer in 1988, and again in 1998-99, as the Upper Chicot. (Ex. F.) In his affidavit, Heslep mentions that he only discovered the correct aquifer at issue after long inquiry into hydrological surveys which provided the key. (*Id.*)

Clearly, and given that trained geologists misidentified the aquifer at issue, this evidence was not discoverable by a layperson such as Morello. As established by his sworn deposition testimony, Morello repeatedly testified that he: (1) does not hold himself out as an environmental law expert (Ex. A at 16); (2) knows nothing about wastewater, groundwater, or groundwater recovery systems (*Id.* at 68, 70); (3) considers groundwater related issues to be "way over [his] head" (*Id.* at 70); (4) considers issues related to CP 50129 as "not my area of expertise" (*Id.* at 82-83). In his affidavit, Morello goes further, stating that "I have no education or practical experience with environmental compliance issues, and I had no reason to question any of the underlying geological or hydrological bases for the compliance plan." (Ex. H.) Taken together, and considering the Strickland court's definition of diligence, Morello cannot be found to have lacked reasonable diligence in procuring the newly-discovered evidence. In fact, it would be unreasonable to find or expect Morello to have discovered the evidence sooner than he did. Accordingly, Morello has satisfied the second requirement for a new trial based on newly-discovered evidence.

### c. THE EVIDENCE IS NOT CUMULATIVE

The third element that must be satisfied for a new trial based on newly discovered evidence is that such evidence is not cumulative of any other evidence in the case. *Waffle House*, 313 S.W.3d at 813. The test for determining whether evidence is cumulative asks "not

merely whether the evidence to be adduced from the two witnesses is similar, but also whether the excluded testimony would have added substantial weight to the offering parties' case." *Sims v. Brackett*, 885 S.W.2d 450, 454 (Tex. App.—Corpus Christi, 1994, no writ). In the present case, there can be no argument that the newly-discovered evidence is not cumulative as it is contrary to Plaintiff's evidence/theory relating to the relevant aquifer and adds substantial weight to Morello's case (as discussed more in the next factor). Indeed, the issue of the plume potentially affecting the Brazos River Alluvium Aquifer appears nowhere in the record in this case. Accordingly, Morello has satisfied the third requirement for a new trial based on newly-discovered evidence.

### d. THE NEWLY-DISCOVERED EVIDENCE WOULD HAVE ELIMINATED THE NEED FOR THE TRIAL BELOW

The final element that must be satisfied for a new trial based on newly discovered evidence is that the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House*, 313 S.W.3d at 813. Based on testimony from the Heslep affidavit, this test is met. On this point, Heslep states as follows:

> In essence, the Upper Chicot was erroneously identified as far back as 1988 as a potentially affected aquifer despite the fact that the Upper Chicot generally flows south/southeast, while the flow of the aquifer under the Vision Metals/White Lion facility is to the north. This error was carried forward thereafter in all reports and proposed plans and adopted by the TCEQ and its predecessor. ***The State failed to detect the error, and required the more stringent pump and treat system based on the error. Had this error been detected by the State, a less stringent, less expensive monitored natural attenuation plan would have been appropriate. A monitored natural attenuation plan would have been much cheaper to install, maintain, and operate than the existing system.***
>
> It is my opinion that a monitored natural attenuation plan would have been found appropriate for the site from the start of White Lion's ownership of the site, had the correct aquifer been identified by the State.

(Ex. E, emphasis added.)

In summary, and had Plaintiff correctly determined that the aquifer below the Property was the Brazos River Alluvium Aquifer, CP-50129 would have had vastly different and less expensive remedial and monitoring provisions. In his affidavit, Morello states that White Lion's failure to comply with CP-50129's remediation and monitoring requirements was due to financial inability. (Ex. L; Ex. H). Morello also states that Heslep had previously estimated the costs of a monitored natural attenuation plan (as would have been proper had Plaintiff identified the proper aquifer at issue), and that White Lion could have financially borne such a burden. (*Id*.) In short, there would have been a completely different result in this case and likely no case at all. Accordingly, Morello satisfied the fourth requirement for a new trial based on newly-discovered evidence.

## IV.  CONCLUSION

WHEREFORE, for the reasons provided above, Morello respectfully requests that the Court vacate its summary judgment of April 14, 2015 and grant him a new trial in this matter. Morello also requests any and all other and further relief to which he may be entitled.

Respectfully submitted,

LAPEZE & JOHNS, P.L.L.C.

By:_____

Keith W. Lapeze
Texas Bar No.  24010176
Taylor L. Shipman
Texas Bar No. 24079323
601 Sawyer Street, Suite 650
Houston, Texas 77007
Tel.  (713) 739-1010
Fax.  (713) 739-1015
keith@lapezejohns.com
taylor@lapezejohns.com

ATTORNEYS FOR DEFENDANT

# CERTIFICATE OF SERVICE

A copy of this documents was served on all counsel of record in accordance with the Texas Rules of Civil Procedure on May 14, 2015.

_____

Keith W. Lapeze

**VERIFICATION**

State of Texas      §
                               §
County of  Fort Bend §

Before me, the undersigned notary, on this day personally appeared Bernard Morello, a person whose identity is known to me. After I administered the oath to him, upon his oath he read this Motion for New Trial and confirmed that the facts stated in it are within his personal knowledge and are true and correct.

FURTHER AFFIANT SAYETH NOT

_____
Bernard Morello

SUBSCRIBED AND SWORN TO BEFORE ME on this __14__ day of May, 2014, to which witness my hand and seal.

SARAH DELEON
Notary Public, State of Texas
My Commission Expires
June 16, 2018

_____
Notary Public in and for the State of Texas

# EXHIBIT A



CAUSE NO. D-1-GV-06-000627

| | | |
|---|---|---|
| STATE OF TEXAS,<br>PLAINTIFF | *<br>*<br>*<br>* | IN THE DISTRICT COURT OF |
| VS. | *<br>*<br>* | TRAVIS COUNTY, TEXAS |
| BERNARD MORELLO,<br>DEFENDANT | *<br>* | 353RD JUDICIAL DISTRICT |

## ORAL DEPOSITION OF BERNARD MORELLO

## SEPTEMBER 19, 2014

EXHIBIT

DEBBIE CUNNINGHAM, CSR                     AUSTIN, TEXAS

Austin
tel |512|320 8690
fax |512|320 8692

Dallas
tel |972|364 9777
fax |972|364 9778

Houston
tel |281|471 8500
fax |281|471 8504

San Antonio
tel |210|277 6200
fax |210|277 6232

3100 West Slaughter Lane | Suite 101 | Austin, Texas 78748 | toll free 877 720 8690 | toll free fax 866 720 8692 | www.integritytexas.com

APPEARANCES

COUNSEL FOR PLAINTIFF:

    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    Environmental Protection Division
    P.O. Box 12548
    Austin, Texas 78711-2548
    (T) 512.475.4138 | (F) 512.320.0911
        By: Craig Pritzlaff, Esq.
        craig.pritzlaff@texasattorneygeneral.gov

COUNSEL FOR DEFENDANT:        (VIA SPEAKERPHONE)

    MUNSCH, HARDT, KOPF & HARR, P.C.
    700 Milam Street, Suite 2700
    Houston, Texas 77002-2806
    (T) 713.222.4030 | (F) 713.222.5830
        By: Mary W. Koks, Esq.
        mkoks@munsch.com

ALSO PRESENT:
    David A. Terry, Esq., TCEQ Staff Attorney
    Sireesha Chirala, Assistant Attorney General
    Katerina DeAngelo, Assistant Attorney General

--oOo--

3

INDEX

ORAL DEPOSITION OF

BERNARD MORELLO, SEPTEMBER 19, 2014

                                          Page

APPEARANCES                                 2


EXAMINATION OF BERNARD MORELLO:

BY MR. PRITZLAFF                            6


CHANGES AND SIGNATURE                     110

REPORTER'S CERTIFICATION                  112

FURTHER CERTIFICATION                     115

--oOo--

EXHIBIT INDEX

ORAL DEPOSITION OF

BERNARD MORELLO, SEPTEMBER 19, 2014

| Description | | Page |
|---|---|---|
| Exhibit 1 | Notice of Deposition | - | 9 |
| Exhibit 2 | Court Order | - | 13 |
| Exhibit 3 | Real Estate Purchase Agreement | - | 18 |
| Exhibit 4 | First Amendment to Real Estate Purchase Agreement | - | 20 |
| Exhibit 5 | Permit for Industrial Solid Waste Management Site | - | 28 |
| Exhibit 6 | Compliance Plan for Industrial Waste Management Site | - | 29 |
| Exhibit 7 | Compliance Plan Application | - | 31 |
| Exhibit 8 | 7/23/04 Transmittal letter from TCEQ to Bernard Morello | - | 32 |
| Exhibit 9 | 9/20/04 TCEQ letter to Bernard Morello | - | 33 |
| Exhibit 10 | 10/7/04 TCEQ letter to Bernard Morello | - | 35 |
| Exhibit 11 | Assignment of Real Estate Purchase Agreement | - | 43 |
| Exhibit 12 | 10/14/04 TCEQ letter to Bernard Morello, White Lion Holdings, LLC | - | 73 |
| Exhibit 13 | 14/14/04 letter from TCEQ to Bernard Morello, White Lion Holdings, LLC | - | 75 |

5

| Exhibit 14 | 6/26/08 TCEQ letter to Bernard Morello, Registered Agent, White Lion Holdings, LLC | – | 83 |
| Exhibit 15 | 2/14/14 letter from TCEQ to Bernard Morello, Registered Agent, White Lion Holdings, LLC | – | 84 |
| Exhibit 16 | Series of four photographs | – | 86 |
| Exhibit 17 | A series of four date-stamped photographs | – | 87 |

--oOo--

6

(Friday, September 19, 2014, 1:11 p.m.)

P R O C E E D I N G S

BERNARD MORELLO,

having taken an oath to tell the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. PRITZLAFF:

Q. Good morning. My name is Craig Pritzlaff. I'm a lawyer representing the State of Texas, with the Attorney General's Office, here on behalf of the Texas Commission on Environmental Quality, TECQ. We've met before, haven't we?

A. Yes.

Q. Can you please state your full name for the record?

A. Bernard J. Morello.

Q. And the "J" is for?

A. Joseph.

Q. And your current address, please?

A. 5100 San Felipe, Number 78, Houston, Texas 77056.

Q. That's the same address of White Lion Holdings, LLC?

A. Yes.





Q. Your counsel is here, participating by telephone, correct?

A. Yes.

Q. Have you been to a deposition before?

A. Yes.

Q. So you know how this works; but just as a reminder, this is similar to as if we were in a courtroom, but it's much less formal. I'm going to be asking you a series of questions; and as you can see, the court reporter is here, taking down everything that we say. And you understand everything is going to be taken down and recorded by the court reporter?

A. Yes.

Q. To help her out, let's try not to a talk over each other. Respond "yes" or "no." She cannot record a head nod or an "uh-huh" or a "huh-uh." Do you understand that?

A. Uh-huh.

(Laughter.)

Q. (BY MR. PRITZLAFF) Okay. Yes. Again, let's not talk over ourselves.

The notes that the court reporter is taking down, you will have an opportunity to make changes to that, to review it, and to sign off of on that. Do you understand?



A. Okay. Yes.

Q. The transcript can then be used as evidence. Do you understand that?

A. Yes.

Q. You understand you have taken a sworn oath today to answer each question in this deposition truthfully and honestly?

A. Yes.

Q. You understand that it's just as if we were before a jury or a Court and that testimony can be used in court if necessary?

A. Yes.

Q. If you don't understand me at any time --

MR. PRITZLAFF: Or, Mary, if you can't hear me at any time --

Q. (BY MR. PRITZLAFF) -- just ask me to repeat or speak up. And can we have an understanding that if you ask a question, we can agree you've understood it and have heard the question?

A. Yes.

Q. Now, I'll arrange -- at any point in time if you need to take a break, please just let us know; and we'll take a break. And the restroom facilities are out in the hall; or if you need to speak with your counsel, we can set you up in a room as well.

A.    Okay.

Q.    Is there anything you need right now before we get going?

A.    No.

Q.    Are you on any medication or under the influence of any kind of drug that might influence your ability to testify truthfully or honestly?

A.    No.

Q.    Do you have any physical, mental, or emotional impairment that might prevent you from answering truthfully and honestly today?

A.    No.

Q.    Did you meet with anyone in preparation for your deposition?

A.    No.

Q.    Did you review any documents in preparation for your deposition?

A.    No.

(Exhibit 1 marked.)

MS. KOKS:  Craig, this is Mary.  I'm hoping that the documents you are going to refer to -- I may have them; I may not.  I have some of the records in this case.  If you could just tell, you know, verbally which ones they are exactly, then, I can see if I've got it so I can look at it as well.

MR. PRITZLAFF: Understood. I've marked the Notice of Deposition as Exhibit 1.

MS. KOKS: Thank you.

MR. PRITZLAFF: And I'm handing it to Mr. Morello.

Q (BY MR. PRITZLAFF) Mr. Morello, did you receive that document?

A. Yes.

Q. Did you review that document?

A. Not really, no.

Q. Okay. On the second page of the document, there's a list of instructions. Did you review that?

A. No.

Q. Okay. On that page am I correct that it's asking for various documents? Correct?

A. Yes. You know, I'll take that back. I think these are questions that Stephen Doggett did ask me. We had a conversation about these, and I think he said you had all these documents or he was going to give them to you. So I take that back. I didn't read this. He read some of this stuff over the phone to me.

Q. Okay. So there are no documents that you're bringing to the deposition today in response to that subpoena duces tecum?

A. No, because, like I said, I think he said you

had all these documents.

Q.    Okay.  I do have one quick question.

A.    Yes.

Q.    For Number 1, it says, "A list of all White Lion Holdings, LLC's members, managers, officers, employees from 2004 to the present."  Does such a list exist?

A.    No.

Q.    Okay.  On Number 2, "The Company Agreement for White Lion Holdings, LLC."  Does such a Company Agreement exist?

A.    No.

Q.    Number 3, an operating agreement between White Lion Holdings and Bernard Morello.  Does such an operating agreement exist?

A.    No.

Q.    These are self-explanatory, I think.  I did speak to Mr. Doggett about the deeds.

"All documents relating to the conveyance" -- Number 6 "of any real property comprising any part of the Site from Bernard Morello to White Lion Holdings, LLC."  Do those documents exist?

A.    No, there is no documents.

Q.    Number 7, "All documents relating to conveyance of any real property comprising any part of

the Site from any person to Bernard Morello."  Do any such documents exist?

A.   No.

Q.   Okay.   Number 8, "All documents relating to any distribution or compensation from White Lion Holdings, LLC to Bernard Morello from April 2, 2004 until the present."  Any such documents?

A.   No.

Q.   Number 9, "All documents relating to any loan from White Lion Holdings, LLC to Bernard Morello from April 2nd, 2004 to the present."  Do any such documents exist?

A.   No.

Q.   Number 10, "All documents concerning removal of any part of the Corrective Action System."  Corrective Action System is defined as that set forth in Section II of the Compliance Plan, meaning the groundwater remediation system.  Do any such documents concerning removal of any part of that Corrective Action System exist?

A.   I don't have any other than the Compliance Plan.

Q.   Number 11, "All documents concerning operation and maintenance of the Corrective Action System."  Do any such documents exist?

A.   No.

Q.   "All documents concerning the financial assurance mechanism for the Site."  Do any such documents exist?

A.   Other than the original one from 2004 to 2005, and I think you have that.  I believe you do.

Q.   There's some debate about which one I have, and I can speak to your counsel to make sure I have the right one.  I think that covers that document.

(Exhibit 2 marked.)

Q    (BY MR. PRITZLAFF)   I have a document marked Exhibit 2, Order.  And have you seen that document?

A.   Yes.

Q.   Okay.  And that document was an order from the Court, ordering this deposition to proceed today at 1:00, correct?

A.   Correct.

Q.   Okay.  Other than yourself, is there anyone else that may have relevant documents?

A.   The lawyers.

Q.   Other than your lawyers, is there anyone else at White Lion Holdings, LLC that may have documents relevant to this matter?

A.   No.

Q.   Would you say you're the record custodian for

White Lion Holdings?

A.    I guess you could say that, yes.

Q.    Is anyone else at White Lion Holdings responsible for maintaining records?

A.    No.

Q.    Since this is a deposition that may -- some of this testimony may be utilized in court, it would be helpful for you to tell the jury a little bit about yourself.  So I would just like to go very briefly into your background, and then we'll delve into the site. Have you gone by any other names?

A.    No.

Q.    Where were you born?

A.    Omaha, Nebraska.

Q.    And what was your date of birth?

A.    7/21/57.

Q.    How long did you live in Nebraska?

A.    Probably all but the last, maybe, 15 to 16 years.

Q.    Have you lived anywhere else other than Nebraska and Texas?

A.    No.

Q.    When did you move to Texas?

A.    Probably '98, '99 area, somewhere in there.

Q.    Did you go to high school in Nebraska?

A.   Yes.

Q.   **Did you graduate?**

A.   Yes.

Q.   **Did you go to college or university?**

A.   Yes.

Q.   **Which college or university?**

A.   UNO, University of Nebraska Omaha.

Q.   **Did you graduate?**

A.   No.

Q.   **How many years did you complete?**

A.   Probably five, six years off and on.

Q.   **But no degree?**

A.   No degree.

Q.   **What did you study?**

A.   Business.

Q.   **Did you have any other education, formal education?**

A.   Not really.  I mean, I went to law school; but auditing classes.  That's it, just auditing.

Q.   **Which law school was that?**

A.   Creighton University.

Q.   **In Omaha?**

A.   Yes.

        (Reporter requests repeat.)

        THE WITNESS:  Creighton.

MR. PRITZLAFF: C-R-E-I-G-H-T-O-N.

Q. (BY MR. PRITZLAFF) After your school, did you -- let me step back to your law school education. Did you take any courses related to environmental law or environmental regulations?

A. No.

Q. In your undergraduate experience, did you take any courses related to environmental science?

A. No.

Q. Environmental law?

A. No.

Q. So you would not hold yourself out as an expert in environmental compliance or environmental law matters?

A. No.

Q. Have you ever been arrested?

A. No.

Q. After your schooling, what did you do?

A. Well, during schooling, I worked. That's why it was five or six years; and that's why I didn't graduate because I pretty much worked the whole time, real estate principally.

Q. Did you purchase and sell properties?

A. No, purchase and hold properties.

Q. Do you still do that today?

A.    Yes.

Q.    Do you work in any area outside of Nebraska or Texas?

A.    No.

Q.    Are you currently married?

A.    No.

Q.    Do you have any children?

A.    No.

Q.    Do you have any family members that have any interest in White Lion Holdings?

A.    No.

Q.    Let's turn now to 2004 and the former Vision Metals site.  How did you learn about the sale of the property?

A.    You know, this is going back 10 or 11 years; but I think there was an ad in the Houston Chronicle, I believe in the real estate section.  And there was an auction.

Q.    This was a bankruptcy auction, correct?

A.    Yes.

Q.    Did you conduct any due diligence prior the purchase?

A.    No, other than go by it.

Q.    When I use the term "due diligence," do you understand what I mean?

A.    Yeah, that's pretty broad.

Q.    **What does that mean to you when I say "due diligence"?**

A.    Well, due diligence, to me, is doing an in-depth study and analysis of the project, the site.  I do a drive by, typically, before I buy a location, to look at the transportation aspect of it, the social economic conditions.  In this case it's really not important for an industrial site.  It is transportation, but not social economic conditions.  I look at the growth of an area, how the area is growing, and the infrastructure that's in place.

Q.    **That's a typical type of diligence that you do at other properties you purchase?**

A.    Yes.

Q.    **Do you conduct environmental analyses of any of the properties?**

A.    I never have, no; but I've never bought anything that had any environmental issues with it.

Q.    **Have you ever purchased any other kind of industrial property?**

A.    Not -- not like this, no, no.  Industrial-zoned property, yes, but not -- maybe just vacant land, industrial land.

(Exhibit 3 marked.)

Q     (BY MR. PRITZLAFF)   I'm handing you a document I've marked as Exhibit 3, a Real Estate Purchase Agreement by and between Vision Metals and Bernard Morello.   Have you seen that document before?

A.    Many years ago.

Q.    What is your understanding of the effect of this document?

MS. KOKS:   Objection, form.

Q     (BY MR. PRITZLAFF)   You can answer if you understood my question.

A.    No, I don't understand your question.

Q.    What is this document?

A.    A purchase agreement.

Q.    For what?

A.    It's between two parties, the sale of Vision Metals.

Q.    And who are those parties?

A.    Bernard Morello and Vision Metals.

Q.    And which property does this purchase and sale agreement concern or real estate agreement concern?

A.    37 acres, 25.322 acres, and 115.22, it looks like.   I think there's something missing here.   There should be another tract, too; but I don't see it.

Q.    Is it fair to say it generally encompasses the site of the former Vision Metals facility that is the

subject of this suit?

A.    It encompasses, yes, the whole farmland and the plant and some vacant land adjacent to the plant.

Q.    **And on page 14, is that your signature?**

A.    Yes.

(Exhibit 4 marked.)

Q    **(BY MR. PRITZLAFF)  I'm handing you an exhibit marked Exhibit 4, First Amendment to Real Estate Purchase Agreement.  Did this document amend the real estate purchase agreement that we just looked at in Exhibit 3?**

A.    Yes.

Q.    **And on State Bates Number 610, is that your signature?**

A.    Yes.

Q.    **Let's go through this very briefly.**

A.    Okay.

Q.    **So on the first page of this document, we have the --**

MS. KOKS:  Which one are you referring to?  I'm sorry.

MR. PRITZLAFF:  I'm on the First Amendment to Real Estate Purchase Agreement, Mary.

MS. KOKS:  Okay.  Thank you.

MR. PRITZLAFF:  We marked that as

Number 4.

MS. KOKS: I got that. Thank you.

Q  (BY MR. PRITZLAFF) On State 605, Excluded Assets, what was excluded out of the deal?

A.  Personal property.

Q.  Okay.

A.  It looks like there was deposits, energy futures, things like that.

Q.  And moving to the second page of the agreement, there was another amendment to Section 3.1, the purchase price was reduced?

A.  Yes.

Q.  And on Section 6.3, referring to personal property, what is that? What was the effect of that amendment?

A.  I'm not following you on that one.

Q.  I'm on Paragraph E.

A.  Paragraph E. Okay. They are to remove it by August 1st; and if not, it will be deemed abandoned. And then the company is entitled to remove property thereafter.

Q.  What kind of property?

A.  Personal property.

Q.  Was it personal property related to anything involving the Corrective Action System, the groundwater

remediation system?

A. Some, yes.

Q. **What parts of personal property were involved?**

A. I think compressors, electric switch gear, some of the -- I think it was called process water system or something like that, where they were treating groundwater onsite.

Q. **That was part of the personal property that was part of the sale?**

A. Well, it wasn't supposed to be part of the sale. We had quite a dispute on what was to be sold and kept with the building and what was to be sold to other parties. So it was contested.

Q. **Okay.**

A. Transformers, gone, that I believed stayed with the building, but went with the personal property.

Q. **Monitoring wells?**

A. No, not monitoring wells.

Q. **Recovery wells?**

A. No.

Q. **Piping from the monitoring or recovery wells?**

A. A lot of it was destroyed.

Q. **So is it your testimony that piping from recovery wells was destroyed by --**

A. By third parties, yes.

Q.   Who?

A.   Purchasers and their contractors.

Q.   **Did you specifically witness any of those parties destroying parts of the Corrective Action System?**

A.   Out of the 38 buyers, yes, and their contractors, yes.

Q.   **Which ones?**

A.   We have lawsuits pending or we did have lawsuits on several occasions and the names I don't know, but I believe you have a packet of all that information.

Q.   **Let's keep going for now.**

A.   Okay.

Q.   **Section F, what is the effect of that provision?**

A.   That looks like that I have the ability -- or the Corporation, because this was assigned to the Corporation, has the ability to hire Jennifer Stevens, current environmental counsel to the Company, to facilitate the buyer's dealings with Environmental Protection Agency, Texas Commission, with respect to environmental obligations associated with real estate. That should be at buyer's sole cost and expense.

Q.   **So is it fair to say they loaned you their**

**environmental lawyer to assist you with environmental matters?**

A.   Well, I don't know if they could have done that because she was representing them; and we had a dispute on several items.  So I think that might be a conflict of interest, anyway.

**Q.   Did you utilize her to help you at all with any environmental matters?**

A.   No, other than I think she filled the forms out after I had closed on the Permit and Compliance Plan.  That was a month or two after the closing.

**Q.   So she helped transfer of the Permit and Compliance Plan after the transaction?**

A.   Yes.

**Q.   Did you retain another environmental counsel to assist you?**

A.   No.

**Q.   Did you retain any other environmental counsel to assist you with compliance with the Compliance Plan?**

A.   No.

**Q.   Did you retain an environmental consultant to assist you?**

A.   No.

**Q.   Switching to page 3, Paragraph H, Post-Closure/Corrective Action Insurance, what is the**

effect of that provision?

A. I think that was the insurance that I was referring to that carried over after the closing until 2005.

Q. Did you -- did White Lion renew that policy?

A. We tried.

Q. How did you try?

A. We contacted whoever the -- I don't remember who the company was. We contacted them, and they declined coverage.

Q. When you say "we," who do you mean by "we"?

A. I contacted them.

Q. What is your role at White Lion Holdings, LLC?

A. Manager.

Q. Are there any other managers at White Lion?

A. No.

Q. Are there any other officers at White Lion?

A. No.

Q. Is there any other person other than you at White Lion that makes decisions for White Lion?

A. Well, yes, I guess you could say that.

Q. Who would that person or persons --

A. Well, it would be -- I made very little decisions because of the conditions that I was under at the time. So it was driven mainly by the conditions on



the ground and the damages. And I was seeking advice from two lawyers. One is George Bamberg, and the other was Stephen Doggett, who you know.

Q. **Were they employed by White Lion?**

A. No.

Q. **Did White Lion retain them as counsel?**

A. Yes.

Q. **Did you separately retain them as counsel individually?**

A. Not until this recent action that the State has taken, no.

Q. **But --**

A. They never represented me if that's what you're asking. I think that's what you're asking.

Q. **Yes.**

A. Yeah.

Q. **But they are not employed by White Lion?**

A. No. They are engaged by White Lion.

Q. **They are not part of the management, formal management structure of White Lion, correct?**

A. No.

Q. **In terms of the formal management structure of White Lion, it's just you, correct?**

A. Yes.

Q. **So when you say, "We tried to renew the**

financial assurance policy," work me through that decision-making process. The decision-making process was just solely conducted by yourself, correct, for White Lion?

A.    Right.    I had contacted -- again, I don't know the name of the company now.  It's been ten or eleven years ago.  And I believe this gentleman in this agreement, who was -- I don't know what his title was -- but he was a Vision Metals officer, part of the agreement that was supposed to be transferred is this insurance.

I didn't even know what it was, truthfully, until recent time because this is a whole new area for me; but they said I didn't have the experience or the qualifications to take over the post-closure insurance.  And so it kind of stopped from there; but, yet, the coverage was still there because it was part of our agreement.  But I think the company was kind of saying, "Hey, wait a second.  This guy doesn't qualify for it."  But, yet, Vision Metals says, "It's part of the contract."  That's what kind of transpired there.

I had a dialogue with them; and they said, "You have to have experience running these facilities."  And I didn't have the experience.



Q. Did you investigate what they would require for the experience needed to obtain financial assurance?

A. They just -- no. They asked me questions, you know, like if I ran a facility. I said, "No. This is the first time. I'm a real estate in vestor." So, no, I did not -- it didn't go any further than that.

Q. Did you seek out to retain anyone to assist you that might have that type of experience?

A. Other than at the time -- at that time it was Mr. Bamberg who was representing me because this was all part of the closing, no, I didn't. He was the attorney that handled the transaction.

(Exhibit 5 marked.)

Q (BY MR. PRITZLAFF) Hold that one there for a moment. We'll come back to it.

A. Okay.

Q. It's bringing me down a trail right now. I've marked as Exhibit 5 a document, Permit for Industrial Solid Waste Management Site. Have you seen this document before?

A. Yes.

Q. This is the hazardous waste and solid waste permit for the site, correct?

A. Yes.

(Exhibit 6 marked.)

Q    (BY MR. PRITZLAFF)   I'm also handing you a document that's been marked Exhibit 6, Compliance Plan for Industrial Waste Management Site.  Have you seen this one before?

A.    Yes.

Q.    This document covers the remediation system at the site, correct?

A.    Yes.

Q.    And it specifically covers the solid waste or hazardous waste impoundments that were formerly part of the wastewater treatment plant system at the site, correct, the closure of those units?

A.    Yeah.  I don't know about wastewater. Wastewater, to me, is sewage.  So I'm not...

Q.    When I say "impoundments at the site," you know what I'm speaking of, correct?

A.    The pits or the caps.

Q.    The closed pit area.

A.    The closed pits, yes.

Q.    And the groundwater beneath it has been contaminated with heavy metals that leach from those pits, correct?

A.    I believe it's stabilized.  I think that was the purpose of it, yes.

Q.     And there's a network of monitoring wells stationed about the site, correct?

A.     Yes.

Q.     To monitor the groundwater beneath the site?

A.     Yes.

Q.     And there also used to be a system of recovery wells to draw groundwater out of that site, correct?

A.     Yes.

Q.     Please turn to page 20 of 24 of the Compliance Plan, Section XI, Financial Assurance.

A.     Yes.

Q.     Are you there?

A.     Yes.

Q.     How much financial assurance does this Compliance Plan require for that property?

A.     It shows 574,000 upon issuance.

Q.     How much financial assurance had Vision Metals had in the policy that you were attempting to have transferred?

A.     I think it was about the same amount.

Q.     Did you -- were you aware of this provision?

A.     No -- you mean at the time I purchased or after the fact?  I guess I need for you to expand on that question a little bit.

Q.     When did you become aware of this provision?

A.   After the auction and when this issue of environmental things came up, after I scratched my ear at the auction.

(Exhibit 7 marked.)

Q   (BY MR. PRITZLAFF)  I have here what's been marked as Exhibit Number 7, entitled Compliance Plan Application.  Have you seen this before?

A.   Yes.

Q.   And on page 5, is that your signature?

A.   Yes.

Q.   And the last two pages contain a letter and enclosure signed by Jennifer Stevens, before-mentioned Vision Metals' environmental counsel, basically just transmitting the document and payment for this transfer of the Permit and Compliance Plan, correct?

A.   Yes.

Q.   So when you said earlier that she helped you, this basically was her only step, was a formality of assisting you to transact this application to transfer --

A.   She didn't help me.  She was representing the seller, not my interest.

Q.   Okay.

A.   Yeah.  This occurred after the closing of the property.

Q.    And she was just facilitating the transfer of the permit for both parties?

A.    I think that's a fair statement, yes.

(Exhibit 8 marked.)

Q    (BY MR. PRITZLAFF)    I have a document that's been marked here as Exhibit 8, a transmittal letter from TCEQ to Bernard Morello.  Have you seen this before?

A.    It's been a long time.  That's who it's addressed to.  So I assume I've seen it ten, eleven years ago.

Q.    And attached to it are two sheets confirming the transfer of both the Permit 50129 and the Compliance Plan 50129 to White Lion Holdings, LLC, correct?

A.    Yes.

Q.    And that's effective July 23, 2004 for both the Compliance Plan and the Permit, correct?

A.    Yes.

Q.    Did the TCEQ contact you concerning the financial assurance?

A.    Well, yeah, I would assume there's probably something in that letter.  So that's one way of contact, yeah.  I would say yes.

I don't understand.  Do you mean like a telephone call?

Q.    Do you recall a telephone call from TCEQ?

A.   Well, I had a dialogue with an Ellie Weinert from TCEQ.  So we may have talked about it at the time.

Q.   **Was this after the permit was transferred?**

A.   We had several conversations up until the time the State filed a lawsuit, and she said she couldn't talk to me anymore.  And I haven't had a conversation with her since then.  I don't know the gist of the conversation that far back.

Q.   **At least as of July 23rd, 2004, you were aware of the financial assurance obligations at the site, correct?**

A.   Yes, I believe it was in place at that time.

(Exhibit 9 marked.)

Q    **(BY MR. PRITZLAFF)  I'm handing you a document that's been marked Exhibit 9, correspondence from TCEQ to Bernard Morello, Sole Manager of White Lion Holdings, LLC, dated September 20th, 2004.  It's been a long time, but do you recall this letter?**

A.   Not really, you know.  It's been ten years ago.  Not specifics about it.  I mean, I can read it; and it might bring some memories.

Q.   **Why don't you go ahead and take some time to review it?**

A.   Okay.

MS. KOKS:  While he's doing that, Craig,

can you tell me again what it is? I was trying to write all this down. It's a letter dated what?

MR. PRITZLAFF: September 20th, 2004, RE: Financial Assurance, site.

MS. KOKS: Thank you.

MR. PRITZLAFF: State Bates Number 626, 627.

A. Okay. I read it.

Q (BY MR. PRITZLAFF) Does that refresh your recollection of events?

A. Yeah. It looks like she was responding to a letter that I had forwarded to her.

Q. The letter references the prior, in-place Vision financial assurance, does it not?

A. Yes.

Q. And is it fair to say that the TCEQ advised you there on page 2 that, "We understand that financial assurance for this permit and compliance plan currently is in effect through an insurance policy issued by Zurich North America Insurance to the previous facility owner, Visions Metals, Inc. However, as we stated in our August 27th, 2004 letter to you, White Lion, as the new owner and operator, is required to establish financial assurance with" -- probably should be "within" -- "six months of the ownership change. To

date, this has not been done."

Further down in the letter, "Please provide adequate financial assurance, as is required under 30 TAC, Chapter 37, Subchapter P, by October 6th, 2004."

Is that an accurate reading of those provisions of the letter?

A.   Yes, uh-huh.

Q.   Did you -- did White Lion provide financial assurance by October 6th, 2004?

A.   Yes.   Because of the financial insurance that I assumed through the purchase, yes.   I believe it expired January of 2005, I think it was.

Q.   Do you agree that TCEQ disagreed that the Zurich North American insurance policy that you believe was applicable was not applicable?

MS. KOKS:   Objection, form.

Q    (BY MR. PRITZLAFF)   If you understood that, you can answer.

A.   I think there was a question whether it was applicable or was not applicable.   We were having a dialogue about that.   That's when I called whoever Zurich was represented by.

(Exhibit 10 marked.)

Q    (BY MR. PRITZLAFF)   I have here a document



marked as Exhibit 10, dated October 7th, 2004, State 630 to 631. This is correspondence from TCEQ to Bernard Morello, Sole Manager, White Lion Holdings, LLC, correct?

A. Yes.

Q. Why don't you take a moment to read that?

A. Okay.

Q. What is your understanding of this letter?

A. Kind of a backup to the previous letter, just saying that they have not received an acceptable financial mechanism due on October 6th.

Q. Was an acceptable financial assurance mechanism ever provided to TCEQ?



A. From my understanding, up until January of 2005, it was; but I don't in any way, shape, or form expect to be an expert in this area. So I really don't know. The purchase agreement, obviously, says it's to be transferred. So I believe they had paid the policy in full, and they received no refund. So it was just transferred to White Lion Holdings.

Q. Was a copy of that transferred policy in White Lion's name submitted to TCEQ?

A. I don't know if the lawyer, Mr. Bamberg, submitted that or not -- or Jennifer Stevens. I would



not know that. I wouldn't have probably handled that,

37

anyway. It would have been the lawyers' responsibility to do that, I would think, at the closing or -- I don't -- no, I didn't -- I didn't -- it wasn't my responsibility as part of the purchase agreement to get that transferred. It was my understanding it was transferred.

Q. **When you began to receive these letters from TCEQ in September and October, what did you do to inquire about the financial assurance?**

A. I had a very good dialogue with the EPA out of Dallas, and they were the ones that were helping me along. And I asked them about this; and they said, "Well, that's a prorated number; and that is based upon many years ago when the plan was started. It was in the Eighties sometime, and that should be reduced." Because I didn't know anything about this. This is all new to me. I didn't even know what this was about.

So they said, "You can get that reduced." So any of the correspondence that you see, like this letter here, correspondence, that was written by EPA and signed by me.

MR. PRITZLAFF: Objection, nonresponsive.

Q **(BY MR. PRITZLAFF) My question is: When you received this correspondence from the TCEQ, how did you respond to TCEQ with respect to the financial assurance?**

A. I first called up the Dallas office of EPA and ask them, "What is this? What does this mean?" And they would kind of explain to me what it meant. Again, I think I had several conference calls with Eleanor, "Ellie" Weinert; and she would kind of go through the process with me, also.

Q. Did you investigate how much it would cost to obtain financial assurance in the amount specified in the Compliance Plan?

A. Yes. I think actually on the policy there was a number -- and I don't remember -- but it was a huge number for financial assurance. I don't know what that number is, but I got sort of like a dec sheet of the policy and it showed how much the premium was.

Q. Who at White Lion would analyze the financial implications of obtaining financial assurance as specified in the Compliance Plan, Section XI?

A. I mean, I was the only one; but I didn't know anything about it. So, again, I didn't know anything about it. So I was just asking these other folks that I mentioned at EPA and TCEQ. So they were kind of helping me along.

Q. Could White Lion Holdings, LLC afford to host the financial assurance as specified in Section XI of the Compliance Plan?



A.    No.  That's why they denied my application. They sent out an application; and I was not experienced enough to do this, to run an operation like this.  And I may be confusing that with the permit, too, because I think the permit said the same thing.  They waived any experience at all.

Q.    **To your knowledge, did they base their decision on the financial wherewithal of White Lion Holdings, LLC?**

A.    They may have.

Q.    **Were you required to submit financial documents to the insurance company as part of your application to obtain financial assurance?**

A.    I think what I told them is probably all the assets they have is just the facility, and there's a loan against it.  So that was it.  It was new, so.

Q.    **Which company were you speaking with to obtain financial assurance?**

A.    Again, I don't know.  Whoever represented Zurich Insurance.  I don't know who that is.

Q.    **Did you investigate any other companies to obtain financial assurance?**

A.    No.

Q.    **Why not?**

A.    Well, you know, first, I didn't know about it;

and, then, according to what they were telling me, this is a very, very specialized area of insurance. There's very few people that sell that product.

Q. **When you say "at first I didn't know about it," you knew about it at least as of July 23rd, 2004, correct?**

A. I -- yeah, according to the letters, yes. Yes.

Q. **Did anyone -- strike that.**

**As the sole decisionmaker at White Lion, you allowed White Lion to not provide financial assurance as specified in Section XI of the Compliance Plan, correct?**

A. I don't know if I can say I didn't allow. I didn't even know what it is or what it's even for. It's not did I allow. All I know is the premium was extremely high, and I could not afford that. I was just starting a new project, so.

Q. **So as the sole decisionmaker at White Lion, you, for whatever reason, permitted White Lion to not obtain financial assurance, correct?**

A. Yeah, for whatever reason. Yes.

Q. **As the sole decisionmaker for White Lion, you caused White Lion to not obtain financial assurance as specified in Section XI of the Compliance Plan, correct?**

A.    No.

          MS. KOKS:  Objection, form.

A.    I think I answered it already:  No.

Q     **(BY MR. PRITZLAFF)  You individually allowed the financial assurance at the facility to lapse, correct?**

A.    No.

Q.    **You individually permitted the financial assurance at the facility to lapse, correct?**

A.    No.

Q.    **Who permitted the financial insurance to lapse?**

A.    I guess it would fall back on the condition that I was under.  I could not provide financial assurance.  I was not acceptable for that, for financial assurance.  So it's not like -- first, I didn't know what it was for; secondly, I could not really afford it, starting a new project; and, thirdly, the folks for both EPA and TCEQ were telling me that's based upon a Compliance Plan that is -- I think it was 30 or 32 years.  And it's prorated over a period of years; so that number would be drastically reduced.  So those elements, it's like putting somebody in a car that doesn't know how to drive.

Q.    **Is it fair to say you didn't know how to drive**

White Lion?

A.   Yeah.

          MS. KOKS:  Objection, form.

A.   I guess so.  I'd say that.

Q    (BY MR. PRITZLAFF)  Did you look at retaining any consultant to assist you or advise you with respect to obtaining financial assurance?

A.   No.

Q.   Let's go back to Exhibit 4, please.

A.   Okay.

          MR. PRITZLAFF:  Back on Exhibit 4, Mary.

          MS. KOKS:  Thank you.

Q    (BY MR. PRITZLAFF)  Page 3, Section I, Mr. Morello, why don't you take a moment to read that?

A.   Section 5?

Q.   "I" as in "indigo."

A.   Okay.

Q.   It's entitled Utilities.  Read that and tell me what your understanding of that provision is.

A.   Okay.

Q.   You've completed reading it?

A.   Yes.

Q.   What is the ANTS facility?

A.   I have no idea.

Q.   Does the term "Acid Neutralization Treatment

System" sound correct?

A.   Yes.

Q.   Do you know what the Acid Neutralization Treatment System is?

A.   I think that was the process that I referred to earlier.  That's what I believe it is.

Q.   Do you know whether that ANTS facility was utilized for treatment of groundwater recovered from the Corrective Action System?

A.   Yes, I believe so.

Q.   This provision says that the buyer will agree to continue to run the ANTS facility, correct?

A.   Right.

Q.   So this ANTS facility and the treatment system associated -- which is the treatment system associated with the Corrective Action System, was not part of the personal property that was sold separately, correct?

A.   No, I'm not quite sure of that.  I can't say "yes" or "no."  I do not know that.

Q.   But, in any event, this provision says that the buyer shall continue to run the ANTS facility, correct?

A.   Right.

(Exhibit 11 marked.)

Q   (BY MR. PRITZLAFF)  Hold that one.  I have

here Exhibit 11.

MR. PRITZLAFF:  Mary, Assignment of Real Estate Purchase Agreement, which we marked as 11.

MS. KOKS:  Okay.  Thank you.

Q     (BY MR. PRITZLAFF)  Mr. Morello, do you want to take a moment to read that and explain what this document is?

A.     This would be because at the time I showed up at the auction, I didn't have a corporation; and I believe the purchase agreement -- and maybe it's this agreement; I'm not real sure -- allowed me to assign the facility to a corporation.  I believe that's what this is.  Yeah.

Q.     Who did you assign it to?

A.     To White Lion Holdings.

Q.     Okay.  So you initially purchased the facility and then transferred your rights, duties, and obligations under the real estate contract to White Lion?

A.     Right.  I assigned my rights to White Lion Holdings, yeah.

Q.     I just wanted to make sure we had that on the record.  So when we're speaking of the duties under this agreement, it's now flowing to White Lion, with you as sole owner?

A.    Correct.

Q.    So now, back to Exhibit 4, which is the one right in front of you.

A.    Okay.

Q.    Back to the amendment.  Back to page 3, Section I.

A.    Okay.

Q.    We've discussed the buyer continues to agree to run the ANTS facility after closing and to continue to run any and all facilities necessary to comply with the environmental obligations associated with the real property, correct?

A.    Yes.

Q.    And I want to clarify what you've stated earlier with respect to the personal property.  That was excluded or otherwise sold separately by Vision, correct?

A.    Yes.

Q.    Okay.  This provision states that the buyer, you, White Lion, would continue to run the Corrective Action System, correct?

A.    Run ANTS facility.  So that's what it says, ANTS.

Q.    And continue on to that same paragraph. "...and to run any and all facilities necessary to

comply with the environmental obligations associated with the" --

A. Yes, right.

Q. Would you agree that that includes the Corrective Action System?

A. Yeah. But, you know, corrective action -- I'm you know, a little confused. Corrective Action System, Compliance Plan, I'm a little confused on the terms.

Q. Sure. Well, let's explore what the Corrective Action System is then.

A. Okay.

Q. Let's turn to the Compliance Plan --

A. Okay.

Q. -- which is Exhibit 6.

A. Okay.

Q. I'd refer you to page 4 --

A. Okay.

Q. -- entitled Corrective Action Systems.

A. Okay.

Q. Why don't you read through Section II for a moment and then tell me when you're ready.

A. Okay.

Q. Did that help refresh your recollection of what the Corrective Action System is?

A. Well, yes -- not my recollection. I just -- I

don't know these terms you're using.  I know "Compliance Plan" because I see it here.  Okay.  Yes.

Q.    **What is your understanding of the Corrective Action System?**

A.    It -- what page is that on?

Q.    **Page 4 of 24.**

A.    To install and operate a Corrective Action System with groundwater monitoring background wells, point of compliance wells.

Q.    **And then observation wells and other wells to remediate and/or contain contaminated groundwater, correct?**

A.    Yes.

Q.    **And then if you will turn to Table 2, page 23 of 24, do you agree that this page comprises a list of those wells that are the Corrective Action System?**

A.    I believe that's what's referred to, yes. Yeah.

Q.    **So in Section A there are three background monitoring wells, correct?**

A.    Yes.

Q.    **And in Section B there are 13 points of compliance wells, monitoring wells, correct?**

A.    According to this, yes.

Q.    **And in Section C there are five recovery**

system wells, correct?

A.   Yes.

Q.   And in Section D there are 9 wells associated with monitoring wells, observation wells, correct?

A.   Yes.

Q.   So there's approximately 26 total wells, correct?

A.   I haven't added them up, but I believe what you say.  I haven't added them up.

Q.   Do you want to add them up yourself?

A.   No.  I believe you.

Q.   If you'll note on Section C, Zone 1, RW-26, Recovery Well 26 --

A.   Okay.

Q.   -- so that gets you to 26 total wells?

A.   Yes.

Q.   Some wells, if you'll note, have an A, B, or C behind them.

A.   Okay.

Q.   Do you know what that means?

A.   No, I do not.

Q.   Do you now have an understanding of the Corrective Action System, of what it involves?

A.   Basically, yes.

Q.   Okay.  Would you agree that that system was

not part of the personal property sold by Vision Metals?

A.     No, I do not agree.  As I said before, the utilities and the lines were cut and severed; transformers were removed.  So part of this process system was removed.  So I think it was all linked together.

Q.     When was the process system removed?

A.     Part of it was removed, I believe, right at the time of the sale.  The buyers came in there.  And then afterwards, whatever was kind of left is when I took it down.

Q.     What did you take down?

A.     There was tanks and -- that's all I remember were just large tanks.

Q.     You yourself?

A.     Yes.

Q.     What equipment did you use?

A.     We had cranes.  I had help, too.  I didn't do it all myself, but I had cranes to take it down.

Q.     Did you take out the monitoring wells?

A.     No.

Q.     Who took out the monitoring wells?

A.     I think the monitoring wells had been damaged for years.  If you're referring to the wells around the mounds, we didn't take them out.  They were damaged over

the years.

Q.    **What did the monitoring well look like?**

A.    PVC and the metal cap over it.

Q.    **How tall was the metal cap?**

A.    I don't know.  Maybe 3, 4 feet, 2 feet, protruding out of the ground.

Q.    **Was it colored?**

A.    Yes.

Q.    **What color?**

A.    White and orange, I believe.

Q.    **Were they highly visible?**

A.    Yes.  Oh, sure.

Q.    **They were visible onsite in 2004?**

A.    You know, I can't say in 2004 that I walked back there.  You could see the ones from the building, yes; but it covered a fairly good-sized area.  So I don't know, you know, if all of them were there at that time.  I don't know.

MR. PRITZLAFF:  We've been going for over an hour.  Do you need a break?

THE WITNESS:  No, I'm fine.

MR. PRITZLAFF:  Mary, are you okay?

MS. KOKS:  Yeah, I'm all right.

MR. PRITZLAFF:  Okay.  Let's proceed for a little while longer.

Q      (BY MR. PRITZLAFF) Tell me a little bit about the site itself.  What was the plan for the site?

A.    You mean once I had acquired it?

Q.    Correct.

A.    First, I just wanted to buy the farmland and the buildings.  That's what I showed up at the auction for.  The plan was to as soon as the -- this is right after the closing.  I believe the buyers moved in right away, personal property buyers.  And the goal was to get the buildings empty, because they bought all the personal effects, and to lease it out, lease each building out.  That was kind of the plan.  That plan dramatically changed at the end of the removal date.

Q.    How so?

A.    The buyers, the personal property buyers -- and I'm not saying all 38 of them because some of them acted extremely responsible if they did damages.  But several of them did extensive damage to the utility infrastructure there.  It was so unsafe to use anything there without shutting everything down because there was open water lines.  There was open gas lines.  There was open electrical lines, high voltage.  Whatever other kind of lines, whatever utilities there were, they were virtually destroyed.  And the way I've compared it is going into a war zone; and after the war is over with,

things are cannibalized. I mean, that's basically what it looked like after the removal process.

Q. **Let's say in 2004, how often would you be at the site?**

A. During the removal, every day, even Saturdays and Sundays.

Q. **How engaged were you in the cleanup process?**

A. Are we talking about cleanup or removal of personal property?

Q. **Tell me how involved you were and how you were involved in sort of a general, broad sense.**

A. Well, I was trying to protect and have the buyers respect the real property. And so I was from one end of the facility to the other and there was so much going on and the buyers had -- which was probably the worst thing -- unfettered access to the facility. They had a short window, depending on what they purchased, to remove it from the facility. So they took whatever measures they could with total disregard for real property and the buildings. They just went in there and did whatever they could to get their equipment out. That's all they were interested in.

And it wasn't up to me even though I fought this. The auctioneer had control of these buyers, and that's what started these damage lawsuits is

that they didn't want to fix.  Some did.  Some acted real responsibly.  They came to me and said, "Hey, we did some damage; we'll fix it."

I said, "That's fantastic."

Others just walked away, just said, "Forget it."  And so after -- I don't know.  It was after a year or something that notices were sent out we finally filed a lawsuit and proceeded, you know, to go after them.

Along the way -- if you want me to keep going here.

Q.    Yes, please.

A.    -- they wanted me to mitigate the damages.  So I was -- my plan basically for the facility was thrown out because I realize when somebody buys a facility like that I would have some work to do, cleanup work to do; it's not tidy.  The floors were not going to be where you could eat off of them.  So I knew there was some cleanup I had to do, but we're talking major cleanup.  There were estimates out there well over a million dollars worth of damage.  That was unforeseen.  I had no idea that was going to happen.

You know, the personal property buyers and the auction company were trying to pretty much get rid of me so they could do their removal.  And they were

threatening that I was interfering with them, and I was only trying to protect the property. And, you know, the dynamics of the project and the direction of the project turned 180 degrees when all that happened. And so it's been a major struggle.

And I haven't wavered one bit on it from day one. I'm as excited about the project today as I was back then. And then when the State came down and started enforcing this in 2013, that moved any of my efforts to continue to now efforts to deal with the State, in all honesty.

So I've been lacking. And the place looks -- it doesn't even look like the same place that it did from the time I saw it in the beginning before the Company bought it. And it doesn't look anything like it did after the removal. It's a totally changed place. I think there has been a video that I believe Mr. Doggett offered to you at one time; and, as I said, it looked like a war zone. And it looks presentable. That was my goal, to make it look presentable, enticing for industry or storage to lease.

And it's been -- because I've had no utilities, it has been an extremely difficult task to do that. So it's been used for staging basically because there is no utilities. That's it in a nutshell.

And maybe I went on too much or didn't answer your question, but I don't think I've ever expressed that or you maybe don't know any of the background. I know your big focus is this area here, but I had a huge amount of responsibilities that was undertaken. And they just got larger as it progressed, so.

Q. **Anything you want to add on to that; or does that encapsulate the situation as you saw it 2004, post purchase to date in terms of what was going on at the site?**

A. Yeah. I mean, you know, there was no option once the damages occurred in what could be done. That restricted a lot of things. I had no experience. I was buying some metal buildings on a piece of ground and some farmland and trying to lease it out; but I probably -- after that happened, I took on something much greater than I expected. And they were circumstances out of my control when other people damaged the property. I have high respect, myself, for other people's possessions; but other people in this world do not.

Q. **Did you make any decisions for White Lion to retain additional employees to help you monitor the situation at the site?**

A.   When you say "monitor," I don't understand what you mean by that.

**Q.   Well, when you were explaining what was going on and you were having to run from one point to the other and people were coming into your facility with unrestricted access and out of the facility, is it fair to say that you were stretched thin, trying to monitor everything going on?**

A.   Well, the buyers were trying to go back -- and the auction company -- go back to the bankruptcy court, saying I was interrupting the removal operations.  And there was a window.  It depended on what you acquired there as personal property; but there was a window to get things out, a 30-day, 60-day, 90-day window.

          And it was a difficult task because some people's personal property was in front.  This was a jam-packed facility with equipment all over; and to get one machine out, you had to move another machine.  So there was a lot of argument among the buyers of, "You've got to get your machinery out so I can get mine out."

          In the meantime, my concern was damage to the facility.  That was my principal concern; but they were trying to get me out of the picture as much as they could so they could, you know, get their possessions out.  I think because it was such a short window -- and

this is -- I'm only saying this as, I guess, in hindsight, you could say. I think what happened is the creditors wanted to close out the estate; and they were forced to just say, "Get this stuff out." Because my understanding is they had two other auctions at this facility to try to sell it. I didn't attend it. I didn't know about it until after. So it was a going concern as a pipe manufacturer.

Q. **Was all that work completed by August 1st, 2004?**

A. August 1st? No. There was a buyer that stayed longer, and they had -- they needed more time to remove some of there equipment out of there.

Q. **Just one buyer?**

A. One of the buyers, yes.

Q. **So most of the work, then, was completed by August 1st?**

A. No, there were several people that just walked away. The buyer I'm referring to, they were actually the buyer of the facility; but they were going to buy the whole thing, lock, stock, and barrel, not as a going concern, but all the machinery. And they --

Q. **They weren't the buyer, prospective purchaser?**

A. No, no, no. They were the buyer of the real and personal property.

Q.    I thought you were the purchaser of the property?

A.    Well, what happened, the way they set it up is they tried to -- wanted to maximize the estate.  So they auctioned it in two different ways, either as a bulk bid, real and personal property, and as a bid just for the real property and then a bid for that personal property.  And somebody else was the higher bidder.  It happened to be one of the associates of the buyer; but there was a several-million-dollar check, I guess, that came back insufficient.  So that's when it fell back on me.  And that's kind of how that -- I was not really the first buyer there.  I was kind of the fallback buyer.

Q.    You can't disagree that you're the owner of the property?

A.    White Lion is the owner of the property, yes.  Yes.

MS. KOKS:  Can we clarify what we mean by "the property"?  I think there's been some confusion on that point.

Q    (BY MR. PRITZLAFF)  What does "the property" mean to you?

A.    Well, when I had raised my hand or scratched my ear, whatever you want to call it, at the auction, it was broken down into farmland and then vacant land and

then plant land. The plant encompassed 37 acres. And then there was some vacant land that was a forested area, I guess you would call it; it was covered in trees at the time and that was adjacent to the plant. And then beyond that is the farm ground.

Q. And the farm ground encompasses 115 acres, correct?

A. Yes. The farmland is owned by myself and I'm not exactly sure of the acres, but I believe it's 115. I believe you're probably right there.

Q. And so the balance of the real estate that was the subject of the real estate purchase agreement stayed with White Lion Holdings. The farmland component of approximately 115 acres, you later conveyed -- or it was conveyed to you specifically, Mr. Morello?

A. Right.

Q. When all of the personal property removal was occurring was post-sale, mostly pre-August 2004, correct?

A. The majority, other than some people just walked away.

Q. Did you direct White Lion to retain any additional personnel to assist with the oversight of the personal property removal?

A. No.

Q.    You mentioned White Lion was then embroiled -- or brought a series of lawsuits against some of the entities involved with the removal of the properties, correct?

A.    Right.

Q.    Did any of those suits concern specifically -- strike that question, and let me start over.

Did any of those lawsuits specifically address any of those entities that were sued causing White Lion to not comply with the Permit or the Compliance Plan?

A.    Yes.

Q.    In which lawsuits was that claim specifically made?

A.    Any lawsuits -- and I don't have the names of the parties -- but any lawsuits that stated in there about the utilities or damage to utilities.  And this keeps in my mind a professional and workmanlike manner. Those are the parties that we filed lawsuits against, and I don't have specific names for you.

Q.    Was a specific claim made based upon -- for interference with White Lion's ability to comply with the Permit or Compliance Plan?

A.    I don't know how the lawsuit was framed.  I don't know that.  Again, that was ten years ago.  I

don't know.  I can't answer that.

Q.    Was a specific suit filed against any entity for damage done to the Corrective Action System?

A.    I don't know if it's ever mentioned the word "Corrective Action System" in the lawsuits.  I can't say that because I haven't seen those for years.  I don't know.

Q.    Has any of those lawsuits concerned damage to a monitoring well?

A.    Again, that's the same answer.  I don't know. I haven't seen those lawsuits for years.  So I don't know.

Q.    Do any of those lawsuits concern damage to a recovery well?

A.    Same answer.  I don't know.

Q.    Did you specifically see a party remove a monitoring well?

A.    No, not -- no.

Q.    Did you specifically see any person remove any monitoring well at the site?

A.    Well, when you say "remove," I don't know -- maybe you can explain what you mean by "remove."

Q.    You previously described the monitoring wells on the site as a 3-foot yellow box sticking out of the ground?

A.    Right.

Q.    **Did you see anyone remove any of those yellow boxes?**

A.    I can say that I saw it damaged.  I think it falls back to the intent, is what I'm trying to get to. Did they intentionally damage them?  No, I don't think so.  No.

Q.    **Did you notify TCEQ of this damage?**

A.    No.

Q.    **Why not?**

A.    I didn't even know I had to.

          MR. PRITZLAFF:  Why don't we take a break?  We've been going for over an hour and a half.

          MS. KOKS:  That's fine with me.  Thank you, guys.  I'm going to put you on mute so that you don't hear any background noise.

          MR. PRITZLAFF:  Let's reconvene in ten minutes.  Is that too much time or too little?

          THE WITNESS:  No, that's fine.

          MS. KOKS:  That's fine.  I'll tell you what, I'll just call back in.

          MR. PRITZLAFF:  Okay.  I'm going to leave the line open.

          MS. KOKS:  Okay.  I'll call back in.

          MR. PRITZLAFF:  Okay.

(Off the record from 2:43 to 2:54 p.m.)

MR. PRITZLAFF: Okay. We're back on the record. And, Mary, you're still on, right? I just want to make sure.

MS. KOKS: I am, yes. Thank you.

Q    (BY MR. PRITZLAFF)  Did you insure the site?

A.    Yes.

Q.    In what name did you insure the site?

A.    I believe it was -- liability was Bernard Morello and White Lion, I believe.

Q.    So the policy is just for the broad liability coverage, correct?

A.    Yes.

Q.    It was both in your name, Mr. Morello, as well as White Lion Holdings?

A.    I believe so. You're talking about what -- you know, I don't know what year you're talking about.

Q.    Initially, in 2004.

A.    I don't know. Now, I know because I renewed the policy; and both names are on there. It's for liability. And I don't know back then. I can't answer that.

Q.    Okay. Since you purchased the facility, the former Vision Metals site, has anyone else had control of that site?

A.   What do you mean by "control"?

Q.   **What would you say "control" means?**

A.   Possession.

Q.   **Has anyone else had possession of the facility?**

A.   Yes.

Q.   **Who?**

A.   Tenants.

Q.   **From what time periods?**

A.   I don't know the first tenant I had there what the time period was, but the last tenant is just moving out now.  So I don't know.

Q.   **Has anyone else operated the site?**

A.   There's really no operation going on.  It's not a manufacturing facility.  So I think that's what you mean.  I'm not sure.  Maybe you can explain.

Q.   **Well, let's go about it a different way.  How often are you at the facility?**

A.   Most weekdays and oftentimes on Saturday.

Q.   **How many hours do you spend out there?**

A.   Probably, a guess -- it varies a lot, but sometimes 60, 80 hours a week.

Q.   **How long have you been out there from 60 to 80 hours a week?**

A.   Since I started.

Q.    When did you start?

A.    Right after I got possession of it, after the buyers were finished removing.

Q.    Since April of 2004 to the present?

A.    No.  They were in there, still, up until August or so, whatever it was, when the last buyer moved out.  And then tenants moved in; and they have possession of the property, separate areas, you know.

Q.    So since at least some point in 2004 to the present, you've been at the site 60 to 80 hours a week?

A.    Pretty much so, yes.

Q.    Who at White Lion is responsible for making decisions about what transpires on the site?

A.    Today or back then?  I don't understand what you mean by that, for the timeframe.

Q.    Let's say in the '04, '05 timeframe.

A.    Not many decision were being made back then because of the conditions out there.  Decisions like areas to clean up, if that's what you mean, or mitigating damages of this buyer or mitigating damages of that buyer.  It kind of all ebbed and flowed with how much each party involved in the lawsuits were banging on Mr. Doggett's door, saying, "He's not mitigating his damages."  So I'd move over there.  It was kind of back and forth.  I was kind of all over the place, trying to

satisfy, you know, different areas and trying to get the place presentable for tenants.

Q.   Who at White Lion is responsible for making environmental compliance decisions?

A.   I guess I would be.  I guess you could say me; but under the conditions, it's hard to make decisions.

Q.   Is there anyone at White Lion that could have made those decisions other than you?

A.   No.

Q.   Who at White Lion is responsible for complying with the Compliance Plan?

A.   White Lion.

Q.   Anyone other than you at White Lion that would be responsible for compliance with the Compliance Plan?

A.   There is nobody else.  I'm the shareholder of White Lion.  So that's all there is.

Q.   Who made the decision at White Lion to stop monitoring the groundwater wells?

A.   That was, I guess you could say, third-party buyers and contractors, their actions.

Q.   How did third-party buyers or contractors prevent White Lion from taking a sample from a monitoring well in the Compliance that's part of the Corrective Action System?

A.   I don't think they prevented sampling.  I'm

talking about the groundwater treatment.

Q.   So none of those third parties would have -- could have or did -- let me restate it completely.

None of those third parties prevented White Lion from taking any monitoring sample -- any groundwater sample from any monitoring well on the facility, correct?

A.   No.

Q.   But it's your testimony that the third-party contractors interfered with White Lion's ability to operate the recovery wells?

A.   The pump and treat system, yes.

Q.   Do you know which company would have prevented White Lion from continuing to maintain and operate the pump and treat system?

A.   Principally the ones we sued based on the utilities' and, again, I don't have those names at all.

Q.   How much power does it take to run the pump and treat system?

A.   No idea.

Q.   Have you ever tried to repair the pump and treat system?

A.   No.

Q.   Who at White Lion made the decision to not repair the pump and treat system?

A.    There's nothing to repair if there's nothing there.  It's gone.

Q.    **Who made the decision to not replace the pump and treat system if it was gone, at White Lion?**

**Let me restate the whole thing.  Who at White Lion made the decision not to replace the pump and treat system if it was gone?**

A.    The pump and treat system, as I understand it, was a massive system.  So it was -- you know, there was no option to replace it.

Q.    **Isn't it true White Lion never intended to operate the pump and treat system?**

A.    No.

Q.    **Did White Lion attempt to transfer the wastewater permit at the site to White Lion from Vision Metals?**

A.    Wastewater?  I'm not quite sure about wastewater.  I don't know anything about that.

Q.    **How did White Lion intend to handle the groundwater recovered from the pump and treat system?**

A.    I don't know because I didn't know anything about it.  You're asking me questions, and I'm not an expert in this area.  So I don't know.

Q.    **Did White Lion ever retain expertise to advise it on how to comply with the Compliance Plan?**

A.   Yes.

Q.   **When?**

A.   I think it was 2013.

Q.   **Note on Exhibit 7 --**

MR. PRITZLAFF:  And, Mary, we've marked as Exhibit 7 the Compliance Plan application.

MS. KOKS:  Thank you.

Q    **(BY MR. PRITZLAFF)  Note on page 2, Section 4, and then right above Section 5, it says, "Wastewater Permit Numbers."  Do you see that?**

A.   Yes.

Q.   **And what does it say in bold?**

A.   "TPDES 01237 (Not being transferred to new owner; Vision Metals will terminate.)"

Q.   **That bolded part is something that you typed in, correct?**

A.   No.

Q.   **Who typed it in?**

A.   Whoever prepared this.  I didn't prepare this. I don't know.

Q.   **Who prepared this for you?**

A.   I have no -- I have no idea.  I don't know.

Q.   **Did you review this before you signed it?**

A.   I can't say ten or eleven years ago I did that.  I don't know.

Q.    If groundwater was being removed from the recovery system, how did White Lion intend to collect that material?

A.    You know, it's way over my head because I don't understand.  I'm not an expert in this area.  So it's hard for me to answer.  If I was an expert in here, I could answer; but I don't know.  I simply don't know.

Q.    You, as the sole decisionmaker for White Lion, did not obtain the expertise needed to comply with the Compliance Plan, correct?

A.    Yes.

Q.    Why was that decision made?

A.    Because there was limited resources.  There was many other fires I was trying to put out on the site, and this was just one of multiple things that I had to deal with.  So I guess it was prioritized.

Q.    So you, as the sole decisionmaker for White Lion, because of financial reasons, allowed White Lion to not comply with the Compliance Plan?

A.    No, that's not true.  I think what it is, is unforeseen circumstance came up that didn't allow resources at all to be focused in this area.  Because I didn't hear a thing from the State I figured, well, it mustn't be that important.

Q.    When you say you didn't hear a thing from the

State, what do you mean by that?

A. Well, I think about -- shortly after I purchased it, they filed a lawsuit from probably 2005 or so -- or maybe it was in 2004; I'm not sure -- but I didn't hear from them until you got engaged in -- really of any significant substance until you got engaged last whatever it was, middle of last year. So I was just busy putting out other fires, as I said there, and figured it mustn't be important because I didn't hear much of anything.

Q. So you, as the sole decisionmaker of White Lion, determined that if the State was not contacting you, it was not worth complying with the Compliance Plan, correct?

A. No, no. That's not what I said.

Q. If there was a groundwater pump and treat system on the property -- and you do not dispute that you knew it was on the property, correct?

A. Yes.

Q. What does "pump and treat" mean to you?

A. Pump the groundwater and treat it, like a treatment plant. That's how I would guess.

Q. How did White Lion intend to treat the groundwater?

A. I have no idea.

Q.   Did you make any affirmative decision for White Lion to engage a company to assist it with treating groundwater at the site?

A.   No, other than just getting the EPA to assist me.   That was it.

Q.   So you, as the sole decisionmaker of White Lion, knew pump and treat meant pump water out and treat it, correct?

A.   I know it today.   Did I know it back then? No.

Q.   When was the first time you, as the sole decisionmaker of White Lion, read the Compliance Plan?

A.   Probably last year when this all started.

Q.   When did you, as the sole decisionmaker of White Lion, first read the Permit?

A.   Same time, last year.

Q.   Who at White Lion was onsite when TCEQ would come to visit the property?

A.   I would have been.

Q.   Who at White Lion interacted with TCEQ when TCEQ would call White Lion?

A.   You mean the people that came out?   Is that what you mean, or are you talking about -- I'm misunderstanding.

Q.   Yeah, it was a terrible question.

A.    Okay.

Q.    **When TCEQ would send White Lion a letter, who at White Lion was responsible for responding to that correspondence?**

A.    They would address it to me.  So, obviously, I would respond.

Q.    **Was there any other person at White Lion who would have been charged with the responsibility of responding to TCEQ?**

A.    No.

(Exhibit 12 marked.)

Q    **(BY MR. PRITZLAFF)  I have here a document that's been marked as Exhibit 12, correspondence from TCEQ to Bernard Morello, White Lion Holdings, LLC, dated October 14th, 2004.  Why don't you take a moment to read that.**

A.    Okay.

Q.    **Earlier I believe you testified that TCEQ wasn't involved early on in the site, correct?**

A.    No, they were -- I think I had a dialogue with them early on the site -- in the purchase of it, early on.

Q.    **So is it fair to say TCEQ was involved in the site and in dialogue with you since you purchased it?**

A.    Up until the time the lawsuit was filed, I had

a dialogue; but after that, no dialogue at all.

Q. So you agree that TCEQ was involved -- was in communication with you concerning compliance at the site since at least April of 2004?

A. Yeah. If that's what the date of the letter is, yes.

Q. What is your understanding of this letter as you have read it?

A. Well, again, I don't know all these terminologies in here. They are basically responding to correspondence that I sent them; and then, they are wanting me to submit a response by April 27th. And, basically, this letter was shipped off to EPA; and then EPA wrote a letter. And they'd send it back to me, and I'd sign it. That's why there's all the technical terms in the letters to TCEQ. I just signed the letter.

Q. Did you specifically respond with the information that TCEQ asked for in this letter April 14th, 2004 letter?

A. You know, I don't know anything about this. So it's hard for me to say if I responded appropriately. I don't know because I don't know anything about this. This is so out of my knowledge, my sphere of knowledge that I don't know. You know, I can't answer that. You know, I can't answer that.

Q. Do you recall TCEQ coming out to visit your property in 2004?

A. I'm not sure if it was 2004 or 2005; but I do remember that a gentleman came out, yes.

(Exhibit 13 marked.)

Q (BY MR. PRITZLAFF) I'm handing you a document marked as Exhibit 13, correspondence from TCEQ to Bernard Morello, sole manager of White Lion Holdings, LLC, dated December 14th, 2004. Why don't you take a moment to review that letter.

A. Okay.

Q. You're the only person at White Lion that would have met the TCEQ inspector at the site, right?

A. Right.

Q. It's a long time ago. Do you recall meeting Mr. Arnett on November 12, 2004?

A. Yes, I remember him specifically.

Q. What do you recall about that inspection and your visit with Mr. Arnett?

A. I do not want to answer that because he confided in me. So all I can say is he walked around the place. He and I walked around the facility.

Q. He confided in you?

A. Well, put it this way: He said some things to me that -- he said, "Just keep this between you and I."

And that was it.  So I kept it at that.

Q.    **What was the substance of this confidence?**

A.    Again, it's -- he said, "This is all about politics.  This agency is extremely political."  And let's leave it at that.

Q.    **But the purpose of his visit was not to discuss politics, correct?**

A.    No.  He was just -- because I wasn't experienced in this area, I think he was trying to educate me and give me some advice.

Q.    **What was he looking at when he was visiting your facility?**

A.    We just walked around.  I don't know what specifically he was looking at.  I don't know.

Q.    **Do you recall receiving this letter?**

A.    Not specific to this letter, but that is me on there.

Q.    **Do you have any reason to suspect you did not receive it?**

A.    No, I'm quite sure I received it.

Q.    **How did you respond when you received this letter?**

A.    I don't know back then how I responded. Typically, what I would do is fax it to EPA; and then EPA would respond back for me.  And so that's typically

what transpired. I don't know if it did on this letter specifically, but...

Q. Now, EPA is a Federal government agency, correct?

A. Yes.

Q. Is EPA the permittee at the site?

A. No. I think that was a big problem that TCEQ had is because they were --

MR. PRITZLAFF: Objection, nonresponsive.

THE WITNESS: Okay.

Q (BY MR. PRITZLAFF) Is EPA the named permittee of the Compliance Plan?

A. No.

Q. Who is?

A. White Lion Holdings.

Q. Was this -- was any of the correspondence that you received from TCEQ directed to the Environmental Protection Agency?

A. No. I think they were just trying to help.

Q. These letters were directed to you, correct?

A. Yes.

Q. As sole manager of White Lion Holdings, correct?

A. Yes.

Q. Whose responsibility was it to respond to the

correspondence from TCEQ when it was directed to Bernard Morello, Sole Manager of White Lion Holdings, LLC?

A.   Well, I just saw in here this is going back to 2001 on here.  I didn't even own it in 2001.

Q.   Where are you referring?  On Section 2 there, on State page 830 --

A.   Yeah.

Q.   -- Summary of Investigation Findings, discussing recordkeeping and annual reporting procedures applicable to generators.  And what is your understanding of the reference to years prior to your ownership?

A.   You know, I don't know.  It says recovered ground waters for those years based on amount generated.  You know, again, I don't know anything about this.  I can assume what it means.  It means how much gallons they pumped out of the ground.  Again, this is not my area of expertise.

Q.   You're an extremely intelligent person correct?  You've been very successful in your career, correct?

A.   I don't want to answer that.

Q.   Do you understand that this is talking about recovery of water, groundwater?

A.   Yes.

Q.   Does that not imply continued obligations to recover groundwater if the prior facility was reporting what groundwater it recovered?

A.   Well, I see that here, yeah.  I see where you're coming from with that, yes.

Q.   Would that not have been a reasonable interpretation of this letter in December of 2004?

A.   Yes.

Q.   As the sole decisionmaker at White Lion, you individually allowed White Lion to disregard its compliance obligations, did you not?

A.   No.

Q.   Then who did?

A.   The circumstances that White Lion was surrounded in at the time.

Q.   Did you ever respond to TCEQ in response to this December 2004 letter or any other letter that you received, or White Lion received, from TCEQ about these circumstances and those circumstances causing an inability of White Lion to comply?

A.   I may have had some conversation with Ellie Weinert and maybe Mr. Arnett on the phone.  I don't know.  That's a long time ago.

Q.   Can you specify an exact time and place of those telephone calls?

A. No, no, no. I know I had a dialogue with Ellie and Bruce.

Q. **You've been involved in real estate transactions for almost four decades, correct?**

A. Pretty close.

Q. **Documenting things in paperwork is important in real estate transactions, is it not?**

A. Well, you mean closing documents? I don't understand what you mean.

Q. **If you're going to enter is a contract, generally you embody that into a written document, correct?**

A. Yeah. You keep it in an archive file, yes.

Q. **If someone objects to some provision, that's generally embodied in some kind of correspondence, correct?**

A. Every circumstance is different. I assume that would happen, yes.

Q. **Would you not have deemed it wise for White Lion to have responded to correspondence from TCEQ telling it that it's in violation of various requirements?**

A. I can't say that I did or did not respond because I had not only written letters but there was also telephone calls, telephone conversations, and then

site visits.

Q.    Let's look at Exhibit 6 again, Compliance Plan, on page 14, Section B, Reporting Requirements, Section 2.  Did White Lion ever submit a report, as referenced in this section, on January 21st and July 21st of each year?

A.    No.

Q.    Who made that decision for White Lion to not submit those reports?

A.    Well, first of all, I didn't read this until last year.  So I wouldn't have known to submit the plans.

Q.    So it was you, correct?

A.    That I didn't submit, yeah.  If you don't know something, you can't submit something.

Q.    You transferred -- you instructed White Lion and had White Lion transfer the permit to White Lion, correct?

A.    I instructed?  No.  No, I didn't instruct.  I signed the document.  I didn't prepare the document, no. I don't know who prepared the document.

Q.    You signed the application to transfer, correct?

A.    Yes.

Q.    Each the Permit and the Compliance Plan?

A.   Yes.

Q.   If you entered into a contract with someone to purchase a piece of property and the other party refused, later, after you signed the contract, to give you the property because they said they never read the contract, would you agree with that?

MS. KOKS:  Objection, form.

Q    (BY MR. PRITZLAFF)  You can answer if you understand the hypothetical.

A.   Why don't you re-ask it?  I don't understand the question.

Q.   Sure.  If you entered into a contract with someone to buy something and you both signed the contract and that someone then, later, refuses to give you what you contracted to purchase and they say, "Well, I never read it, so I don't need to do it," would you say, "Okay.  Sure.  Fine"?

A.   No, I wouldn't.

Q.   Is it reasonable for you, as the sole decisionmaker of White Lion, to not have read a Compliance Plan that's in White Lion's name until 2013, nine years after the Permit and Compliance Plan were transferred to White Lion?

MS. KOKS:  Objection, form.

A.   If I knew what -- even if I read it, I

wouldn't know what it meant, anyway, because this is not my area of expertise. Now, I have learned in the last year; but prior to that, no.

Q. (BY MR. PRITZLAFF) TCEQ came out at other times to your facility, correct?

A. Yes.

Q. Do you recall when?

A. I think this Mr. Bruce -- whatever his last name is -- Bruce Arnett came out again, to follow up; and I don't know when he came out. But he did come back out.

(Exhibit 14 marked.)

Q (BY MR. PRITZLAFF) I have here a document that's been marked as Exhibit 14, correspondence from TCEQ to Bernard Morello, Registered Agent, White Lion Holdings, LLC, dated June 26th, 2008. Do you want to read through that and let me know when you're finished?

A. Okay.

Q. Do you recall meeting Mr. Elijah Gandee on January 4th, 2008?

A. Yes.

Q. Do you recall what Mr. Gandee looked at when he visited the facility in 2008?

A. I think he did the same thing that Mr. Arnett did. He walked around -- both of us walked around the

facility.

Q.   Did he discuss with you the outstanding violations that are attached to this correspondence?

A.   I don't know if he did at that time.  I think this probably came after his site visit, so.

Q.   The monitoring wells were visible on the site in 2008, correct?

A.   I think so, yes.

Q.   But the system was not operational, correct?

A.   Right.

Q.   Do you recall Mr. Gandee returning to the site?

A.   Yes.

          (Exhibit 15 marked.)

Q    (BY MR. PRITZLAFF)   I have a document that's been marked Exhibit 15, correspondence from TCEQ to Bernard Morello, White Lion Holdings, LLC, dated February 14, 2014.  I'll let you read that document for a moment.

A.   Okay.

Q.   Do you recall this visit by Mr. Gandee of July 29th, 2013?

A.   Yes.

Q.   During this visit, the monitoring wells were all gone, correct?

A.   I don't know if they were or not.

Q.   **Well, let's look on the summary of violations.**

A.   Okay.

Q.   **Number 4.**

A.   Okay.

Q.   **Why don't you read through that a moment and tell me when you're done.**

A.   Okay.

Q.   **Do you dispute anything that's written there in that Section 4 of this letter?**

A.   I wouldn't know either way.  You know, we walked around the whole facility; and, you know, he asked me some questions and proceeded on.

Q.   **Well, let's look at his statement here in Section 4, the second paragraph, third sentence. "Furthermore, none of the above-ground portions of the wells nor any bumper guards nor metal protective casings were observed during the investigation."  Do you dispute that?**

A.   No.

Q.   **So sometime between 2008 and this site inspection in July of 2013, the bumper guards, metal protective casings of the wells, were removed.  Who removed them?**

A.   Well, I think they were damaged; and then once

they get shredded up, you just pick up the pieces. Mowers would hit them constantly.

Q.    **Shredded by what?**

A.    By your shredders.

Q.    **What shredders?**

A.    Mowers, shredders, equipment that shreds the vegetation.

Q.    **Shredded solid steel well casings, is that your testimony, by a lawnmower?**

A.    No, I'm saying plastic, PVC plastic.  There was metal housings around it.  I think it was just sheet metal, I believe, sheet metal housings; and they were rusted off.  Several of them were that way for -- you know, again, I didn't walk around the whole facility back in 2004; but I think several of them were gone or deteriorated back then.

Q.    **Who was responsible at White Lion for ensuring that those monitoring well casings would not be destroyed; anyone other than yourself?**

A.    Yeah -- no, no, there is not.

Q.    **Okay.**

(Exhibit 16 marked.)

Q    **(BY MR. PRITZLAFF)   I have here a document that we've marked as Exhibit 16, which is a series of four photographs.**

A.    Right.

Q.    Do these photographs accurately represent what we're talking about when we refer to monitoring well covers?

A.    Yes, yes.

Q.    And the gauge of the steel is accurate as it's shown, correct?

A.    It's very thin steel; and it's all rusted at the bottom where it hit the soil, yeah.

Q.    And it's --

A.    Just like it's shown here in these pictures. I don't know when these were taken, but that's what they look like. Maybe there's a date on it here. I can't see it on this photo.

(Exhibit 17 marked.)

Q    (BY MR. PRITZLAFF)  In any event, that's a reasonable approximation, representation, of what the monitoring wells generally look like, correct?

A.    Yes.

Q.    I have here now another exhibit marked 17, which is a series of four pictures which I believe are date stamped, generally showing the site around the impoundments, correct?

A.    Yes.

Q.    And none of those protective caps are visible,

correct?

A. No.

Q. You see nice, green, mowed fields, correct?

A. Yeah. If there's not a lot of obstacles, that's correct.

Q. I seem to recall -- and please correct me if I get this testimony wrong -- but I believe you stated at some point earlier that you wanted to make the property more enticing for a prospective purchaser, correct?

A. Presentable so people would be interested in leasing, yes.

Q. Did you use the word "enticing"?

A. I don't know. If I used that term, are you saying?

Q. Did you use that term?

A. I don't know if I used it or not.

Q. In any event, a property without all of those monitoring wells on it is certainly more enticing, is it not?

A. The way these pictures look, yes, I will agree with you. Yes. Comparison of the two, yes, that looks much better.

Q. Isn't it true you wanted those wells removed?

A. No.

Q. Would you, when you were at the site during

any of the 60 to 80 hours a week every week for the last 10 years, observe the mowers?

A.   I have seen hit them and damage them before, but that's kind of an occurrence that happens.  That happens on the buildings, too, anything that's in the way.

Q.   You didn't go out and chop them down yourself?

A.   No.

Q.   Did you direct someone to go chop those down?

A.   No.

Q.   You allowed them to be chopped down, correct?

A.   No.

Q.   You allowed them to not be replaced, correct?

A.   I think we are in the process of doing that now.

Q.   When was the first time you noticed a monitoring well had been -- one of those metal casings has been removed?

A.   I didn't know how many of them were out there, so I couldn't tell you.  I don't know when they were first removed.

Q.   When was the first time you noticed one that you knew where it was was gone?

A.   I really didn't count monitoring wells. That's not something I did.  I seldom actually would go

back in this area, as I had no reason to.

Q.    Did you ever see a monitoring well get destroyed?

A.    Not destroyed but damaged, yes, and chewed up, yes.

Q.    Tell me how --

A.    The well is still there.  It's just the cover is gone.

Q.    Tell me a specific instance of when you observed that.

A.    I don't know a specific instance.  I don't know.

Q.    Who hired the mowers to go out on your site?

A.    I would have hired them.

Q.    Did you enter into a contract with the mowers?

A.    I don't know if I had a contract or it was just a verbal agreement.  I don't know.

Q.    When you say "I," was that you, Mr. Morello?

A.    No.  It was my capacity as White Lion Holding's manager.

Q.    Does anyone else at White Lion make contracting decisions?

A.    Make contracting decisions?  No, I would say not, no.

Q.    In any event, at some point in time, you would

have noticed a monitoring well had been damaged or destroyed by a mower or some other event, correct?

A. Right, the closer they were to the buildings, which I'd look out; but stuff on the other side, I seldom go back there to pits or mounds.

Q. As the sole decisionmaker for White Lion, you allowed White Lion not to replace those wells, correct?

A. My understanding, the wells are still there; just the head or the top is not there. The well is still there.

Q. You, as the sole decisionmaker of White Lion, allowed the wells to not be replaced, correct -- or repaired, correct?

A. They have been -- some have been repaired, yes. I believe there was a new one put in last year; maybe more than one. I'm not sure.

Q. In any event, at the site, the Corrective Action System is in a complete and total state of disrepair, correct?

A. Yes.

Q. And you, as the sole decisionmaker of White Lion, permitted White Lion to not replace or repair that Corrective Action System, correct?

A. If you could, explain a timeframe for me. I mean, that's a broad question. Is it from 2004 to 2013

or 2013 to 2014?

MR. PRITZLAFF: Would you read back my question to him?

I'll object as nonresponsive.

(The material was read as requested.)

A.   But what I'm saying is:  Is there a timeframe you're saying there or what?

Q.   (BY MR. PRITZLAFF)  In 2013, at the time of the TCEQ inspection, you would agree that the Corrective Action System was in a complete and total state of disrepair, correct?

A.   Yes.

Q.   And you, as the sole decisionmaker of White Lion, permitted White Lion to not repair or replace the Corrective Action System, correct?

A.   In 2013, no, that is not correct.

Q.   What about in '12?

A.   No.

Q.   As the sole decisionmaker of White Lion -- let me restart this.

Is it fair to say that in 2004, the Corrective Action System was non-functional?

A.   In 2004, yes, that's correct.

Q.   Is it fair to say from 2004 to the present, the Corrective Action System has not been operational?

A.    Correct.

Q.    **As the sole decisionmaker of White Lion, you have allowed White Lion to keep the Corrective Action System non-functional, correct?**

A.    Yes.

Q.    **As the sole decisionmaker for White Lion, you have permitted White Lion to not repair the Corrective Action System, correct?**

A.    No.  I have corrected it last year.  We've taken action now on it.

Q.    **Is it your testimony that that Corrective Action System today is fully functional?**

A.    No.

Q.    **So as the sole decisionmaker of White Lion, through today, since White Lion has owned the property, you have permitted White Lion to not operate the Corrective Action System by allowing it to be repaired?**

A.    The Corrective Action System is gone.  It's all -- there is no pump and treat.  All that facility is gone, and that's all part of this.  This is still here.  It's underground, but the pump and treat system is gone.

Q.    **So as the sole decisionmaker of White Lion, you have permitted the Corrective Action System to be gone?**

A.    I have permitted it -- no, I have not

permitted it to be gone. It's like you're asking me would I like to have somebody run into my car. No, I would not like to have somebody run into my car.

Q. **But you permitted White Lion, in your capacity as sole decisionmaker, to not repair it, correct?**

A. Based on the circumstance, yes, that's correct; but I'm trying to get it repaired.

MR. PRITZLAFF: Let's take a short break.

THE WITNESS: Okay.

MR. PRITZLAFF: Mary, let's just take about five minutes. Okay?

MS. KOKS: That sounds fine.

MR. PRITZLAFF: I have it at 12:50 -- or 2:50 right now.

MS. KOKS: You mean 3:50?

MR. PRITZLAFF: Is it 3:50?

MS. KOKS: Yeah.

THE WITNESS: Daylight Savings Time.

MR. PRITZLAFF: You're correct.

MS. KOKS: Okay.

(Off the record from 3:51 to 3:59 p.m.)

MR. PRITZLAFF: Mary, are you ready?

MS. KOKS: Yes, sir, I am. Go ahead.

Q **(BY MR. PRITZLAFF) What happened to the wellheads when they were damaged?**

A.    You mean the shredded portion of them?

Q.    **Any portion of the them.**

A.    Thrown in a dumpster.

Q.    **Who did that?**

A.    Probably I did or some temporary help I had.

Q.    **So you would have picked up the pieces and thrown them away yourself?**

A.    Or temporary helpers, clean up after the mowers or whatever.

Q.    **You said yourself that some of these wells were damaged when you purchased the property or shortly thereafter, correct?**

A.    Well, I said I didn't see all the wells because I didn't walk all the way around the back of them or whatever; but, yes, I saw pictures here in 2004 or so where they were kind of deteriorated.

Q.    **And one of your purposes for this property was to clean it up and make it enticing to tenants and/or on a prospective purchaser, correct?**

A.    To lease it out, look respectable and presentable, yes.

Q.    **And if you saw, like on Exhibit 16, a piece of rusted wellhead sticking up out of the ground, that's not very presentable, is it?**

A.    No, it really isn't.

Q.    Would you have directed someone to remove it?

A.    No.

Q.    Would you have directed someone to paint them?

A.    No.

Q.    If it was unpresentable to the property, why would you not have directed its repair?

A.    Well, up until last year, I didn't really know the function of the whole system.

Q.    If you didn't know the function of the whole system, is it reasonable to say you would have directed it to be removed?

A.    No.

Q.    Did you know what those wells shown in Exhibit 16 were before 2013?

A.    They were protective covers for PVC.

Q.    Did you know what the PVC was for?

A.    A well.

Q.    Did you think to inquire why the well was there?

A.    No.  I mean, it's part of this Corrective Action System.

Q.    But you said you didn't know about the Corrective Action System before 2013?

A.    I didn't know the functioning of the Corrective Action System.

Q.    Look at Exhibit 6 again, the Compliance Plan.

A.    Okay.

Q.    Mr. Morello, turn toward the back, States page 564.  It's a map, Attachment A, Sheet 304.

A.    Okay.

MR. PRITZLAFF:  Mary, did you hear that?

MS. KOKS:  Yeah, I'm trying to track that down myself.

MR. PRITZLAFF:  Okay.

Q    (BY MR. PRITZLAFF)  Have you reviewed that picture?

A.    Yeah.  I've reviewed it, uh-huh.

Q.    What does it mean to you?

A.    Well, it's one that Mr. Couch came out and identified different locations of these wells.

Q.    Remind me who Mr. Couch is.

A.    He's an environmental consultant.

Q.    When did you retain Mr. Couch?

A.    Last year.

Q.    Who does he work for?

A.    White Lion Holdings.

Q.    Who hired him?

A.    I did.

Q.    But this map was not prepared by Mr. Couch, correct?

A.   No.

Q.   Do you understand that this map shows the approximate locations of each well associated with the Corrective Action System?

A.   I do now.

Q.   At what point did you obtain that knowledge or understanding of what this map means?

A.   When I read this plan.

Q.   Which you said before was 2013?

A.   That's correct.

Q.   When you look at this map today and you think back to all the time that you've been on this property, which is considerable over the years, do you recall seeing monitoring wells in the approximate locations demonstrated on this map?

A.   Yes, sure.

Q.   But it never occurred to you, as the sole manager and decisionmaker of White Lion, to investigate what those yellow protrusions from the ground pertained to?

A.   Well, I knew it's all part of the system.

Q.   So you knew it was part of the system?

A.   Yes.

Q.   You knew it was part of the system as early as 2004?

A.   Yes.

Q.   **You knew that all of those wells were parts of a network of groundwater monitoring and recovery wells, correct?  As early as 2004 you knew that?**

A.   Well, put it this way:  I didn't know the -- how they operated and how they functioned.  Put it that way.  I knew they were part of an entire system, a network; but I'm not...

Q.   **You may not understand the engineering or the technical science behind the operation of each well --**

A.   Right.

Q.   **-- but you knew, from looking at the site, from the point in time you purchased it to today, that those wells were part of some network of monitoring, correct?**

A.   Yes.

Q.   **And you understood that that network of monitoring related to contaminated groundwater at the facility, right?**

A.   I knew there were issues; but I didn't know anything about them, put it that way.

Q.   **But you knew that the system related somehow to some environmental issue at the site, correct?**

A.   Yes, yes.

Q.   **And, yet, as the sole decisionmaker of White**

Lion, you affirmatively allowed that system to fall into disrepair?

A.   No.   Again, it goes back to intent.   Would I want somebody to purposely hit my vehicle?   No.   Things happen.

Q.   When someone hits your vehicle, the reasonable response is to have it repaired, correct?

A.   Unless it's totalled.

Q.   As the sole decisionmaker for White Lion, it's reasonable if you see a system on your site that's attached to a Compliance Plan, that it should be repaired, correct?

A.   No, I think -- no.   It's all interworked together.

Q.   So it's not reasonable to repair it?

A.   No.   I'm saying it's all interconnected.   It's like, going back to the car analogy, just because you have an engine, it doesn't mean you can drive the car around.   You have to have a transmission.   You have to have a rear end.   You have to have metal around it and seats.   That's what I'm saying.   It was all interconnected.

Q.   Did you ever investigate how much it would have cost to repair or rehabilitate a monitoring well?

A.   No.

Q.   TCEQ has been in contact off and on with you since 2004 when you took possession of the property, correct?

A.   Yes.

Q.   We've talked about that.  It never occurred to you, as the sole decisionmaker of White Lion, to alert TCEQ of the status of those wells?

A.   No.

Q.   It never occurred to you when TCEQ visited your property to look at those wells, to discuss what you needed to do to get the Corrective Action System back into compliance?

A.   Did they discuss it with me?  Again, that's a conversation that was a long time ago.  I don't know the specifics; but you have to understand, there was some different fires I'd been putting out --

Q.   I'll stop you there.

A.   It was important.  I don't mean to say it wasn't important, but there was many other fires there and many other responsibilities at that facility that were on a much higher priority than this.  The system was destroyed in the beginning and the resources were limited and very thin and so a person can only do so much unless you're Exxon Mobil.

Q.   How does White Lion get its funding?

A.    I lend the company money.

Q.    **Are there documents that record the lending?**

A.    No.

Q.    **Does White Lion keep books?**

A.    Yes.

Q.    **Who keeps those books?**

A.    I keep the books.

Q.    **Is anyone else responsible for keeping those books?**

A.    No.

Q.    **You're the only person at White Lion.  So do you keep minutes of decisions made?**

A.    No, I don't even have meetings.

Q.    **Where are the books kept for White Lion?**

A.    In our office -- it isn't really books.  You pay something, and that's it.  How much you have and how much goes out.

Q.    **What other sources of income other than you does White Lion have?**

A.    I'm not a source of income for them at all.

Q.    **What other sources of financial resources -- strike that.**

**From what sources does White Lion receive revenues from?**

A.    Rent, scrap.  That's it.

Q. When did income from rent begin to come into White Lion?

A. I don't have the dates; but it was way after the purchase, in recent years I will say.

Q. After 2008?

A. Yes, I would say so.

Q. After 2009?

A. Yes, I would say so.

Q. After 2010?

A. I don't know. I don't have the exact -- I don't want to say yes because I don't know, but it's in more recent years.

Q. When did revenues from scrap begin to come in to White Lion?

A. Probably in the beginning.

Q. Did the revenue from -- so scrap was the only revenue for White Lion until the lease revenues came in, correct?

A. Yes.

Q. Was the revenue of scrap sufficient to cover White Lion's debts and obligations?

A. No.

Q. Did White Lion receive loaned monies from any other person other than you?

A. No.

Q. Did White Lion receive financing from any other entity other than you?

A. Yes.

Q. Such as financial institutions?

A. Yes.

Q. You previously stated that there was a priority system that you had in your decision-making process for all of the various tasks and steps that needed to be accomplished by White Lion at the property, correct?

A. Yes, yes.

Q. How were those priorities -- what was the decision -- how did you make that decision to prioritize? What factors did you consider?

A. A lot of it had to do with the damages that were done to the facility, and I think I said this before: The buyers kept complaining that I wasn't mitigating my damages. So I would get a call from Mr. Doggett, saying, "Work on this area." This place looked like a mess, a war zone, at the time I acquired it afterwards, after the tenants -- not the tenants -- the buyers and contractors left.

So I had a plan to clean up, and that plan changed dramatically because of the damages. So I was trying to appease the buyer's concern on mitigating

the damages.  And so I was kind of all over the map.
It's a large facility.  I was trying to satisfy this and
satisfy that, and I was moving around that area.

And I know probably what you're going to
say is, "Well, why didn't you appease the State of
Texas?"  It's because I didn't hear from them.  It seem
like it was a big subject; and, obviously, since
testing, the conditions there have improved
dramatically.

Q.    **So the correspondence that TCEQ sent to you in 2004 did not qualify, in your mind, as concern of the State of Texas?**

A.    No, because it was in noncompliance three and a half years before I bought it; and nothing was done.

Q.    **The Notice of Violation that you received in December of 2004, which I've marked as Exhibit 13, did not qualify as a concern --**

A.    First of all, I didn't know --

Q.    **-- of the company?**

A.    -- I didn't understand any of it.  I've said that before.

Q.    **What does the term "Notice of Violation" mean to you?**

A.    Well, I understand that.  I'm not stupid.  I know what a Notice of Violation is.  It's a violation.

But you have to understand that area, and that's not my thing.

Q. In subsequent months, TCEQ corresponded with you further concerning the violations that they observed, correct, through 2005, correct?

A. Did they correspond with me? Yes, we had a dialogue.

Q. And they threatened to bring an enforcement action against you, correct?

A. If that's what the letter says, but I saw those enforcement letters now in the files of the previous owner; and nothing was ever done. I didn't think it was that important, and they were an experienced operator. I'm not.

Q. You're saying one of your decision prongs in your decisionmaking matrix was that the State didn't care. That's just not true, is it?

MS. KOKS: Objection, form.

MR. PRITZLAFF: I'll move on.

Q (BY MR. PRITZLAFF) And then, the State ultimately -- TCEQ referred the matter to the Attorney General's Office, and a civil suit was filed. When the civil suit was filed, at that point in time, did the decisionmaking matrix for you raise any higher?

A. I don't think you're understanding. You're

acting like I intentionally did something. There's so much a human being can do. And that's a very large facility; and under the conditions I was in -- it was not planned to be this way -- but under the conditions I was in, unless you had unlimited resources and unless you had expertise in this area, nobody else could have done any different than what I did. And that is try to make the best of the situation you're in, and that's what I've tried to do all along.

Q. But you've said before that the Corrective Action System is gone.

A. It is.

Q. It does not exist; and that occurred under your watch, correct?

A. The Corrective Action System, the system itself, the functioning -- these are just fixtures here. This is just a pipe that runs into the ground. All the internet work that runs it is all gone. It was damaged at the time that the buyers were there. The equipment was gone. The pipes were cut. Electricity was cut. I've already went over all that. It was destroyed.

Q. And you, as the sole decisionmaker of White Lion, made a conscious decision not to repair and replace the Corrective Action System because it would have cost too much money out of your own pocket,

Mr. Morello, right?

A.   No.

          MS. KOKS:   Objection, form.

A.   No.

Q.   (BY MR. PRITZLAFF)   Who receives distributions from White Lion?

A.   No one.

Q.   Does White Lion file its own tax returns?

A.   Yes.

Q.   No one other than you could have made a decision for White Lion to repair the Corrective Action System, right?

A.   To answer that, my hands were tied.

          MR. PRITZLAFF:   Object as nonresponsive.

          I'll have the question read back to you.

          (The material was read as requested.)

Q    (BY MR. PRITZLAFF)   That's a yes-or-no question.

A.   No.

          MR. PRITZLAFF:   I have no further questions.  Thank you for your time.

          THE WITNESS:   Sure.

          MS. KOKS:   I'll reserve mine to the time of trial.

          MR. PRITZLAFF:   Mary, thank you for

participating by telephone.

MS. KOKS: Oh, I appreciate you allowing me to do so.

(Deposition adjourned at 4:22 p.m.)

--oOo--

112

CAUSE NO. D-1-GV-06-000627

| STATE OF TEXAS, | ) | IN THE DISTRICT COURT |
| Plaintiff, | ) | |
| v. | ) | TRAVIS COUNTY, TEXAS |
| BERNARD MORELLO, | ) | |
| Defendant. | ) | 353RD JUDICIAL DISTRICT |

REPORTER'S CERTIFICATION

ORAL DEPOSITION OF BERNARD MORELLO,

Taken on September 19, 2014

I, Debbie D. Cunningham, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

That the witness, BERNARD MORELLO, was duly sworn by me, and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on _____ October 2. 2014 _____ to the witness or to the attorney for the witness for examination, signature, and return to me by _____ October 22. 2014;

That the amount of examination time used by each party at the deposition is as follows:

**BY MR. PRITZLAFF:**      **02:51:32**

**BY MS. KOKS:**            00:00:00

**That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:**

COUNSEL FOR PLAINTIFF:

> OFFICE OF THE ATTORNEY GENERAL OF TEXAS
> Environmental Protection Division
> P.O. Box 12548
> Austin, Texas  78711-2548
> (T) 512.475.4138 | (F) 512.320.0911
>          By:  Craig Pritzlaff, Esq.
>          craig.pritzlaff@texasattorneygeneral.gov

COUNSEL FOR DEFENDANT:          (VIA SPEAKERPHONE)

> MUNSCH, HARDT, KOPF & HARR, P.C.
> 700 Milam Street, Suite 2700
> Houston, Texas  77002-2806
> (T) 713.222.4030 | (F) 713.222.5830
>          By:  Mary W. Koks, Esq.
>          mkoks@munsch.com

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after

they have occurred.

Certified to by me this day, September 29, 2014.

*Debbie D. Cunningham*
Debbie D. Cunningham, CSR
Texas CSR 2065
Expiration: 12/31/2014
INTEGRITY LEGAL SUPPORT SOLUTIONS
3100 West Slaughter Lane, Suite 101
Austin, Texas 78748
www.integrity-texas.com
512-320-8690; FIRM # 528

FURTHER CERTIFICATION UNDER RULE 203, TRCP

The original deposition/errata sheet was / was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to MR. PRITZLAFF, Esq., Custodial Attorney;

That $_____ is the deposition officer's charges to the Plaintiff for preparing the original deposition transcript and copies of exhibits, if any;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me on _____.


Debbie D. Cunningham, CSR
Texas CSR 2065
Expiration: 12/31/2014
INTEGRITY LEGAL SUPPORT SOLUTIONS
3100 West Slaughter Lane, Suite 101
Austin, Texas 78748
www.integrity-texas.com
512-320-8690; FIRM # 528

# EXHIBIT B



## Texas Natural Resource Conservation Commission

Austin, Texas

COMPLIANCE PLAN FOR INDUSTRIAL
SOLID WASTE MANAGEMENT SITE
issued under provisions of TEXAS
HEALTH AND SAFETY CODE ANN.
Chapter 361 and Chapter 26 of the Texas
Water Code

DOCKET  1999-1208-IHW

COMPLIANCE PLAN NO. CP-50129
EPA I.D. NO. TXD000449397
SWR NO. 30008

This Compliance Plan is issued in
conjunction with Permit No. HW-50129-001

This Compliance Plan supersedes and
replaces Compliance Plan No. CP-50129
issued March 15, 1995

First Issuance Date January 12, 1988

Name of Permittee:

Vision Metals, Inc.
P.O. Box 952 (2010 Spur 529)
Rosenburg, Texas 77471

Site Owner:

Vision Metals, Inc.
24 Lloyd Wright Drive
P.O. Box 37
Ann Arbor, Michigan 48106

Registered Agent for Service:

David Wellhofer, Chief Engineer
Vision Metals, Inc.
P.O. Box 952
Rosenburg, Texas 77471

Classification of Site:

Hazardous industrial solid waste post-
closure care

The Permittee is required to conduct the Corrective Action and Ground-Water Monitoring Programs in accordance with limitations, requirements, and other conditions set forth herein. All references herein refer to the Compliance Plan unless the Permit is specifically referenced. This Compliance Plan is issued subject to the rules and other Orders of the Commission and laws of the State of Texas. This Compliance Plan does not exempt the Permittee from compliance with the Texas Clean Air Act.

This Compliance Plan remains in effect until amended or revoked by the Commission. This Compliance Plan will be reviewed upon expiration of the authorization to store and process industrial solid waste pursuant to Permit No. HW-50129-001 and modified as necessary to assure compliance with 30 TAC Chapters 305 and 335.

ISSUED DATE: NOV 16 1999

For The Commission

STATE OF TEXAS
COUNTY OF TRAVIS

I hereby certify that this is a true and correct copy of a Texas Commission on Environmental Quality (TCEQ) document, which is filed in the Records of the Commission Given under my hand and the seal of office.

MAY 16 2007

Rodney J. Peschel, Alternate Custodian of Records

EXHIBIT

STATE - 538

## TABLE OF CONTENTS

**SECTIONS**

Page

I.      Size and Location of Facility  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Corrective Action Systems  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.    General Design, Construction, and Operation
                Requirements  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     Corrective Action Objectives and the
                Ground-Water Protection Standard  . . . . . . . . . . . . . . . . . . . . . . . . . . 7

V.      Corrective Action Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.     Ground-Water Monitoring Program . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

VII.    Response and Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

VIII.   Corrective Action for Solid Waste Management Units  . . . . . . . . . . . . . . . . . . . . . . . 16

IX.     Stabilization/Interim Corrective Measures Program . . . . . . . . . . . . . . . . . . . . . . . . . 18

X.      Compliance Schedule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

XI.     Financial Assurance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

XII.    General Provisions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

XIII.   Force Majeure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**TABLES**

I.      Table of Hazardous and Solid Waste Constituents and Concentration Limits for the
        Ground-Water Protection Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.     Designation of Wells by Function . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

III.    Compliance Period  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**ATTACHMENTS**

A.      Facility Site Maps
        Sheet 1 of 4 - Facility Site Location Map
        Sheet 2 of 4 - Projected Hydrogeologic Cross-Section Showing Zone 1 and Zone 2
        Sheet 3 of 4 - Monitoring Well Location Map
        Sheet 4 of 4 - SWMU Location Map

B.      Well Design and Construction Specifications

I.    SIZE AND LOCATION OF FACILITY

A.    The industrial solid waste management facility is located on an 82.3 acre tract of land in Fort Bend County approximately 1 mile southwest of Rosenburg, Texas as depicted in Attachment A, Sheet 1. The facility is in the drainage area of Segment No. 2102 of the Brazos River Basin (North Latitude 29°32'50", West Longitude 95°50'42").

The term "Uppermost Aquifer" as referenced in this Compliance Plan refers to the Zone 1 "Shallow Zone Sand" unit that ranges in elevation from approximately 68 to 72 feet above Mean Sea Level (MSL) and Zone 2 "Deep Zone Sand" unit in which the potentiometric surface ranges in elevation from approximately 43 to 44 feet above MSL. The two zones are further defined in Attachment A, Sheet 2.

B.    The Compliance Plan is specific to five closed units designated as Waste Management Area I and depicted in Attachment A, Sheet 3, for which the ground-water Corrective Action Program applies pursuant to 30 TAC §335.166 for release(s) from RCRA-regulated units. Waste Management Area I consists of the following five closed units with a total surface area of 1.96 acres:

1.        Effluent Holding Pond (NOR No. 008);

2.        Primary Settling Pond (NOR No. 009);

3.        Secondary Settling Pond (NOR No. 010);

4.        Polishing Lagoon (NOR No. 011); and,

5.        Drying Beds (NOR No. 002).

C.    The Compliance Plan is specific to the Solid Waste Management Units (SWMUs) and/ or Areas of Concern (AOCs) listed in Section VIII and depicted in Attachment A, Sheet 4 for which investigation and necessary corrective action applies pursuant to 30 TAC 335.167.

D.    The Compliance Plan applies to any SWMU and/or AOC discovered subsequent to issuance of this Compliance Plan. The Permittee shall notify the Executive Director within fifteen (15) days of such discovery. Within sixty (60) days of discovering a SWMU or AOC, the Permittee shall submit an RCRA Facility Assessment (RFA) for that unit which shall be based on U.S. EPA RCRA Facility Assessment Guidance, October 1986, NTIS PB 87-107769. The purpose of an RFA is to identify releases or potential releases of hazardous waste or hazardous constituents from SWMUs or AOCs that may require corrective action. If the RFA indicates that there is a release or a potential for release that warrants further investigation, the Permittee shall conduct an investigation and necessary corrective action in accordance with Section VIII of the Compliance Plan.

E.    All dates in this Compliance Plan shall be referenced to the date of issuance of this Compliance Plan by the Texas Natural Resource Conservation Commission unless otherwise specified.

II.     CORRECTIVE ACTION SYSTEMS - Components and Functions Authorized

The Permittee is authorized to install and operate the following Corrective Action System components subject to the limitations contained herein. The Corrective Action System shall consist of the following components:

A.     Ground-water monitoring system shall at a minimum consist of the following categories of wells to monitor ground-water quality:

      1.     Background Well(s) unaffected by the operation of the facility; and,

      2.     Point of Compliance Wells to demonstrate compliance with the Ground-Water Protection Standard.

B.     The Permittee is authorized to install, operate and maintain the following additional corrective action system wells to monitor ground-water quality and hydrogeological conditions of the aquifer:

      1.     Corrective Action Observation Wells to evaluate ground-water flow direction and gradient in the Uppermost Aquifer and evaluate the effectiveness of the remediation program; and,

      2.     Corrective Action System Wells to remediate and/or contain contaminated ground water.

C.     Ground-water Corrective Action System to effect withdrawal, treatment, and/or containment of contaminated ground water by means of recovery wells, interceptor trenches, bioremediation, air sparging and/or another alternate Corrective Action System design. Any alternate Corrective Action System designs proposed by the Permittee subsequent to issuance of this Compliance Plan that are equivalent to or exceed the performance of the Corrective Action Systems approved herein shall become part of the Compliance Plan upon approval by the Executive Director. The type of Corrective Action System in operation at the facility and an evaluation of system performance shall be reported in accordance with Section VII.B.2.

D.     Collection and conveyance system to store recovered ground water prior to disposal at authorized facilities. If the recovered ground water is characteristically hazardous and/or is contaminated with listed hazardous waste and the collection system does not meet the wastewater treatment unit exemption under 30 TAC §335.2(f) and §335.41(d), the collection system shall comply with the following regulations: 1) If the contaminated ground water is stored without a permit or interim status for less than ninety (90) days, then the container and tank collection systems shall comply with provisions of 30 TAC §335.69(a)(1) / 40 CFR Part 265 Subparts I and J; 2) If the contaminated ground water is stored for more than ninety (90) days, then the container and tank collection system shall comply with the provisions of 30 TAC §335.152(a)(7) & (8) / 40 CFR Part 264 Subparts I and J. The collection and conveyance system shall consist of the following components:

      1.     A ground-water corrective action system;

2.      A ground-water storage system; and,

3.      Appurtenances for the collection and conveyance of recovered contaminated ground water.

E.   Treatment system to reduce the concentration of hazardous constituents to the concentration specified in Table I in contaminated ground water by means of biological, physical, and chemical treatment processes.

F.   Ground-water containment system to inhibit contaminated ground water above Table I concentration limits to migrate beyond the influence of the corrective action system.

III.   GENERAL DESIGN, CONSTRUCTION, AND OPERATION REQUIREMENTS

A.   All plans submitted with the Compliance Plan Application dated November 19, 1997 concerning the design, construction, and operation of the authorized components of the Corrective Action and Ground-Water Monitoring Programs are approved. All plans must comply with this Compliance Plan and Texas Natural Resource Conservation Commission Rules. Any alternate Corrective Action System designs proposed by the Permittee subsequent to issuance of this Compliance Plan that are equivalent to or exceed the performance of the Corrective Action Systems approved herein shall become part of the Compliance Plan upon approval by the Executive Director.

B.   The following handling methods are authorized for recovered ground water having concentrations of hazardous constituents exceeding the Ground-Water Protection Standard:

1.      Treatment through an on-site wastewater treatment system and discharge via a permitted outfall in compliance with a current industrial wastewater discharge permit;

2.      Treatment of recovered ground water by means of air stripping and carbon absorption. The air stripper shall be maintained in compliance with applicable air quality regulations;

3.      Disposal at other authorized on-site facility or permitted off-site facility; and,

4.      Any other treatment methods approved by the Executive Director.

The method(s) utilized for handling recovered ground water shall be reported in accordance with Section VII.B.2.

C.   The Permittee shall maintain a list of disposal methods of all recovered contaminated ground water pursuant to this Compliance Plan, including water purged from wells during sampling at each well, and make it available for inspection upon request.

D.   Well Construction, Installation, Certification, Abandonment and Plugging Procedures

1. For all wells to be constructed after issuance of this Compliance Plan, the Permittee shall submit to the Executive Director the proposed well location and construction diagram for approval at least thirty (30) days in advance of the anticipated date of installation or in accordance with an approved schedule for installation. These requirements may be met through submittal of a work plan by the Permittee and subsequent approval by the Executive Director. Well installation shall commence upon written approval of the Executive Director.

2. The wells shall be constructed and maintained so ground-water samples are representative of the aquifer's water quality. A record of drilling and construction details demonstrating compliance with the terms of this Section of this Compliance Plan shall be prepared in accordance with Attachment B. Wells constructed prior to issuance of this Compliance Plan may be utilized as ground-water monitoring wells if they meet the standards of Attachment B or are otherwise authorized by the compliance plan.

3. The Permittee shall submit certification of well installation in accordance with Attachment B within sixty (60) days of installation. If the Permittee or the Executive Director determines that the well integrity or materials of construction or well placement no longer enable the well to yield samples representative of ground-water quality, then the Permittee shall replace the well.

4. Unless the Permittee proposes an alternate well design that will result in wells of equivalent performance and specifications, each well installed after issuance of this Compliance Plan shall follow the design specifications contained in Attachment B of this Compliance Plan.

5. Prior to installation of a Point of Compliance or Background replacement well, the Permittee shall submit to the Executive Director for approval, the replacement well specifications and an explanation of why the well is being replaced. For any Point of Compliance or Background well to be considered as a replacement well and not as a new well, the well shall have no design changes from the well being replaced. The well shall be drilled within fifteen (15) feet of the well being replaced unless an alternate location is authorized by the Executive Director. The Permittee shall submit a replacement well certification to the Executive Director in accordance with this Section and Attachment B.

6. Plugging and abandonment of a well, which is part of the monitoring and corrective action system of this Compliance Plan, shall commence upon written approval of the Executive Director. The well shall be plugged and abandoned in accordance with Attachment B.

E. The Permittee shall not install or maintain any drinking water or supply wells within plumes of ground-water contamination at the facility.

IV.  CORRECTIVE ACTION OBJECTIVES AND THE GROUND-WATER PROTECTION STANDARD

Corrective Action Objectives

A.  The Ground-Water Protection Standard defines the objective of ground-water quality restoration, with respect to hazardous constituents, which is to be achieved at the Point of Compliance and beyond in accordance with Provision V.A by operation of the Corrective Action Program at this facility.

B.  Point of Compliance is designated in Attachment A, Sheet 3 and is further defined for purposes of this Compliance Plan by Table II, which identifies Point of Compliance Wells for which ground-water monitoring procedures will apply (Section VI).

C.  Hazardous constituents detected in ground water are specified in Table I, Column A. Other constituents of concern are specified in Table I, Column C.

D.  Concentration limits are specified in Table I, Column B as non-detectable values as determined by analytical method Practical Quantitation Limits (PQLs) based on Appendix IX of 40 Code of Federal Regulations (CFR) Part 264, Maximum Concentration of Constituents (MCCs) as listed in Table 1 of 30 TAC §335.160, and/or Alternate Concentration Limits (ACLs) in accordance with 30 TAC §335.160(b). These values shall be utilized as concentration limits of the Ground-Water Protection Standard (GWPS) and shall be the values for statistical comparisons unless Table I is amended in accordance with current guidance and regulations to authorize Alternate Concentration Limits (ACL) as defined in 30 TAC §335.160 (b) or background values in accordance with Section VI.A of this Compliance Plan or any other accepted levels as they are promulgated by the Texas Natural Resource Conservation Commission or the Environmental Protection Agency. The Executive Director or the Permittee may request to replace concentration limits through a modification or amendment to this Compliance Plan in accordance with 30 TAC §305 Subchapter D. An application to modify/amend the concentration limits is required to be submitted if the criteria (i.e. risk-based demonstration, site-specific conditions, and/or off-site land use) originally used to establish the GWPS has changed and the current GWPS is not protective of human health and the environment.

E.  Compliance Period for each unit is specified in Table III.

F.  Ground-Water Protection Standard Achieved

    1.  Achievement of the Ground-Water Protection Standard in accordance with Section V.A is defined by the results of the data evaluation of Section VI.D wherein the concentrations of hazardous constituents have been reduced by the Corrective Action Program (Section V) to concentrations that do not exhibit an increase when directly compared to the concentration limits of Table I or a statistically significant increase if statistical procedures are used.

2.        If the Ground-Water Protection Standard is achieved at RCRA-regulated units in accordance with Section V.A in the corrective action area during the Compliance Period, the Permittee may apply to modify or amend this Compliance Plan to revise the Corrective Action Program to the extent necessary to demonstrate by means of the Ground-Water Monitoring Program that the Ground-Water Protection Standard will not be exceeded during the remainder of the Compliance Period.

3.        If the Ground-Water Protection Standard is not achieved at RCRA-regulated units in accordance with Section V.A in the corrective action area during the Compliance Period, the Corrective Action Program must continue until the Ground-Water Protection Standard has not been exceeded in all wells of Table II.A, B, and C for that corrective action area for three (3) consecutive years.

4.        If the Ground-Water Protection Standards established in this Compliance Plan for the RCRA-regulated unit have not been exceeded for three (3) consecutive years at the end of the Compliance Period, then the Permittee must, within ninety (90) days, submit an application for a Compliance Plan/Permit modification or amendment to establish a Compliance Monitoring Program or a Detection Monitoring Program for the aquifer(s) during the remaining portion of the 30-year post-closure care period in accordance with 40 CFR Part 264.117. If the 30-year post-closure care period has expired, the Permittee may request ground-water monitoring for that RCRA-regulated unit be discontinued. Until approval of the request, the Permittee shall continue ground-water monitoring under current Compliance Plan provisions for each RCRA-regulated unit.

## V.   CORRECTIVE ACTION PROGRAM

The Corrective Action Program shall remediate, recover, and/or contain contaminated ground water from the Uppermost Aquifer. The Corrective Action Program shall consist of the system components of Section II, to be operated according to the specifications of this Compliance Plan. The Permittee shall conduct the Corrective Action Program until the performance standards of Section V.A are met. The Permittee shall initiate the Corrective Action Program immediately upon issuance of this Compliance Plan, except where other specific response deadlines may apply.

A.   Performance Standard

The Permittee shall conduct the Corrective Action Program to remedy the quality of ground water by removing or treating in place the hazardous constituents so as to achieve the concentration limits specified in the Ground-Water Protection Standard of Section IV of this Compliance Plan in accordance with the following:

1.        At the Point of Compliance and between the Point of Compliance and the downgradient facility property line;

2.      Beyond the facility boundary where necessary to protect human health and the environment, unless the Permittee demonstrates to the satisfaction of the Executive Director that, despite the Permittee's best efforts, the necessary permission from the property owner(s) was not received to undertake such action. The Permittee is not relieved of all responsibility to clean up a release that has migrated beyond the facility boundary where off-site access is denied;

3.      Operate the Corrective Action System so as to intercept, contain and/or treat the area of contamination in the Uppermost Aquifer unless the system is under repair or maintenance; and,

4.      Recommend changes to the configuration of the Corrective Action System at any time that it is determined that the contamination present in the Uppermost Aquifer is not being effectively contained and/or remediated.

B.      The Corrective Action Program shall consist of the system components of Section II to be operated according to the plans and specifications as approved in Section III.A and the specifications of this Compliance Plan.

1.      If ground-water recovery wells are utilized in the Corrective Action System, the flow rate at each Recovery Well shall be set and recorded once a week. This weekly flow rate data shall be used to calculate a semiannual total flow which shall be reported in accordance with Section VII.B.2.f of this Compliance Plan.

2.      All Corrective Action System components shall be maintained in a functional and leak-free condition. All above ground collection system pipes shall be inspected weekly. In addition, the area surrounding the wells shall be inspected weekly for wet spots indicating leaks in buried sections of the collection system. If a leak is detected in any part of the collection system, it must be reported within twenty-four (24) hours to the Texas Natural Resource Conservation Commission Region 12 Office and action must be taken immediately to stop the leak and resolve the problem.

3.      The Permittee shall notify the Executive Director of any scheduled or non-scheduled periods of Corrective Action System shutdown, Corrective Action System malfunction, or treatment system shutdown for maintenance lasting more than thirty (30) days. The Permittee shall notify the Executive Director in writing no later than seven (7) days following the date the Permittee determines that the shutdown will last more than thirty (30) days. All shutdowns and malfunctions, irrespective of duration, shall be recorded in the facility's inspection log.

VI.     GROUND-WATER MONITORING PROGRAM

The Permittee shall install, operate and maintain the Ground-Water Monitoring System to evaluate the effectiveness of the Corrective Action Program for those units undergoing remediation. The

monitoring program for Corrective Action shall include Background Wells and Point of Compliance Wells of Table II and other wells as necessary which have been approved by the Executive Director.

A.  Waste Management Area Specific Background Ground-Water Quality

The Permittee may submit to the Executive Director for review and approval a plan to determine waste management area specific background values of the naturally-occurring hazardous constituents of Table I in lieu of the concentration limits given in this Table. The plan shall include appropriate background well locations and screened intervals, well sampling schedules, and methodology for determining and expressing background values in a form appropriate for the statistical evaluation of the monitoring results. Once background values have been established, the Permittee shall submit a modification or amendment request to the Executive Director in accordance with 30 TAC §305 Subchapter D to replace the concentration limits of Table I with the background values.

B.  Sampling and Analysis Plan

1.  Wells shall be sampled according to the Sampling and Analysis Plan dated July 20, 1994. The Sampling and Analysis Plan is hereby incorporated into the Compliance Plan by reference as if set out fully herein. The Permittee or the Executive Director shall propose modifications as necessary to the Sampling and Analysis Plan. Any and all revisions to the plan shall become conditions of this Compliance Plan at the beginning of the first quarter following approval by the Executive Director.

2.  An up-to-date and approved Sampling and Analysis Plan shall be maintained at the facility and made available for inspection upon request.

3.  The collected samples shall be analyzed in accordance with the current edition of U.S. EPA Publication SW-846, Test Methods for Evaluating Solid Waste and American Society for Testing and Materials (ASTM) Standard Test Methods or any other methods accepted by the TNRCC. Ground-water analyses required by this Compliance Plan shall utilize laboratory methods which are capable of measuring the concentration of each hazardous constituent at a concentration equal to or less than the corresponding value specified in Table I, Column B except when matrix interference prevents achievement of that level.

C.  Sampling and Analysis Frequencies and Parameters

1.  Frequencies of sampling are defined below:

a.  "Month" shall be a calendar month;

b.  "Quarter" shall be based on divisions of the calendar year (i.e., January through March, April through June, July through September, October through December);

c.     "Semiannual" shall be based on divisions of the calendar year (i.e., January through June, July through December) and consist of two consecutive quarters;

d.     "Annual" or "Year" shall be four consecutive quarters, beginning with the first quarter. Years shall be designated consecutively, beginning with the "first year", "second year", etc; and,

e.     "Calendar year" shall be based on divisions of the calendar (i.e. January through December).

2.     Sampling of wells shall commence during the first complete quarter after issuance of this Compliance Plan. Thereafter, samples shall be collected on a semiannual basis during the first thirty (30) days of each first and third quarter. Data evaluations shall be completed within sixty (60) days of collection of the last sample date unless QA/QC procedures show that data is unacceptable and reanalyses or resampling must be performed. In such cases, the Executive Director will be notified as soon as it becomes apparent that the 60-day time limit will not be met.

3.     In the first and subsequent years of ground-water monitoring, the wells shall be sampled and analyzed according to the following schedules:

a.     Corrective Action Monitoring

i.     Each Background Well, Point of Compliance Well, and Corrective Action System Well of Table II shall be sampled and analyzed semiannually for the constituents of Table I, Columns A and C until the completion of the Compliance Period, or until the achievement of the Ground-Water Protection Standards in accordance with Section IV.F.

ii.    Each Background Well, Point of Compliance Well and Corrective Action System Well shall continue to be sampled according to Section VI.C until any changes to these groups of wells are approved by the Executive Director pursuant to Section II.C.

iii.   Each Point of Compliance (POC) Well of Table II shall be sampled for the constituents of Table I according to Section VI.C until analytical results satisfy the Ground-Water Protection Standards of Table I for all Wells of that area for two consecutive sampling events. All POC Wells shall then be sampled and analyzed semiannually for the constituents of Table I until all constituents of Table I are below the Ground-Water Protection Standards for all Wells of that area in accordance with Section IV.F.

iv.     If the Ground-Water Protection Standards are achieved in all wells (Background wells, POC wells, and Corrective Action System wells) in accordance with Section IV.F.1, then the Permittee may apply to modify or amend the Compliance Plan according to Section IV.F.2., or Section IV.F.4.

4.      Field Determination Requirements - All Wells Specified in Section VII.B.2.c

a.      Water level measurements relative to Mean Sea Level shall be measured to within 0.01 ft and shall be performed during each sampling event effective immediately with issuance of this Compliance Plan. Measurements shall be taken in all monitor wells specified in Table II of this Compliance Plan.

b.      Field determinations of pH, Temperature, and Specific Conductivity.

c.      Field observations including descriptions of appearance (clarity, color, etc.) shall be recorded semiannually for all Background, Point of Compliance, and Corrective Action System Wells.

d.      The total depth of each well of Table II, which is not equipped with a dedicated pump, shall be measured during each sampling event. Total depth of each well of Table II, which is equipped with a dedicated pump, shall be measured when: 1) pumps are removed for maintenance; or 2) the ground-water production rate of the dedicated pump decreases by 25% from the initial production rate when the pump was installed. The measured total depth shall be compared to the total depth recorded on the well construction log. Should a comparison of the measured and the recorded total depth reveal that greater than 20% of the well screen has been silted in, the Permittee shall perform such actions necessary (redevelopment, replacement, etc.) to enable the well to function properly.

e.      All wells specified in Section VII.B.2.c and specified in Table II of this Compliance Plan shall be inspected during each sampling event in accordance with specifications in the Sampling and Analysis Plan. Repairs or a proposal for replacement for any affected well shall be performed within ninety (90) days of the routine sampling event inspection which identified the problem well.

D.    Data Evaluation Procedures

Data evaluation in accordance with this Section shall be performed within sixty (60) days of sample collection for all wells of Table II.A, B, and C for the duration of the Compliance Monitoring and Corrective Action Monitoring programs. When evaluating the monitoring results of each well pursuant to Section VI for the constituents of Table I the Permittee shall either:

1.          Directly compare the value of each constituent to the respective concentration limit of Table I (Column B) and determine if it is less than, equal to, or greater than the concentration limit. If the values for all the constituents are less than or equal to the respective concentration limits, that well shall be considered compliant with the Ground-Water Protection Standard for the sampling event. If one or more constituent value is greater than the respective concentration limit, that well shall be considered non-compliant with the Ground-Water Protection Standard for the sampling event; or,

2.          Compare the value of each constituent to its respective concentration limit of Table I using one of the following procedures:

      a.    The Confidence Interval Procedure for the mean concentration based on a normal, log-normal, or non-parametric distribution. The 95 percent confidence coefficient of the t-distribution will be used in constructing the confidence interval (Section 6.2.1 of Statistical Analysis of Ground-Water Monitoring Data at RCRA Facilities - Interim Final Guidance, U.S. EPA, April 1989) and the Statistical Analysis of Ground-Water Monitoring Data at RCRA Facilities - Addendum to Interim Final Guidance (July 1992). The confidence interval upper limit for each constituent shall be compared with the corresponding concentration limit in Table I or Table II. To be considered in compliance, the confidence interval upper limit for a well in question must not exceed the tabled concentration limit. A confidence interval upper limit above the tabled concentration limit shall be considered as evidence of statistically significant contamination; or,

      b.    An alternative statistical method proposed by the Permittee and approved by the TNRCC. Any proposed alternative method must be appropriate with respect to distributional assumptions and must provide reasonable control of both false positive and false negative error rates.

VII   RESPONSE AND REPORTING

A.    Corrective Action Monitoring

1.            If the Permittee or the Executive Director determines that the Corrective Action Program required by this Compliance Plan no longer satisfies the requirements of 30 TAC §335.166 or §335.167, the Permittee must, within ninety (90) days of either the Permittee's determination or Executive Director's notification, submit an application for a Compliance Plan modification or amendment to make any appropriate changes to the Corrective Action Program which will satisfy the regulations.

2.            If the Executive Director determines that the lateral or vertical extent of ground-water contamination is not delineated, the Permittee must, within thirty (30) days of the date of the Executive Director's notification, initiate an investigation to determine the extent of the contamination based on the Practical Quantitation Limits (PQLs) of 40 CFR Part 264 Appendix IX.

B.     Reporting Requirements

1.            Water table maps shall be prepared from the ground-water data collected pursuant to Section VI and shall be evaluated by the Permittee with regard to the following parameters:

         a.     Development and maintenance of a cone of depression during operation of the system;

         b.     Directions of ground-water flow;

         c.     Effectiveness of hydrodynamic control of the contaminated zone during operation; and,

         d.     Estimation of the rate and direction of ground-water contamination migration.

2.            The Permittee shall submit a report to each recipient listed in Section XII.C by January 21 and July 21 of each year and shall include the following information determined since the previously submitted report, if those items are applicable:

         a.     The Corrective Action System(s) authorized under Section II.C in operation during the reporting period and a narrative summary of the evaluations made in accordance with Sections V, VI, and VII of this Compliance Plan for the preceding six (6) month period. These periods shall be January 1 through June 30 and July 1 through December 31;

         b.     The method(s) utilized for management of recovered/purged ground water shall be identified in accordance with Section III.B;

         c.     An updated table and map of all monitoring and corrective action system wells. The wells to be sampled shall be those wells

proposed in the Compliance Plan Application dated November 19, 1997 and any changes subsequently approved by the Executive Director pursuant to Section II.C. Provide in chronological order, a list of those wells which have been added to, or deleted from, the ground-water monitoring and remediation systems since original issuance of the compliance plan. Include the date of TNRCC approval for each entry;

d.    The results of the chemical analyses, submitted in a tabulated format acceptable to the Executive Director which clearly indicates each parameter that exceeds the Ground-Water Protection Standard. Copies of the original laboratory report for chemical analyses showing detection limits and quality control and quality assurance data shall be provided if requested by the Executive Director;.

e.    Tabulation of all water level elevations required in Section VI.C.4.a, depth to water measurements, and total depth of well measurements collected since the data that was submitted in the previous semiannual report;

f.    Potentiometric surface maps showing the elevation of the water table at the time of sampling, delineation of the radius of influence of the Corrective Action System, and the direction of ground-water flow gradients outside any radius of influence;

g.    Quarterly tabulations of quantities of recovered ground-water, and graphs of monthly recorded flow rates versus time for the Recovery Wells during each semiannual period.

h.    Tabulation of all data evaluation results pursuant to Section VI.D and status of each well with regard to compliance with the Corrective Action objectives and compliance with the Ground-Water Protection Standards;

i.    Maps of the contaminated area depicting concentrations of Table I constituents exceeding the GWPS as isopleth contours or discrete concentrations if isopleth contours cannot be inferred;

j.    An updated schedule summary as required by Section X;

k.    Summary of any changes made to the monitoring/corrective action program and a summary of well inspections, repairs, and any operational difficulties;

l.    A table of all modifications and amendments made to this Compliance Plan with their corresponding approval dates by the Executive Director or the Commission and a brief description of each action;

m.    Corrective Measures Implementation (CMI) Report to be submitted in accordance with Section VIII.F, if necessary;

n.    Tabulation of well casing elevations in accordance with Attachment B No. 16;

o.    Recommendation for any changes; and,

p.    Any other items requested by the Executive Director.

C.    The Permittee shall enter all monitoring, testing, analytical, and inspection data obtained or prepared pursuant to the requirements of this Compliance Plan, including graphs and drawings, in the operating record at the facility. The operating record at the facility shall be made available for review by the staff of the Texas Natural Resource Conservation Commission upon request.

## VIII.   CORRECTIVE ACTION FOR SOLID WASTE MANAGEMENT UNITS

A.    Corrective Action Obligations

The Permittee shall conduct corrective action as necessary to protect human health and the environment for all releases of hazardous waste and hazardous constituents from any Solid Waste Management Unit (SWMU) and/or AOC. The Permittee shall fulfill this obligation by conducting Corrective Action under 30 TAC 335.167, which consists of the RCRA Facility Investigation (RFI), and if necessary, Stabilization/Interim Corrective Measures, Baseline Risk Assessment (BLRA)/Corrective Measures Study (CMS) and Corrective Measures Implementation (CMI). The Permittee shall conduct an RFI to determine whether hazardous waste or hazardous constituents listed in 40 CFR Part 261, Appendix VIII and/or 40 CFR Part 264, Appendix IX have been released into the environment. If it is determined that hazardous waste or hazardous constituents have been or are being released into the environment, then the Permittee may be required to conduct Stabilization/Interim Corrective Measures, a BLRA/CMS and/or a CMI which is protective of human health and the environment.

Upon Executive Director's review of Corrective Action obligations, the Permittee may be required to perform any or all of the following:

1.    Conduct investigation(s);

2.    Provide additional information;

3.    Investigate additional SWMU(s) and/or AOC(s); and/or,

4.        Submit an application for a modification/amendment to a Compliance Plan to implement corrective measures.

Any additional requirements must be completed within the time frame(s) specified by the Executive Director.

B.    SWMU(s) and/or AOC(s) Required for Investigation

The Permittee shall conduct an RFI for the following SWMUs and/or AOCs in accordance with Section I.C and for any new SWMUs and/or AOCs discovered after the issuance of this Compliance Plan in accordance with Section I.D:

1.        Land Treatment Unit (NOR No. 03).

C.    Variance From Investigation

The Permittee may elect to certify that no hazardous waste or hazardous constituents listed in 40 CFR Part 261, Appendix VIII and/or 40 CFR Part 264, Appendix IX are or never have been present/managed in a SWMU and/or AOC listed in Section VIII.B and/or discovered under Section I.D in lieu of performing the investigation required in Sections VIII.A and VIII.D, provided that confirming data is submitted for the current and past waste(s) managed in the respective unit. The Permittee shall submit such information and certification(s) on a unit-by-unit basis in the time frame required in Section VIII.D for review and approval by the Executive Director of the TNRCC. If the Permittee cannot demonstrate and certify that hazardous waste or hazardous constituents are not or were not present in a particular unit, the investigation required in Sections VIII.A and VIII.D shall be performed for the unit.

D.    RCRA Facility Investigation (RFI)

Within sixty (60) days from the date of issuance of this Compliance Plan and/or within sixty (60) days of approval of the RFA Report which recommends further investigation of a SWMU and/or AOC in accordance with Section I.D, the Permittee shall submit a schedule for completion of the RFI(s) for the SWMUs and/or AOCs listed in Section VIII.B and/or discovered under Section I.D to the Executive Director for review and approval. The Permittee shall initiate the investigations in accordance with the approved schedule and shall address all of the items for RFI Workplan and RFI Report contained in the U.S. EPA publication EPA/520-R-94-004, OSWER Directive 9902.3-2A, RCRA Corrective Action Plan (Final), May 1994. If the Permittee elects to use an alternate but equivalent investigation approach, Executive Director's approval of an RFI Workplan will be required before initiation of investigation(s). The results of the RFI must be submitted to the Executive Director for approval in the form of an RFI Report within the time frame established in the approved schedule. The RFI Report must appropriately document results of the investigation(s). The Report shall be considered complete when the full nature and extent of the contamination, the Quality Assurance/Quality Control procedures and the Data Quality Objectives are documented to the satisfaction of the Executive Director. The Permittee shall propose or conduct Stabilization/Interim Corrective Measures, as necessary, to protect human health and the environment.

E.    Baseline Risk Assessment (BLRA)/Corrective Measures Study (CMS)

Upon approval of RFI Report, if it is determined that there has been a release of hazardous waste or hazardous constituents (listed in 40 CFR Part 261, Appendix VIII and/or 40 CFR Part 264 Appendix IX) into the environment, which poses a potential risk to human health and the environment, then the Permittee shall propose a remedy in accordance with the TNRCC risk reduction rules or as otherwise specified by the Executive Director. This may require a BLRA and/or CMS Report to be submitted for review and approval within the time frame(s) specified by the Executive Director. This Report will identify potential receptors and evaluate risk, and if necessary identify and evaluate corrective measure alternatives and recommend appropriate corrective measure(s) to protect human health and the environment. The BLRA and/or CMS Report shall address all of the applicable items in the TNRCC risk reduction rules and the U.S. EPA publications EPA/520-R-94-004, OSWER Directive 9902.3-2A, RCRA Corrective Action Plan (Final), May 1994.

F.    Corrective Measures Implementation (CMI)

If on the basis of the RFI and/or BLRA/CMS it is determined that there is a risk to the human health and environment, then the Permittee shall submit for approval a CMI Workplan(s) within the time frame(s) required by the Executive Director, not to exceed one-hundred-eighty (180) days of receipt of approval of the RFI and/or BLRA/CMS Report. The CMI Workplan shall address all of the applicable items in the U.S. EPA publications EPA/520-R-94-004, OSWER Directive 9902.3-2A, RCRA Corrective Action Plan (Final), May 1994. The CMI Workplan shall contain detailed final proposed engineering design, monitoring plans and time frames necessary to implement the selected remedy and assurances of financial responsibility for completing the corrective action. Following review and approval, and upon installation of a corrective action system based upon the approved CMI Workplan, the Permittee shall submit a CMI Report which includes as-built drawings of the corrective action system. The CMI Report shall address all the applicable items in the U.S. EPA publications EPA/520-R-94-004, OSWER Directive 9902.3-2A, RCRA Corrective Action Plan (Final), May 1994.

If the CMI Workplan does not propose a permanent remedy, then the CMI Workplan shall be submitted as an application to modify/amend the Compliance Plan within the timeframes specified by the Executive Director. All the requirements of the previous paragraph apply to the corrective measures implemented through the Compliance Plan. Implementation of the corrective measure(s) shall be addressed through issuance of a modified/amended Compliance Plan.

To report the progress of the corrective measures, the Permittee shall submit periodic CMI Progress Reports to the TNRCC in accordance with the schedule specified in the Compliance Plan, or as otherwise directed.

IX.    STABILIZATION/INTERIM CORRECTIVE MEASURES (S/ICMs) PROGRAM

A.    Applicability

The Stabilization/Interim Corrective Measure (S/ICM) Program applies to waste management units or areas of concern (AOCs) under investigation for which a final Corrective Action Program has not been authorized by the Compliance Plan. S/ICM also applies to units/AOCs that are discovered after issuance of this Compliance Plan.

B.      S/ICMs Program Objectives

The objectives of the S/ICM Program is to remove, decontaminate, and/or stabilize the source (i.e., waste and waste residues) and contaminated media to protect human health and the environment. The Permittee shall modify the S/ICM Program, as necessary, to achieve these objectives.

C.      S/ICMs Program Authorized

The Permittee is authorized to design, construct, operate and maintain a S/ICM Program for waste management units/AOCs for which interim measures are necessary to protect human health and the environment. The S/ICM Program shall be operated until final corrective measures established in accordance with Section VIII.F are authorized in the Compliance Plan. At a minimum, the S/ICM Program shall consist of the following:

1.      Specific performance goals to protect human health and the environment;

2.      A monitoring system to evaluate the S/ICM and determine if the objectives outlined in Section IX.B are being met. All S/ICM wells must comply with the requirements of Section III. D and Attachment B of this Compliance Plan; Implementation Schedule;

3.      An implementation schedule to initiate S/ICMs;

4.      Submittal of a report specifying the design of the S/ICM upon installation. During implementation of the S/ICM, periodic S/ICM Status Reports shall be submitted which documents that the objectives of Section IX.B are being achieved. Two copies of the periodic S/ICM Status Report shall be submitted to the Executive Director for review; and,

5.      A procedure to modify the design, as necessary, to achieve the objectives outlined in Section IX.B of this Compliance Plan.

X.      COMPLIANCE SCHEDULE

Within sixty (60) days of issuance of this Compliance Plan, the Permittee shall submit to the Executive Director a schedule summarizing all activities required by the Compliance Plan. The schedule shall list the starting dates of all routine activities. The Permittee shall include an updated schedule in the semiannual report. The schedule shall list the activity or report, the Compliance Plan Section which requires the activity or report and the calendar date the activity or report is to be completed or submitted (if this date can be determined).

XI.    FINANCIAL ASSURANCE

The Permittee shall provide financial assurance for operation of the Ground-Water Corrective Action Programs in accordance with this Compliance Plan in a form acceptable to the Executive Director in an initial amount not less than $574,000 upon issuance of this Compliance Plan. The financial assurance shall be secured, maintained, and adjusted in compliance with TNRCC regulations on hazardous waste financial requirements (30 TAC §335.152 and §335.167 and 40 CFR Part 264 Subpart H).

XII.   GENERAL PROVISIONS

A.    Deed Recordation Requirements

For waste and contaminated soil (including saturated soils) approved to remain in place above background concentration levels after completion of the corrective action and/or ground-water monitoring programs, the Permittee shall record an instrument in the county deed records for the facility to specifically identify the areas of contamination exceeding background values. The deed certification shall follow the requirements of 30 TAC §335.560 and §335.569.

B.    Notification Requirements

The Permittee shall notify the TNRCC Region 12 Office - Houston at least ten (10) days prior to any well installation or sampling activity required by the Compliance Plan in order to afford Region personnel the opportunity to observe these events and collect samples. This notification requirement will not apply to the routine semiannual ground-water sampling events specified in this Compliance Plan.

C.    Distribution of Copies

The Permittee shall submit all schedules, plans, and reports required by this Compliance Plan according to the following distribution list:

1.            An original and one copy to the Corrective Action Section, Remediation Division, Mail Code 127, Texas Natural Resource Conservation Commission in Austin, Texas; and,

2.            One copy to the Waste Program, Texas Natural Resource Conservation Commission Region 12 Office in Houston, Texas.

D.    Compliance Plan Modification or Amendment

If the Permittee determines that the Corrective Action Program, Compliance Schedule, or Financial Assurance required by this Compliance Plan no longer satisfies the requirements of 30 TAC §335.165, §335.166 or §335.167, the Permittee must, within ninety (90) days of making this determination, submit an application for a modification or amendment to make any appropriate changes to the Compliance Plan which will satisfy the regulations. Any application to modify or amend the Compliance Plan shall be accomplished in accordance

with provisions of 30 TAC 305 Subchapter D and submitted to the Industrial and Hazardous Waste Permits Section, Permits Division, Mail Code MC-130, Texas Natural Resource Conservation Commission in Austin, Texas.

E.   Any changes to the Corrective Action or Ground-Water Monitoring Systems are subject to Executive Director's approval.

## XIII.   FORCE MAJEURE

The Permittee's non-compliance with one or more of the provisions of this Compliance Plan may be justified only to the extent and for the duration that non-compliance is caused by a "Force Majeure" event. For purposes of this Compliance Plan, "Force Majeure" is defined as an event that is caused by an Act of God, labor strike, or work stoppage, or other circumstance beyond the Permittee's control that could not have been prevented by due diligence, and that makes substantial compliance with the applicable provision or provisions of this Compliance Plan impossible.

The occurrence of a force majeure event that justifies the missing of one deadline shall not automatically justify the missing of later deadlines unless there is a cumulative effect due to such an event. The Permittee shall keep a record of any delaying events.

If the Permittee anticipates or experiences an inability to comply with any of the provisions of this Compliance Plan due to a "Force Majeure" event, the Permittee shall notify the Executive Director (TNRCC) immediately (within 24 hrs). A written notice must be submitted to the TNRCC within ten (10) days, which describes the nature, cause, and anticipated length of the delay and all steps which the Permittee has taken and will take, with a schedule for their implementation, to avoid or minimize the delay. In the event that performance of any of the activities required by this Compliance Plan is affected by a "Force Majeure" event, then the Permittee shall propose a plan for the Executive Director's (TNRCC) approval, for achieving the objectives of the Compliance Plan by alternative means in the most timely manner.

## TABLE I
### Corrective Action Program

Table of Hazardous and Solid Waste Constituents and
Concentration Limits for the Ground-Water Protection Standard
Waste Management Area I

| COLUMN A<br>Hazardous Constituents | COLUMN B<br>Concentration Limits (mg/l) | (COLUMN C)<br>Other Constituents of Concern<br>to be monitored |
|---|---|---|
| Cadmium ................. | $0.010^{MCC}$ | pH |
| Cobalt ................. | $2.2^{MSC}$ | Conductivity |
| Lead ................. | $0.050^{MCC}$ | Total Dissolved Solid (TDS) |
| Barium ................. | $2.0^{MCL}$ | Iron |
| Chromium ................. | $0.10^{MCL}$ | Sulfate |
| Nickel ................. | $0.73^{MSC}$ | |
| Silver ................. | $0.18^{MSC}$ | |
| Zinc ................. | $11.0^{MSC}$ | |

MSC    Alternate Concentration Limit pursuant to 30 TAC §335.160(b) based upon the Medium-Specific Concentration (MSC), Residential Risk Reduction Standard No. 2 specified in 30 TAC §335 Subchapter S.

MCL    Alternate Concentration Limit pursuant to 30 TAC §335.160(b) based upon the Maximum Contaminant Level (MCL) specified in 40 CFR Part 141, National Primary Drinking Water Regulations Subparts B and G.

MCC    Maximum Concentration of Constituents (MCC) for Ground-Water Protection specified in Table I of 30 TAC §335.160.

**TABLE II**
Designation of Wells by Function
Waste Management Area I

A.     BACKGROUND *

       Zone 1

       MW-3
       MW-11
       MW-12

B.     POINT OF COMPLIANCE WELLS

       Zone 1                          Zone 2

       MW-2                            MW-7
       MW-4                            MW-18C
       MW-8                            MW-19C
       MW-9                            MW-20C
       MW-10                           MW-21C
       MW-13
       MW-16
       MW-17

C.     CORRECTIVE ACTION SYSTEM WELLS

       Zone 1:        RW-22, RW-23, RW-24, RW-25, RW-26

D.     CORRECTIVE ACTION OBSERVATION WELLS *

       Zone 1                          Zone 2

       P-1                             MW-1
       P-2                             MW-6
       P-3                             MW-14
       MW-5                            MW-15
                                       MW-18A, MW-18B
                                       MW-19A, MW-19B
                                       MW-20A, MW-20B
                                       MW-21A, MW-21B

*      Wells previously referenced as Supplemental Wells and/or Piezometers in Compliance Plan
       Application dated November19, 1997.

Note:  Wells and piezometers identified on Attachment A maps that are not listed in Table II are subject
       to change, upon approval by the Executive Director, without modification to the Compliance
       Plan.

## TABLE III
### Compliance Period
### Waste Management Area I

| | |
|---|---|
| Year Closed | 1991 |
| Year Waste Management Activities Initiated | 1967 |
| Compliance Period | 32 Years |
| Compliance Period Began | 1988 |



Map Source: USGS 7.5 Min. Quad Sheet RICHMOND, TX., 1980.

ROSENBERG

Vision Metals

FACILITY LOCATION

TEXAS

STATE - 562

**Attachment A - Sheet 1 of 4**
**Facility Site Location Map**
**Vision Metals, Inc.**
**Compliance Plan No. CP-50129**



LEGEND

----- SHALLOW ZONE POTENTIOMETRIC SURFACE

— — DEEP ZONE POTENTIOMETRIC SURFACE

**Attachment A - Sheet 2 of 4**
Projected Hydrogeologic Cross-Section
Showing Zone 1 & Zone 2
Vision Metals, Inc.
Compliance Plan No. CP-50129

STATE - 563



STATE - 564

## Designation of Wells by Function

**Background Wells**
Zone 1: MW-3, MW-11, MW-12

**Point of Compliance Wells**
Zone 1: MW-2, MW-4, MW-8, MW-9, MW-10, MW-13, MW-16,
MW-17
Zone 2: MW-7, MW-18C, MW-19C, MW-20C, MW-21C

**Corrective Action System Wells (Zone 1)**
RW-22, RW-23, RW-24, RW-25, RW-26

**Corrective Action Observation Wells**
Zone 1: MW-5, P-1, P-2, P-3
Zone 2: MW-15, MW-18A&B, MW-19A&B, MW-20A&B,
MW-21A&B

## EXPLANATION

**Waste Management Area I**

① Holding Pit-Pickle Liquor and Rinse, Closed, 0.15 acre

② Primary Settling Pit, Closed, 0.08 acre

③ Secondary and Final Settling, Closed, 0.17 acre

④ Pickle Sludge Drying Beds, Closed, 1.3 acre

- - - - - - - - - -  Boundary of Waste Management Area I
◐  Zone 1 Monitoring Well Location
●  Zone 2 Monitoring Well Location
▲  Recovery Well Location

## Attachment A - Sheet 3 of 4
## Monitoring Well Location Map

MUEGGE ROAD

FENCE
BOUNDARY

RESERVO

RESERVO

① 

**RFI SWMUs**

① Land Treatment Unit,
inactive, 5.8 Acres



STATE - 565

Attachment A - Sheet 4 of 4
SWMU Location Map
Vision Metals, Inc.
Compliance Plan No. CP-50129
Map Scale: 1"=200'

## Attachment B - Well Design and Construction Specifications

1.  The Permittee shall use well drilling methods that minimize potential adverse effects on the quality of water samples withdrawn from the well, and that minimize or eliminate the introduction of foreign fluids into the borehole.

2.  All wells constructed to meet the terms of this Compliance Plan shall be constructed such that the wells can be routinely sampled with a pump, bailer, or alternate sampling device. Piping associated with recovery wells should be fitted with sample ports or an acceptable alternative sampling method to facilitate sampling of the recovered ground water on a well by well basis.

3.  Above the saturated zone the well casing may be two (2)-inch diameter or larger schedule 40 or 80 polyvinyl chloride (PVC) rigid pipe or stainless steel or polytetrafluoroethylene (PTFE or "teflon") or an approved alternate material. The PVC casing must bear the National Sanitation Foundation logo for potable water applications (NSF-pw). Solvent cementing compounds shall not be used to bond joints and all connections shall be flush-threaded. In and below the saturated zone, the well casing shall be stainless steel or PTFE.

    The Permittee may use PVC or fiberglass reinforced resin as an alternate well casing material in and below the saturated zone provided that it yields samples for ground-water quality analysis that are unaffected by the well casing material.

4.  The Permittee shall replace any well that has deteriorated due to incompatibility of the casing material with the ground-water contaminants or due to any other factors. Replacement of the damaged well shall be completed within ninety (90) days of the date of the inspection that identified the deterioration.

5.  Well casings and screens shall be steam cleaned prior to installation to remove all oils, greases, and waxes. Well casings and screens made of fluorocarbon resins shall be cleaned by detergent washing.

6.  For wells constructed after the date of issuance of this Compliance Plan, the screen length shall not exceed ten (10) feet within a given transmissive zone unless otherwise approved by the Executive Director. Screen lengths exceeding ten (10) feet may be installed in ground-water recovery or injection wells to optimize the ground-water remediation process in accordance with standard engineering practice.

7.  The Permittee shall design and construct the intake portion of a well so as to allow sufficient water flow into the well for sampling purposes and to minimize the passage of formation materials into the well during pumping. The intake portion of a well shall consist of commercially manufactured stainless steel or PTFE screen or approved alternate material. The annular space between the screen and the borehole shall be filled with clean siliceous granular material (i.e., filter pack) that has a proper size gradation to provide mechanical retention of the formation sand and silt. The well screen slot size shall be compatible with the filter pack size as determined by sieve analysis data. The filter pack should extend no more than three (3) feet above the well screen. A silt trap, no greater than one (1) foot in length, may be added to the bottom of the well screen to collect any silt that may enter the well. The bottom of the well casing shall be capped with PTFE or stainless steel or approved alternate material.

STATE - 566

Ground-water recovery and injection wells shall be designed in accordance with standard engineering practice to ensure adequate well production and to accommodate ancillary equipment. Silt traps exceeding one (1) foot may be utilized to accommodate ancillary equipment. Well heads shall be fitted with mechanical wellseals, or equivalent, to prevent entry of surface water or debris.

8.      A minimum of two (2) feet of pellet or granular bentonite shall immediately overlie the filter pack in the annular space between the well casing and borehole. Where the saturated zone extends above the filter pack, pellet or granular bentonite shall be used to seal the annulus. The bentonite shall be allowed to settle and hydrate for a sufficient amount of time prior to placement of grout in the annular space. Above the minimum two (2)-foot thick bentonite seal, the annular space shall be sealed with a cement/bentonite grout mixture. The grout shall be placed in the annular space by means of a tremie pipe or pressure grouting methods equivalent to tremie grouting standards.

The cement/bentonite grout mixture or TNRCC approved alternative grout mixture shall fill the annular space to within two (2) feet of the surface. A suitable amount of time shall be allowed for settling to occur. The annular space shall be sealed with concrete, blending into a cement apron at the surface that extends at least two (2) feet from the outer edge of the monitor well for above-ground completions. Alternative annular-space seal material may be proposed with justification and must be approved by the Executive Director prior to installation.

In cases where flush-to-ground completions are unavoidable, a protective structure such as a utility vault or meter box should be installed around the well casing and the concrete pad design should prevent infiltration of water into the vault. In addition, the Permittee must ensure that 1) the well/cap juncture is watertight; 2) the bond between the cement surface seal and the protective structure is watertight; and 3) the protective structure with a steel lid or manhole cover has a rubber seal or gasket.

9.      Water added as a drilling fluid to a well shall contain no bacteriological or chemical constituents that could interfere with the formation or with the chemical constituents being monitored. For ground-water recovery and injection wells, drilling fluids containing freshwater and treatment agents may be utilized in accordance with standard engineering practice to facilitate proper well installation. In these cases, the water and agents added should be chemically analyzed to evaluate their potential impact on in-situ water quality and to assess the potential for formation damage. All such additives shall be removed to the extent practicable during well development.

10.     Upon completion of installation of a well, the well must be developed to remove any fluids used during well drilling and to remove fines from the formation to provide a particulate-free discharge to the extent achievable by accepted completion methods and by commercially available well screens. Development shall be accomplished by reversing flow direction, surging the well or by air lift procedures. No fluids other than formation water shall be added during development of a well unless the aquifer to be screened is a low-yielding water-bearing aquifer. In these cases, the water to be added should be chemically analyzed to evaluate its potential impact on in-situ water quality, and to assess the potential for formation damage.

For recovery and injection wells, well development methods may be utilized in accordance with standard engineering practice to remove fines and maximize well efficiency and specific

capacity. Addition of freshwater and treatment agents may be utilized during well development or re-development to remove drilling fluids, inorganic scale or bacterial slime. In these cases, the water and agents added should be chemically analyzed to evaluate their potential impact on in-situ water quality and to assess the potential for formation damage. All such additives shall be removed to the extent practicable during well development.

11. Each well shall be secured and/or designed to maintain the integrity of the well borehole and ground water.

12. The Permittee shall protect the above-ground portion of the well by bumper guards and/or metal outer casing protection when wells are located in traffic areas or outside the secured plant area.

13. Copies of drilling and construction details demonstrating compliance with the items of this provision shall be kept on site. This record shall include the following information:

   . name/number of well (well designation);
   . intended use of the well(sampling, recovery, etc.);
   . date/time of construction;
   . drilling method and drilling fluid used;
   . well location ($\pm$ 0.5 ft.);
   . bore hole diameter and well casing diameter;
   . well depth ($\pm$ 0.1 ft.);
   . drilling and lithologic logs;
   . depth to first saturated zone;
   . casing materials;
   . screen materials and design;
   . casing and screen joint type;
   . screen slot size/length;
   . filter pack material/size;
   . filter pack volume (how many bags, buckets, etc.);
   . filter pack placement method;
   . sealant materials;
   . sealant volume (how many bags, buckets, etc.);
   . sealant placement method;
   . surface seal design/construction;
   . well development procedure;
   . type of protective well cap;
   . ground surface elevation ($\pm$ 0.01 ft. MSL);
   . top of casing elevation ($\pm$ 0.01 ft. MSL); and,
   . detailed drawing of well (include dimensions).

14 The Permittee shall complete construction or abandonment and plugging of each well in accordance with the requirements of this Compliance Plan and 30 TAC §238.41 through §238.50 and shall certify such proper construction or abandonment within sixty (60) days of installation or abandonment. If the Permittee installs any additional or replacement wells, well completion logs for each well shall be submitted within sixty (60) days of well completion and development in accordance with 30 TAC §340.73. Certification of each well shall be submitted within sixty (60) days of installation for an individual well project or within sixty (60) days from the date of

completion of a multiple well installation project. The certification shall be prepared by a qualified geologist or geotechnical engineer. Each well certification shall be accompanied by a certification report, including an accurate log of the soil boring, which thoroughly describes and depicts the location, elevations, material specifications, construction details, and soil conditions encountered in the boring for the well. A copy of the certification and certification report shall be kept on-site, and a second copy shall be submitted to the Executive Director. Required certification shall be in the following form:

"This is to certify that installation (or abandonment and plugging) of the following facility components authorized or required by TNRCC Compliance Plan No. CP-50129 has been completed, and that construction (or plugging) of said components has been performed in accordance with and in compliance with the design and construction specifications of Compliance Plan No. CP-50129." (Description of facility components with reference to applicable Compliance Plan provisions).

15.    The Permittee shall clearly mark and maintain the well number on each well at the site.

16.    The Permittee shall measure and keep a record of the elevation of the top of each well casing in feet above mean sea level to the nearest 0.01 foot and permanently mark the measuring point on the well. The Permittee shall compare old and new elevations from previously surveyed wells and determine a frequency of surveying not to exceed five (5) year intervals.

17.    Wells may be replaced at any time the Permittee or Executive Director determines that the well integrity or materials of construction or well placement no longer enable the well to yield samples representative of ground-water quality.

18.    The Permittee shall plug soil test borings and wells removed from service after issuance of the Compliance Plan with a cement/bentonite grout mixture so as to prevent the preferential migration of fluids in the area of the borehole. Certification of each plugging shall be reported in accordance with Provision 14 of Attachment B of this Compliance Plan. The plugging of wells shall be in accordance with 30 TAC §238.41 through §238.50 dealing with Well Drilling, Completion, Capping and Plugging.

19.    A well's screened interval shall be appropriately designed and installed to meet the well's specific objective (i.e., either DNAPL, LNAPL, both, or other objective of the well). All wells designed to detect, monitor, or recover DNAPL must be drilled to intercept the bottom confining layer of the aquifer. The screened interval to detect DNAPL should extend from the top of the lower confining layer to above the portion of the aquifer saturated with DNAPL. The screened interval for all wells designed to detect, monitor, or recover LNAPL must extend high enough into the vadose zone to provide for fluctuations in the seasonal water table. In addition, the sandpacks for the recovery or monitoring well's screened interval shall be coarser than surrounding media to ensure the movement of NAPL to the well.

# EXHIBIT C

REAL ESTATE PURCHASE AGREEMENT

BY AND BETWEEN

VISION METALS, INC.

(a Delaware corporation and a debtor and
debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108)

AND

BERNARD J. MORELLO

FEBRUARY 27, 2004

EXHIBIT

STATE - 581

## TABLE OF CONTENTS

                                                                              Page

1.  PURCHASE AND SALE OF ASSETS; ASSUMPTION OF CERTAIN
    LIABILITIES...................................................................................................1

2.  APPROVAL OF BANKRUPTCY COURT........................................................2

3.  PURCHASE PRICE - PAYMENT....................................................................2

4.  REPRESENTATIONS AND WARRANTIES OF COMPANY ...................2

5.  REPRESENTATIONS AND WARRANTIES OF BUYER ..........................4

6.  COVENANTS......................................................................................................5

7.  CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS ...................5

8.  CONDITIONS PRECEDENT TO COMPANY'S OBLIGATIONS .............5

9.  CLOSING .............................................................................................................6

10. TERMINATION ..................................................................................................7

11. RESOLUTION OF DISPUTES..........................................................................8

12. DEFINITIONS .....................................................................................................8

13. MISCELLANEOUS...........................................................................................11

### Schedules

4.3(a)      Permitted Real Estate Liens
4.3(b)      Real Property

i

## REAL ESTATE PURCHASE AGREEMENT

THIS REAL ESTATE PURCHASE AGREEMENT ("Agreement") dated February 27, 2004, by and between VISION METALS, INC., a Delaware corporation and a debtor and a debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108 ("Company"), and Bernard J. Morello ("Buyer").

### RECITALS

A.     The Company has filed a bankruptcy petition and is a debtor and debtor-in-possession pursuant to 11 U.S.C. §§1107 and 1108.

B.     The Company, through its Gulf States Tubing Division ("GST Division"), is the owner of that certain Real Property located in the

C.     Company, through its Gulf States Tubing Division ("GST Division"), is the owner of that certain Real Property located in the County of Fort Bend, State of Texas.

D.     Buyer desires to purchase the Real Property and to assume the Assumed Liabilities, and the Company desires to Transfer to Buyer the Real Property and the Assumed Liabilities, all upon the terms and subject to the conditions set forth in this Agreement.

E.     Buyer was the successful bidder at the auction approved by the Court in which the Company filed its bankruptcy petition.

F.     Capitalized terms used herein and otherwise not defined shall have the meanings given to them in **Article 12** hereof.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants, agreements and conditions hereinafter set forth, and intending to be legally bound hereby, the parties hereto agree as follows.

1.     **PURCHASE AND SALE OF ASSETS; ASSUMPTION OF CERTAIN LIABILITIES**

1.1.     Purchase and Sale. On the Closing Date, the Company shall Transfer to Buyer, and Buyer shall purchase, pay for, accept, assume and receive the Real Property, including but not limited to any mineral rights associated with the Real Property, free and clear of all Liens and subject only to the terms and conditions hereof; provided, however, that the Real Property shall be transferred subject to all easements, restrictions and other matters of record, and all matters of record shown on the surveys of the Real Property required by **Section 6.2** hereof.

1.2.     Assumed Liabilities. Subject to the terms and conditions of this Agreement, at the time of Closing, Buyer shall assume and agree to pay, perform and discharge the Assumed Liabilities. Buyer shall not assume or have any liability or obligation whatsoever for any Excluded Liabilities.

-1-

STATE - 583

## 2. APPROVAL OF BANKRUPTCY COURT

2.1. _Section 363 Sale_. This Agreement provides for the sale of the Real Property to Buyer, free and clear of all Liens, pursuant to Section 363 of the Bankruptcy Code. The Company has determined that this sale is the only viable alternative to preserve the enterprise value of its business and to maximize the value of the Company's estates for the benefit of all constituencies. Therefore, the Company and Buyer agree to use their commercially reasonable efforts to complete the sale of the Real Property on an expedited basis in accordance with the terms and conditions hereof.

2.2. _Assignment and Assumption_. The Company shall assign and the Buyer shall assume the Assumed Liabilities as of the Closing Date pursuant to Section 363 and to the extent applicable 365 of the Bankruptcy Code and the Sale Order.

2.3. _Sale Hearing_. The Company shall use its best efforts to obtain approval of the sale to the Buyer, who shall have been the winning bidder at the auction held on February 27, 2004.

## 3. PURCHASE PRICE - PAYMENT

3.1. _Purchase Price_. In consideration for the Real Property, in addition to the assumption of the Assumed Liabilities, the Buyer shall pay to the Company an amount equal to Six Hundred Fifty Thousand and 00/100 Dollars ($650,000.00).

3.2. _Deposit_. Buyer has provided a deposit in accordance with the Terms of Sale in the amount of One Hundred Sixty Two Thousand Five Hundred Dollars ($162,500.00). In the event of a default under this Agreement or the Terms of Sale by the Buyer, the Company shall be entitled to retain the Deposit. In the event that the Seller fails to obtain a Sale Order authorizing the sale to the Buyer, Seller shall forthwith return the Deposit to Buyer.

3.3. _Payment of Purchase Price_. The Company hereby agrees that, except to the extent otherwise agreed by the Lenders, the Purchase Price including of the Buyer's Premium (as referenced in the Terms of Sale) shall be paid by Buyer to such accounts designated by the Lenders in order to reduce the amounts owed by the Company to such Lenders.

## 4. REPRESENTATIONS AND WARRANTIES OF COMPANY

The Company makes the following representations and warranties to Buyer, each of which is subject to the provisions of **Section 9.3** hereof:

4.1. Corporate.

(a) _Organization_. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b) _Corporate Power_. The Company has all requisite corporate power and authority to own, operate and lease its properties, to carry on its business as and where such is now being conducted and, upon entry of a Sale Order of the U.S. Bankruptcy

-2-

STATE - 584

Court for the District of Delaware, to consummate the transactions contemplated by this Agreement and the other documents and instruments to be executed and delivered by the Company pursuant hereto and to carry out the transactions contemplated hereby and thereby.

4.2.   Corporate Authority.  The execution and delivery of this Agreement and the other documents and instruments to be executed and delivered by the Company pursuant hereto and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all requisite action (including the approval by the board of directors and shareholders of the Company).  No other or further corporate act or proceeding on the part of the Company or its shareholders is necessary to authorize this Agreement or the other documents and instruments to be executed and delivered by the Company pursuant hereto or the consummation of the transactions contemplated hereby and thereby.   This Agreement constitutes, and when authorized by the Bankruptcy Court and executed and delivered, the other documents and instruments to be executed and delivered by the Company pursuant hereto will constitute, valid binding agreements of the Company, enforceable in accordance with their respective terms.

4.3.   Title to Properties.

(a)   Marketable Title.  At Closing, and subject to the express terms of the Sale Order, the Company will transfer to Buyer good and marketable title to, the Real Property, free and clear of all Liens except as indicated on Schedule 4.3(a); provided, however, that the Real Property shall be transferred subject to all easements, restrictions and other matters of record and all matters of record shown on the surveys of the Real Property (the "Permitted Real Estate Liens").

(b)   Real Property.  Schedule 4.3(b) sets forth all real property owned by the Company and to be sold to the Buyer pursuant to this Agreement pursuant to Lot 3 of the Terms of Sale and the bulk bid for real property consisting of: (1) land, buildings and substation located at Spur 529 and Scott Road and consisting of 38.5 +/- acres which includes 1.522 +/- acres that comprises the substation; (2) farmland consisting of 133.69 +/- acres; and (3) vacant property consisting of 25.32 +/- acres (the "Real Property").

4.4.   No Brokers or Finders.  Except for Daley-Hodkin Corporation, neither the Company nor any of its directors, officers, employees, shareholders or agents have retained, employed or used any broker or finder in connection with the transactions provided for herein or the negotiation thereof.

4.5.   AS IS, WHERE IS, WITH ALL FAULTS.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE COMPANY HEREBY SPECIFICALLY DISCLAIMS ANY EXPRESS OR IMPLIED WARRANTY, GUARANTY OR REPRESENTATION, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING (i) THE NATURE AND CONDITION OF ANY OF THE REAL PROPERTY AND/OR ASSUMED LIABILITIES AND THE SUITABILITY THEREOF FOR ANY AND ALL ACTIVITIES AND USES WHICH BUYER MAY ELECT TO CONDUCT THEREON, AND (ii) THE COMPLIANCE OF THE REAL PROPERTY AND/OR ASSUMED LIABILITIES WITH ANY

-3-

STATE - 585

LAWS, INCLUDING BUT NOT LIMITED TO ANY ENVIRONMENTAL LAWS.

BUYER ACKNOWLEDGES THAT BUYER IS RELYING SOLELY ON ITS OWN INVESTIGATION OF THE REAL PROPERTY AND ASSUMED LIABILITIES AND NOT ON ANY INFORMATION PROVIDED OR TO BE PROVIDED BY COMPANY OR ANY OTHER PARTY, BUYER HAS FULLY INSPECTED THE REAL PROPERTY AND ASSUMED LIABILITIES AND IS THOROUGHLY FAMILIAR WITH THE CONDITION OF THE REAL PROPERTY AND ASSUMED LIABILITIES AND HEREBY ACCEPTS THE REAL PROPERTY AND ASSUMED LIABILITIES IN THEIR "AS IS, WHERE IS, WITH ALL FAULTS CONDITION."

EXCEPT AS SET FORTH IN THIS AGREEMENT, BUYER EXPRESSLY ACKNOWLEDGES THAT COMPANY HAS NOT MADE AND DOES NOT HEREBY MAKE ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, ARISING BY OPERATION OF LAW OR OTHERWISE, WHATSOEVER WITH RESPECT TO THE REAL PROPERTY OR ASSUMED LIABILITIES, INCLUDING WITHOUT LIMITATION ANY REPRESENTATION OR WARRANTY REGARDING CONDITION, HABITABILITY, SUITABILITY, QUALITY OF CONSTRUCTION, WORKMANSHIP, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, AND BUYER ACKNOWLEDGES THAT IT IS ENTERING INTO THIS AGREEMENT WITHOUT RELYING UPON ANY OTHER STATEMENT OR REPRESENTATION MADE BY COMPANY, ANY BROKER OR BY ANY OTHER PERSON.

BUYER EXPRESSLY ACKNOWLEDGES THAT ANY REPRESENTATION AND WARRANTY CONTAINED IN THIS AGREEMENT IS SUBJECT TO SECTION 9.3 HEREOF.

## 5. REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer makes the following representations and warranties to the Company, each of which is true and correct on the date hereof, shall remain true and correct to and including the Closing Date, and shall survive the Closing of the transactions provided for herein.

5.1. **No Brokers or Finders.** Neither Buyer nor any of its directors, officers, employees or agents have retained, employed or used any broker or finder in connection with the transactions provided for herein or the negotiation thereof.

5.2. **No Violation.** Subject to entry of the Sale Order, neither the execution and delivery of this Agreement or the other documents and instruments to be executed and delivered by Buyer pursuant hereto, nor the consummation by Buyer of the transactions contemplated hereby, and thereby will (a) violate any applicable Law or Order, or (b) will require any authorization, consent, approval, exemption or other action by or notice to any Governmental Entity.

5.3 **Financing Available.** The Buyer has the financing or capital available to consummate the transactions contemplated hereby in an expedited manner.

-4-

STATE - 586

## 6. COVENANTS

6.1. Title Insurance. With respect to the Real Property, Buyer, at its option, may obtain a title insurance commitment (the "Commitment") at its sole cost and expense. The Company hereby agrees to provide to the Buyer any prior title commitments in it possession.

6.2. Survey. With respect to the Real Property, Buyer, at its option, may obtain original current surveys of the Real Property, at its sole cost and expense. The Company hereby agrees to provide to the Buyer any prior surveys in its possession.

6.3. Post-Closing Cooperation. After the Closing, the Buyer hereby agrees to reasonably cooperate and assist the Company and its creditors in the Company's liquidation of any assets which remain upon the Buyer's premises. The Buyer expressly agrees to provide the Company and its creditors with reasonable access to the Buyer's facilities during normal business hours to effectively remove and liquidate any such assets, at no cost to the Company. The Company hereby agrees to provide a member of its staff to oversee any such removal, which removal will be completed prior to June 30, 2004, unless mutually extended. Until such time as the removal is completed, Company shall reimburse the Buyer for the utility bills associated with the Real Property.

## 7. CONDITIONS PRECEDENT TO BUYER'S OBLIGATIONS

The obligations of Buyer to close the transactions contemplated by this Agreement are subject to the satisfaction prior to or at Closing of each of the following conditions; provided, however, that the Buyer may waive any one or more of such conditions:

7.1. Representations and Warranties True on the Closing Date. Each of the representations and warranties made by the Company in this Agreement shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the Closing Date as though such representations and warranties were made or given on and as of the Closing Date, except for any changes permitted by the terms of this Agreement or consented to in writing by Buyer.

7.2. Sale Order. The Sale Order shall have been entered and shall be in full force and effect.

7.3. Deliveries. Each of the deliveries required to be made to the Buyer pursuant to **Section 9.1** shall have been delivered.

## 8. CONDITIONS PRECEDENT TO COMPANY'S OBLIGATIONS

The obligations of the Company to close the transactions contemplated by this Agreement are subject to the satisfaction prior to or at the Closing of the following conditions; provided, however, that the Company may waive any one or more of such conditions:

8.1. Representations and Warranties True on the Closing Date. Each of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects when made and shall be true and correct in all material respects at and as of the

-5-

STATE - 587

Closing Date as though such representations and warranties were made or given on and as of the Closing Date.

8.2. **Compliance With Agreement**. Buyer shall have in all material respects performed and complied with all of Buyer's agreements and obligations under this Agreement which are to be performed or complied with by Buyer prior to or on the Closing Date.

8.3. **Sale Order**. The Sale Order shall have been entered and shall be in full force and effect..

8.4. **Deliveries**. Each of the deliveries required to be made to the Company pursuant to **Section 9.2** shall have been delivered.

9. **CLOSING**

The Closing shall take place at the offices of Foley & Lardner, 150 West Jefferson Avenue, Suite 1000, Detroit, Michigan 48226 on the eleventh day after the Sale Order is entered and becomes non-appealable, or at such other time and place as the parties hereto shall mutually agree upon. Such date is referred to in this Agreement as the "Closing Date."

9.1. **Company Deliveries**. At the Closing, the Company shall deliver to Buyer the following, in each case duly executed or otherwise in proper form:

(a) **Deed**. A deed conveying fee simple title to the Real Property free and clear of all Liens except for the Permitted Real Estate Liens. Such deed shall contain a warranty as to title.

(b) **Sale Order**. A certified copy of the Sale Order.

9.2. **Buyer Deliveries**. At the Closing, Buyer shall deliver to Company the following, in each case duly executed or otherwise in proper form:

(a) **Purchase Price**. The Purchase Price (less the Deposit) payable on the Closing Date as required by **Section 3.3** hereof which amount shall be $487,500.

(b) **Assumption of Assumed Liabilities**. Such undertakings and instruments of assumption as will be sufficient to evidence the assumption of the Assumed Liabilities.

(c) **Compliance Certificate**. A certificate signed by the President of Buyer that the representations and warranties made by Buyer in this Agreement are true and correct on and as of the Closing Date with the same effect as though such representations and warranties had been made or given on and as of the Closing Date (except for any changes permitted by the terms of this Agreement or consented to in writing by Company), and that Buyer has performed and complied with all of Buyer's obligations under this Agreement which are to be performed or complied with on or prior to the Closing Date.

(d) **Other Documents**. All other documents, instruments or writings required

-6-

STATE - 588

to be delivered to the Company at or prior to the Closing pursuant to this Agreement and such other certificates of authority and documents as the Company may reasonably request.

9.3.    Effect of Representations and Warranties.

(a)    All of the information and documents provided to Buyer by the Company under this Agreement are acknowledged by Buyer to be based upon the best of the Company's knowledge. All of the Company's representations and warranties set forth in this Agreement are made to the best of the Company's knowledge.

(b)    The representations and warranties contained in this Agreement shall not survive the Closing of this transaction. Buyer's sole remedy for any claimed misrepresentation by the Company shall be to terminate this Agreement before the Closing pursuant to **Section 10.1(c)**. Upon Closing, Buyer shall be deemed to have approved and accepted all information provided by the Company to Buyer hereunder as true, complete and in full compliance with this Agreement, and thereafter Buyer shall have no right of action against the Company for breach or misrepresentation.

9.4    Closing Expenses. Buyer shall be responsible for any and all transfer taxes on the Real Property and any and all other fees, charges and expenses, including but not limited to any recording fees, associated with this Agreement and the transactions contemplated herein. The Company hereby agrees to use its reasonable efforts to obtain the approval of the Bankruptcy Court to waive any expenses referenced in this section pursuant to 11 U.S.C. §§1145-6 and thereby hold the Company and Buyer exempt from such expenses. The Company hereby agrees to share equally with the Buyer any document preparation and closing fees charged by the Title Company; notwithstanding the foregoing, the Company's share shall not exceed $500.

9.5    Release. Excluding the obligations set forth in this Agreement, the Buyer, including its successors, predecessors, assigns, subsidiaries, parents, affiliates and/or related entities as well as any of their officers, directors, employees, partners, attorneys, agents, and/or representatives (the "Buyer Related Parties") hereby unconditionally and irrevocably release and discharge the Company and its successors, predecessors, assigns, subsidiaries, parents, affiliates and/or related entities as well as any of their officers, directors, employees, partners, attorneys, agents, and/or representatives (the "Company Related Parties") from any and all claims, counterclaims, setoffs, choses in action, demands, proceedings, causes of action, orders, obligations, contracts, agreements, debts, damages and liabilities whatsoever, whether known or unknown, suspected or unsuspected, both at law and in equity, which the Buyer and the Buyer Related Parties now has, has ever had or may hereafter have against the Company and the Company Related Parties.

10.    **TERMINATION**

10.1.    Right of Termination Without Breach. This Agreement may be terminated without further liability at any time prior to the Closing:

(a)    by mutual written agreement of Buyer and Company, or

-7-

(b)    by the Company, if Buyer breaches in any material respect any of its material representations, warranties or agreements contained in this Agreement, or

(c)    by Buyer, if the Company breaches in any material respect any of its material representations, warranties or agreements contained in this Agreement.

10.2.    No Liability for Breach of Covenant by Company.  Buyer's sole and exclusive remedy for a breach of any representation, warranty or covenant of the Company set forth in this Agreement shall be to terminate this Agreement pursuant to **Section 10.1** prior to Closing.

## 11.    RESOLUTION OF DISPUTES

11.1.    Disputes.  Any dispute, controversy or claim arising out of or relating to this Agreement, any contract or agreement entered into pursuant hereto or the performance by the parties of its or their terms shall be settled by the Bankruptcy Court.

11.2.    Attorneys' Fees.  The parties agree that the prevailing party in any action brought with respect to or to enforce any right or remedy under this Agreement shall be entitled to recover from the other party or parties all reasonable costs and expenses of any nature whatsoever incurred by the prevailing party in connection with such action, including without limitation attorneys' fees and prejudgment interest.

## 12.    DEFINITIONS

12.1.    Definitions.  Capitalized terms used herein shall have the following meanings:

(a)    "Affiliate" means all shareholders, directors and officers of an entity; the spouse of any individual Person; any Person who would be the heir or descendant of any such Person if he or she were not living; any entity in which any of the foregoing has a direct or indirect interest (except through ownership of less than 5% of the outstanding shares of any entity whose securities are listed on a national securities exchange or traded in the national over-the-counter market); and any Person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with another Person, including the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of securities, election or appointment of directors, by contract or otherwise.

(b)    "Agreement" means this Real Estate Purchase Agreement for the purchase by Buyer of the Real Property and the assumption by Buyer of the Assumed Liabilities and the other transactions contemplated hereby, and all Schedules attached hereto.

(c)    "Assumed Contracts" means the executory contracts and the unexpired leases set forth in the motion seeking entry of the Sale Order.

(d)    "Assumed Liabilities" means all of the Company's, as such relates to the Real Property, (i) Environmental Obligations; and (ii) any and all other Liabilities which may arise from the ownership of the Real Property from and after the Closing.

-8-

STATE - 590

(e)     "Bankruptcy Code" means 11 U.S.C. §§101 et seq. and the rules promulgated thereunder.

(f)     "Bankruptcy Court" means (a) the United States Bankruptcy Court for the District of Delaware, (b) to the extent of any reference under Section 157 of title 28 of the United States Code, the unit of such court constituted under Section 151, title 28 of the United States Code or (c) such other court to which the Company's bankruptcy case may be transferred.

(g)     "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, as amended.

(h)     "Closing" means the consummation of the transactions contemplated in this Agreement.

(i)     "Closing Date" means the date of the Closing.

(j)     "Company" means Vision Metals, Inc., a Delaware corporation and a debtor and a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

(k)     "Damages" means all Liabilities, damages, Losses, penalties, fines, forfeitures, assessments, claims, suits, proceedings, actions, written demands, causes of action, judgments, awards, taxes, and expenses including court costs, reasonable attorneys' fees, consultants' and experts' fees and other costs and expenses incident to the transaction or proceedings or investigation or the defense of any claim known as of the Closing Date (whether or not litigation has commenced).

(l)     "Deposit" means an earnest money deposit of 25% of the Purchase Price.

(m)     "Environmental Laws" means federal, state and local Laws relating to pollution or protection of the environment or worker health and safety, including Laws relating to Waste emissions, discharges, generation, storage, releases or threatened releases of Waste into the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Waste including, without limitation, the Clean Water Act, the Clean Air Act, the Resource Conservation and Recovery Act, the Toxic Substances Control Act and CERCLA, as amended, and their state and local counterparts.

(n)     "Environmental Obligations" means any Liabilities, as such relate exclusively to the Company's GST Division, arising out of, related to or incurred in connection with any pollution, threat to the environment, or exposure to or manufacture, processing, distribution, use, treatment, generation, transport or handling, disposal, emission, discharge, storage or release of Waste that (i) results from the Company's ownership, operation or occupancy of any facility prior to Closing or the Company's business, properties or assets prior to Closing, including without limitation any failure to comply with the Environmental Laws or (ii) occurred, existed, arose out of conditions or circumstances that existed, or were, in whole or in part, caused on or before the Closing

-9-

Date.

(o)   "Governmental Entity" means any court, arbitrator, department, commission, board, bureau, agency, authority, instrumentality or other governing body, having jurisdiction over the Company whether federal, state, municipal or foreign.

(p)   "Law" means any statute, law, ordinance, rule or regulation, including filing rules and requirements of the Securities and Exchange Commission, state securities commissions, stock exchanges and the National Association of Securities Dealers.

(q)   "Lenders" shall mean The CIT Group/Business Credit, Inc.

(r)   "Liability" or "Liabilities" means any and all obligations (whether to make payments, to give notice or to perform or not perform any action), commitments, contingencies and other liabilities (whether known or unknown, asserted or not asserted, whether absolute, accrued, contingent, fixed or otherwise, determined or determinable, liquidated or unliquidated, and whether due or to become due), of a Person and including, without limitation, any Damages.

(s)   "Liens" means mortgages, liens (statutory or otherwise), security interests, claims, pledges, licenses, options, conditional sales contracts, assessments, levies, easements, covenants, reservations, restrictions, rights-of-way, charges or encumbrances of any nature whatsoever other than the Assumed Liabilities; provided, however, that with respect to Real Property, "Liens" does not include any easements, restrictions and other matters of record which do not affect the use or marketability of the Real Property, or any matters of record shown on any surveys of the Real Property which do not affect the use or marketability of the Real Property.

(t)   "Loss" means (i) all losses, damages, judgments, awards, penalties and settlements; (ii) all demands, claims, suits, actions, causes of action, proceedings and assessments determined valid; and (iii) all reasonable costs and expenses (including, without limitation, interest (including prejudgment interest in any litigated or arbitrated matter), court costs and reasonable fees and expenses of attorneys and expert witnesses) of investigating, defending or asserting any of the foregoing or of enforcing this Agreement.

(u)   "Order" means any order, writ, injunction, judgment, plan or decree entered by any court of competent jurisdiction.

(v)   "Person" means any individual, company, corporate body, association, partnership, firm, joint venture, trust, trustee or Governmental Entity.

(w)   "Personal Property" means all Inventory, Equipment, office furniture and all other personal property owned, utilized or held for use by the Company on the Closing Date.

(x)   "Purchase Price" means the aggregate price to be paid by Buyer for the Real Property including the Assumed Liabilities.

-10-

STATE - 592

(y)     "Real Property" shall have the meaning described in **Section 4.3(b)**.

(z)     "Sale Order" means a final order of the Bankruptcy Court approving this Agreement, and authorizing, pursuant to all applicable sections of the Bankruptcy Code, all of the transactions and agreements contemplated hereby, which order shall not have been stayed, vacated or otherwise rendered ineffective, and which includes, without limitation, the following provisions:

(i)     a finding that the Real Property are property of Company's estate within the meaning of Section 541 of the Bankruptcy Code;

(ii)     a finding that all parties in interest, including each person or entity known to the Company to have any ownership interest in the Real Property have been given proper and adequate notice of the motion seeking entry of the Sale Order;

(iii)     a provision that authorizes the sale of the Real Property and assignment of the Assumed Liabilities to Buyer free and clear of all Liens; provided, however, that the Real Property shall be transferred subject to all easements, restrictions and other matters of record and all matters of record shown on the surveys of the Real Property required by **Section 6.2**; and

(iv)     a finding that Buyer has acted in good faith within the meaning of Section 363(m) of the Bankruptcy Code.

(aa)     "Terms of Sale" means the terms of sale approved by the Court.

(bb)     "Transfer" means to sell, deliver, assign and convey.

(cc)     "Waste" means any substance which is defined or regulated as a hazardous or toxic waste, hazardous or toxic substance, pollutant or contaminant under any Environmental Law, including but not limited to, polychlorinated biphenyls ("PCBs"), petroleum or petroleum fractions, and asbestos.

13.     **MISCELLANEOUS**

13.1.     _Further Assurance_.  From time to time, at either party's reasonable request and without further consideration, each party will execute and deliver to the other party such documents, instruments and consents and take such other action as such party may reasonably request in order to consummate more effectively the transactions contemplated hereby.

13.2.     _Disclosures and Announcements_.  Both the timing and the content of all disclosure to third parties and public announcements concerning the transactions provided for in this Agreement by either the Company or Buyer shall be subject to the approval of the Company and Buyer in all essential respects, except as otherwise required by law, the Bankruptcy Court or other court of competent jurisdiction.

13.3.     _Assignment_.  Except for any assignment by the Buyer to any Affiliate of the

-11-

STATE - 593

Buyer or as expressly provided herein, the rights and obligations of a party hereunder may not be assigned, transferred or encumbered without the prior written consent of the other party.

13.4. <u>Amendment and Modification</u>. Buyer and the Company may amend, modify and supplement this Agreement in such manner as may be agreed upon by them in writing; provided, however, that no amendment, modification or supplement shall be effective unless in writing signed by both parties.

13.5. <u>Notice</u>. All notices, requests, demands and other communications hereunder shall be given in writing and shall be: (a) personally delivered; (b) sent by telecopier, facsimile transmission or other electronic means of transmitting written documents; or (c) sent to the parties at their respective addresses indicated herein by registered or certified U.S. mail, return receipt requested and postage prepaid, or by private overnight mail courier service. The respective addresses to be used for all such notices, demands or requests are as follows:

If to Buyer, to:    Bernard J.Morello

5100 San Filipe

Houston, TX 77056

Phone:(713) 850-8669

or to such other person or address as Buyer shall furnish to Company in writing.

If to the Company, to:
Gulf States Tube
P.O. Box 952
Scott Road & Spur 529
Rosenburg, TX 77471
Attention: Robert T. Bassman

(with a copy to)

Foley & Lardner
150 W. Jefferson Avenue; Suite 1000
Detroit, Michigan 48226
Attn: Sal A. Barbatano, Esq.
Facsimile: (313) 963-9308

or to such other person or address as Company shall furnish to Buyer in writing.

If personally delivered, such communication shall be deemed delivered upon actual receipt; if electronically transmitted pursuant to this paragraph, such communication shall be deemed delivered the next business day after transmission (and sender shall bear the burden of proof of delivery); if sent by overnight courier pursuant to this paragraph, such communication shall be deemed delivered upon receipt; and if sent by U.S. mail pursuant to this paragraph, such

-12-

STATE - 594

communication shall be deemed delivered as of the date of delivery indicated on the receipt issued by the relevant postal service, or, if the addressee fails or refuses to accept delivery, as of the date of such failure or refusal. Any party to this Agreement may change its address for the purposes of this Agreement by giving notice thereof in accordance with this section.

13.6.  Expenses.  Except as otherwise provided herein, each of the parties shall bear its own expenses and the expenses of its counsel and other agents in connection with the transactions contemplated hereby, except that Buyer shall be obligated to pay the Auctioneer the 10% Buyer's Premium provided in the Terms of Sale.

13.7.  Entire Agreement.  Subject to the provisions of paragraph 13.15 hereof, this Agreement and any agreements executed in connection with this Agreement, the Schedules contained herein and the Terms of Sale represent the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior negotiations between such parties.

13.8.  Waiver of Breach, Right or Remedy.  The waiver by any party of any breach or violation by another party of any provision of this Agreement or of any right or remedy of the waiving party in this Agreement (a) shall not waive or be construed to waive any subsequent breach or violation of the same provision, (b) shall not waive or be construed to waive a breach or violation of any other provision, and (c) shall be in writing and may not be presumed or inferred from any party's conduct. Except as expressly provided otherwise in this Agreement, no remedy conferred by this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be in addition to every other remedy granted in this Agreement or now or hereafter existing at law or in equity, by statute or otherwise. The election of any one or more remedies by a party shall not constitute a waiver of the right of such waiving party to pursue other available remedies. In addition to any other rights and remedies any party may have at law or in equity for breach of this Agreement, each party shall be entitled to seek an injunction to enforce the provisions of this Agreement.

13.9.  Invalid Provisions.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement shall not be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, and (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom.

13.10.  No Third Party Beneficiaries.  The terms and provisions of this Agreement are intended solely for the benefit of the parties hereto and their respective successors or permitted assigns, and it is not the intention of the parties hereto to confer third party beneficiary rights upon any other person.

13.11.  Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas to a contract executed and performed in such State, without giving effect to the conflicts of laws principles thereof.

-13-

STATE - 595

explicit cross-reference appears. All schedules shall be updated as of the Closing. The Schedules hereto shall for all purposes be deemed to mean and refer to the Schedules hereto, as amended and supplemented by such updated Schedules.

13.13. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

13.14. Headings. The headings in this Agreement are inserted for convenience only and shall not constitute a part hereof.

13.15. Conflict. To the extent a conflict exists between the terms of the Sale Order and the terms of this Agreement, the terms of the Sale Order shall control for all purposes.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date and year first above written.

Bernard J. Morello

VISION METALS, INC., a Delaware corporation

By: Robert T. Barson

Its: Chief Financial & Restructuring Officer

-14-

## Schedule 4.3(a)

## Permitted Real Estate Liens

Any and all liens, easements, restrictions and other matters of record which do not interfere with the use and enjoyment of the Real Property, including but not limited to:

1. Pipeline right-of-way easement granted to Seagull Resources, Inc. as disclosed by instrument dated February 15, 1985, recorded in Volume 1695, Page 103 of the Official Records of Fort Bend County, Texas.

2. Pipeline right-of-way easement granted to Picton Pipeline County, Inc. by instrument dated February 15, 1985, recorded Volume 1695, Page 103, of the Official Records of Fort Bend County, Texas.

3. Permit granting pipeline crossing to Houston Pipe Line Company issued by Commissioner's Court of Fort Bend County, Texas, certified copy of which is recorded on February 10, 1970, under Fort Bend County Clerk's File No. 182121.

4. A 1/16th royalty interest in and to all oil, gas and other minerals, on, in, under, that may be produced from the Property is excepted herefrom as set forth instrument recorded in Volume 352, Page 75, of the Deed Records of Fort Bend County, Texas.

5. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File Nos. 8815150 and 8522203.

6. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File No. 158397.

7. Industrial Waste Disposal Site as set forth and described by instrument recorded in Volume 749, Page 128, of the Deed Records of Fort Bend County, Texas.

8. Industrial Waste Disposal site as set forth and described by instrument recorded in Volume 780, Page 608, of the Deed Records of Fort Bend County, Texas.

9. Industrial Waste Disposal Site, as set forth and described by instrument recorded in Volume 2166, Page 2593, of the Official Records of Fort Bend County, Texas.

10. Industrial Waste Disposal Site, as set forth and described by instrument recorded in Volume 1843, Page 2452, of the Official Records of Fort Bend County, Texas.

11. Pipeline easement granted to Seaway Pipeline, Inc., a Delaware corporation by instrument recorded in Volume 656, Page 322, of the Deed Records of Fort Bend County, Texas and as amended by instruments recorded in Volume 742, Page 708, of the Deed Records of Fort Bend County, Texas and in Volume 151, Page 889 of the Official Records of Fort Bend County, Texas.

-15-

STATE - 597

12. A $1/16^{th}$ royalty interest in and to all oil, gas and other minerals, on, in, under, that may be produced from the Property is excepted herefrom as set forth in instrument recorded in Volume 404, Page 134 and Volume 407, Page 139, both of the Deed Records of Fort Bend County, Texas.

13. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File No. 8767545.

14. Industrial Waste Disposal Site as set forth and described by instrument recorded in volume 683, Page 610, of the Deed Records of Fort Bend County, Texas.

15. Terms, conditions and stipulations of that certain covenant and provisions by and between Guarantors and Gulf States Tube Corporation set forth in Deed dated April 7th, 1960, recorded in Volume 404, Page 134 and Volume 407, Page 139, of the Deed Records of Fort Bend County, Texas.

16. An easement granted to Houston Lighting and Power Company by instrument recorded in Volume 538, Page 830, of the Deed Records of Fort Bend County, Texas.

17. An unobstructed aerial easement for electrical transmission and distribution lines, granted to Houston Lighting and Power Company by instrument recorded in Volume 1012, Page 501 of the Deed Records of Fort Bend County, Texas.

18. Entrance Road access to the easement described in 17 above, as shown by Sketch No. 81-417, prepared by Houston Lighting and Power Company as attached therein.

19. Pipeline right-of-way easement granted to Seaway Pipeline, Inc., a Delaware corporation, by instrument recorded in Volume 656, Page 322, of the Deed Records of Fort Bend County, Texas, as amended by instrument recorded in Volume 742, Page 708, of the Deed Records of Fort Bend County, Texas and in Volume 1511, Page 889, of the Official Records of Fort Bend County, Texas. Assigned to Phillips Natural Gas Company by instrument recorded in Volume 1449, Page 457 and in Volume 1449, Page 472, both of the Official Records of Fort Bend County, Texas. Said pipeline right-of-way has been amended by Agreement dated April 1, 1985, recorded in Volume 1647, Page 791, of the Official Records of Fort Bend County, Texas, by and between Quanex Corporation, Gulf States Tube Division and Phillips Natural Gas Company.

20. A ½ of all the oil, gas and other minerals, the royalties, bonuses, rentals and all other rights in connection with the same are excepted herefrom, as set forth in instrument recorded in Volume 258, Page 340, of the Deed Records of Fort Bend County, Texas.

21. A $1/32^{nd}$ royalty interest in and to all oil, gas and other minerals, on, in, under, that may be produced from the Property is excepted herefrom as set forth in instrument recorded in Volume 400, Page 171, of the Deed Records of Fort Bend County, Texas.

22. Terms, conditions and provision of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File No. 8507314, assigned by instrument recorded under Fort Bend County Clerk's File No. 8559356.

-16-

STATE - 598

23. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File Nos. 85522199, 8522200, 8522201, as ratified by instruments recorded under Fort Bend County Clerk's File Nos. 8529458, 8529459 and 8529460.

24. Terms and conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File Nos. 8523477, 9523478 and 8525374.

25. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File Nos. 8774289, 8774290, 87742994, 8808236, 8808237, 8808238, as amended under Fort Bend County Clerk's File Nos. 8857250 and 8815149.

26. Pipeline easement granted to Seaway Pipeline, Inc., a Delaware corporation, by instrument recorded in Volume 656, Page 322, of the Deed Records of Fort Bend County, Texas and as amended by instruments recorded in Volume 742, page 708, of the Deed Records of Fort Bend County, Texas and in Volume 1511, Page 889, of the Official Records of Fort Bend County, Texas.

27. Power line easement as disclosed by Deed into Gulf Stream Tube Corporation dated May 31, 1967, recorded in Volume 488, Page 853, of the Deed Records of Fort Bend County, Texas.

28. A ½ royalty interest in and to all oil, gas and other minerals, on, in, under, that may be produced from the Property is excepted herefrom as set forth in instrument recorded in Volume 488, Page 853, of the Deed Records of Fort Bend County, Texas.

29. Terms, conditions and provisions of that certain oil, gas and mineral lease(s) recorded under Fort Bend County Clerk's File No. 8507314, assigned by instrument recorded under Fort Bend County Clerk's File No. 8559356.

30. A 1/16th royalty interest in and to all oil, gas and other minerals, on, in, under, that may be produced from the Property is excepted herefrom as set forth in instrument recorded in Volume 394, Page 587 of the Deed Records of Fort Bend County, Texas.

31. Easement for pipeline as evidenced by pipeline markers located on the Northeast and southeast corners of the Property as disclosed by survey dated November 25, 1997, prepared by John G. Thomas, R.P.L.S. No. 1494.

32. Railroad spur tract running through the Easterly portion of the Property as disclosed by survey dated November 19, 1997, revised on November 25, 1997, prepared by John G. Thomas, R.P.L.S. No. 1494.

33. Drainage ditch running through the middle of the Property as disclosed by survey dated November 19, 1997, revised on November 25, 1997, prepared by John G. Thomas, R.P.L.S. No. 1494.

34. .That certain easement granted to Houston Lighting and Power.

35. . Those certain oil, gas and mineral rights granted to Brinkerhoff-Turner.

-17-

STATE - 599

36. Those certain oil, gas and mineral rights granted to Don Shepard.

37. That certain easement for transmission of petroleum and petroleum related products granted to Seaway Petroleum.

38. That certain Industrial Waste Deed Certification that was filed in January 2001.

STATE - 600

## Schedule 4.3(b)

### Real Property

That certain lot, tract or parcel of land lying and being situated in Fort Bend County, Texas, and out of and part of the C.P. Osborne Survey, Abstract No. 691, and the Moses Merritt Survey, Abstract No. 287, and a part of Lot 81 of Slavin and George Subdivision, and more particularly described by metes and bounds as follows, to-wit:

COMMENCING at the Southwest corner of the Henry Scott League, Abstract No. 83, Fort Bend County, Texas;

THENCE North along the West line of said Henry Scott League, at 1531.9 feet pass a 1-1/4 inch iron pipe, the South corner of the C.P. Osborne Survey, Abstract No. 691 and continuing North along said League line at 2214.7 feet pass South corner of the Moses Meritt Survey abstract No. 287, at 2283.7 feet pass centerline of G.H. & S.A. RR. Co. R.O.W. and continuing a total distance of 2320.8 feet to a point;

THENCE West 34 feet to a ¾ inch iron pipe in the Northwest right-of-way line of the G.H. & S.A. RR. Co. and fence line, also being the West right-of-way of a County Road commonly known as Scott Road as the PLACE OF BEGINNING of this herein described tract of land;

THENCE South 55 deg. 41 min. West along the Northwest right-of-way line of the G.H. & S.A. RR. Co. 551.6 feet to a ¾ inch iron pipe in the Southwest line of the C.P. Osborne Survey, for a corner;

THENCE North 21 deg. 58 min. 30 sec. West 2050.91 feet to a ¾ inch iron pipe in a fence line also being the South right-of-way line of a County Road commonly known as Mueggs Road, which point is South 49 feet from the North line of the C.P. Osborne Survey, for a corner;

THENCE North 83 deg. 25 min. East along a fence line also being the South right-of-way line of said County Road commonly known as Mueggs Road and parallel to the North line of the C.P. Osborne Survey and the North line of the Moss Merritt Survey 1231.17 feet to a ¾ inch iron pipe in a fence line also being the West right-of-way line of a County Road commonly know as Scott Road, for a corner;

THENCE South along a fence line also being the West right-of-way line of said Scott Road 1732.0 feet to the PLACE OF BEGINNING containing 37.00 acres of land, according to a survey on the ground made by S.A. Russell, Registered Professional Engineer on the 16th day of June, 1956 and being the same tract conveyed to Gulf States Tube Corporation by Deed dated July 12, 1956, recorded in Volume 352, Page 75, of the Deed Records of Fort Bend County, Texas and subsequently conveyed to Vision Metals, Inc. by Special Warranty Deed dated December 3, 1997 recorded in Volume [    ] Page [    ] of the Deed Records of Fort Bend County, Texas.

STATE - 601

All that certain tract or parcel of land lying and being situated in the C.P. Osborne Survey, Abstract 691, Fort Bend County, Texas, out of Lot 81 of the Slavin and George Subdivision and the Moses Merritt Survey, Abstract 87, and the Lester E. Cross Survey, Abstract 408, all in Fort Bend County, Texas, and more particularly described by metes and bounds as follows, to-wit:

BEGINNING at an iron pipe set for the West corner of the C.P. Osborne Survey, Abstract 691, same being the North corner of the Charles N. Simpson Survey, Abstract 485 and in the Southeast line of the Lester E. Cross Survey, Abstract 408;

THENCE South 44 deg. 30 min. West, along the Southeast line of the Lester E. Cross Survey and the Northwest line of the Charles N. Simpson Survey, 336.5 feet to an iron pipe for a corner;

THENCE North 06 deg. 35 min. West, 389.55 feet to an iron pipe in the Southerly line of Mueggs Road for a corner;

THENCE North 83 deg. 25 min. East, along the Southerly line of Mueggs Road at 281.95 feet pass the point of intersection of the South line of Mueggs Road and the Southeast line of the Lester E. Cross Survey, and continuing North 83 deg. 25 min. East along the Southerly line of Mueggs Road for a total distance of 1175.65 feet to an iron pipe set for a corner; same being the Northwest corner of the Gulf States Tube Corporation 37.0 acre tract;

THENCE South 21 deg. 58 min. 30 sec. East along the Westerly line of the said 37.0 acre tract, 1874.91 feet to an iron pipe for a corner;

THENCE South 24 deg. 06 min. West 74.3 feet to an iron pipe for a corner; said point being in the Westerly line of the C.P. Osborne Survey, Abstract 691, for a corner;

THENCE North 45 deg. 30 min. West, 2181 feet along the West line of the C.P. Osborne Survey, Abstract 691 to the POINT AND PLACE OF BEGINNING, containing 25.322 acres of land, being 23.167 acres out of the C.P. Osborne Survey, Abstract 691 and Moses Merritt Survey, Abstract 87 and 2.155 acres out of the Lester E. Cross Survey, Abstract 408, and being the same tract conveyed to Gulf States Tube Corporation by Deed dated April 7, 1960, recorded in Volume 404, Page 134, and by Deed dated August 12, 1960, recorded in Volume 407, Page 139, both of the Deed Records of Fort Bend County, Texas, and subsequently conveyed to Vision Metals, Inc. by Special Warranty Deed dated December 3, 1997 recorded in Volume [    ] Page [    ] of the Deed Records of Fort Bend County, Texas.

That certain 20 acres of land, more or less, out of Section No. 12, Cert. No. 86, H.& T. C. RR. Company Survey, Abstract 485, Fort Bend County, Texas, described as follows, to-wit:

BEGINNING at a ½ inch iron pipe set in the North corner of Section 12, Charles N. Simpson Survey, Abstract 485, Fort Bend County, same being the most Westerly corner of the C.P. Osborne Survey, Abstract 691, and in the Southeast line of the Lester E. Cross Survey, Abstract 408;

THENCE South 45 deg. 30 min. East along the common lines of the Charles N. Simpson Survey

-20-

and the C.P. Osborne Survey, at 2157 feet cross power line, at 2181 feet pass a ¼ inch iron pipe and the Northwest right-of-way of the G.H. & S.A. RR. (Victoria Division) for a corner.

THENCE South 55 deg. 41 min. West along the Northwest right-of-way line of the G.H. & S.A. RR., 436.5 feet to a ½ inch iron pipe set for a corner;

THENCE North 43 deg. 09 min. West at 413 feet cross power line and continuing a total distance of 2233.3 feet to a ½ inch pipe set in the Northwest line of Section 12, Charles N. Simpson Survey, Abstract 485, and the Southeast line of the Lester E. Cross Survey, Abstract 408, for a corner;

THENCE North 44 deg. 30 min. East, along the common line of said Simpson and Cross Surveys, 336.5 feet to the POINT AND PLACE OF BEGINNING, containing 20 acres of land, and being the same tract conveyed to Gulf States Tube Corporation by Deed dated January 6, 1960, recorded in Volume 400, Page 171 of the Deed Records of Fort Bend County, Texas and subsequently conveyed to Vision Metals, Inc. by Special Warranty Deed dated December 3, 1997 recorded in Volume [   ] Page [   ] of the Deed Records of Fort Bend County, Texas.

That certain 115.22 acres of land, more or less, out of Section No. 12, Cert. No. 86, H. & T. C. RR. Company Survey, Abstract 485, Fort Bend County, Texas, described as follows, to-wit:

BEGINNING at a ½ inch iron pipe found marking the North corner of said Section No. 12 and of that certain 1 35.22 acre tract d escribed i n D ecd from Jo e D ailcy, et al to S am D ailcy, et u x, recorded in Volume 258, Page 340, et seq., of the Deed Records of Fort Bend County, Texas, and of the North corner of that certain 20 acre tract conveyed by Sam Daily, et ux to Gulf States Tube Corporation by Deed recorded in Volume 400, page 171 et. seq., of the Deed Records of Fort Bend County, Texas;

THENCE South 45 deg. West, 336.5 feet to a ½ inch iron pipe found for the North corner of and PLACE OF BEGINNING for this tract;

THENCE South 42 deg. 38 min. East, along the Southwest line of said Gulf States Tube Corp. tract, at 1822.2 feet pass power line, in all 2234.7 feet to an iron pipe found for the East corner of this tract; said corner bears South 56 deg. 14 min. West 436.5 feet from the East corner of said Gulf States Tube Corp. Tract;

THENCE South 56 deg. 14 min. West, 2648.67 feet along the Northwest line of the G.H. & S.A. RR. (100 feet wide) to an iron pipe set for the South corner of this tract;

THENCE North 36 deg. 42 min. West, at 30.7 feet pass a ¼ inch by 4 inch galvanized plate found, then along a fence line marking the Northeast line of the Leon Daily, et al 82.35 acre tract, at 1733.16 feet pass a post found, in all 1735.16 feet to an iron pipe set for the West corner of this tract;

THENCE North 45 deg. East, along the Northwest line of the said Section No. 12 at 128 feet pass said power line, in all 2439.9 feet to the PLACE OF BEGINNING and containing 115.22

-21-

acres of land, more or less and being the same tract conveyed to Gulf States Tube Corporation by Deed dated May 31, 1967, recorded in Volume 488, Page 853, of the Deed Records of Fort Bend County, Texas, and subsequently conveyed to Vision Metals, Inc. by Special Warranty Deed dated December 3, 1997 recorded in Volume [    ] Page [    ] of the Deed Records of Fort Bend County, Texas.

STATE - 604

# EXHIBIT D

# ASSIGNMENT OF REAL ESTATE
# PURCHASE AGREEMENT

WHEREAS, effective on February 27, 2004, VISION METALS, INC., a Delaware corporation, herein called "Seller", and BERNARD J. MORELLO, entered into a Real Estate Sale Agreement, herein the "Contract", for the sale by Seller to Buyer of the following-described property in Fort Bend County, Texas, to-wit:

That certain 4 tracts of land in Fort Bend County, Texas, and more particularly described on Exhibit "A" attached hereto (herein the "Property"); and

WHEREAS, the Contract was been amended by First Amendment to Real Estate Sale Agreement dated March 30, 2004; and

WHEREAS, Buyer desires to assign its rights under the Contract, as so amended, to WHITE LION HOLDINGS, L.L.C., a Texas limited liability company ("Assignee"), an affiliated entity of Buyer; and

WHEREAS, Buyer and Assignee desire to document their agreements with respect to said Contract, and the rights and obligations contained therein,

WHEREAS, the Contract provides that Buyer may assign said Contract to an Affiliate of Buyer.

NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:

That the parties do hereby agree as follows:

1.  In consideration of the payment of $10.00 and other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, Buyer does hereby assign and transfer to Assignee all its rights, duties and obligations under the Contract.

2.  By its execution hereof, Assignee hereby agrees to be bound by the terms of the Contract, as so amended, to the same extent that Buyer was bound under the Contract.

EXECUTED THIS THE 5<sup>*</sup> DAY OF APRIL, 2004.

_BERNARD J. MORELLO_

WHITE LION HOLDINGS, L.L.C.

By: _____
Name: Bernard J. Morello, sole Manager

PREPARED IN THE LAW OFFICE OF
MORRIS, LENDAIS, HOLLRAH & SNOWDEN, P.C.
1980 Post Oak Boulevard, Suite 700
Houston, Texas 77056
f:\george\rauscon\Morello_PartAssignof REPA.wpd

EXHIBIT

STATE - 75

# EXHIBIT E

# SPECIAL WARRANTY DEED

THE STATE OF TEXAS §
§    KNOW ALL MEN BY THESE PRESENTS:
COUNTY OF FORT BEND §

THAT **VISION METALS, INC., a Delaware corporation**, hereinafter called "Grantor", for and in consideration of the sum of TEN AND NO/100 DOLLARS ($10.00) cash and other good and valuable consideration in hand paid by **WHITE LION HOLDINGS, L.L.C., a Texas limited liability company**, hereinafter called "Grantee", the receipt of which is hereby acknowledged; has GRANTED, SOLD and CONVEYED, and by these presents does GRANT, SELL and CONVEY unto Grantee all that certain tract or parcel of land, together with all improvements thereon, lying and being situated in Fort Bend County, Texas, described as follows, to-wit:

Tract 1:

A tract or parcel of land containing 37.00 acres, more or less, out of the C.P., Osborne Survey, Abstract No. 691, and the Moses Merritt Survey, Abstract No. 287, and a part of Lot 81 of the Slavin and George Subdivision, in Fort Bend County, Texas, said Tract 1 being more particularly described by metes and bounds on Exhibit "A" attached hereto and made a part hereof;

Tract 2:

A tract or parcel of land containing 25.322 acres, more or less, out of the C.P., Osborne Survey, Abstract No. 691, and the Moses Merritt Survey, Abstract No. 287, and in the Lester E. Cross Survey, Abstract No. 408, and a part of Lot 81 of the Slavin and George Subdivision, in Fort Bend County, Texas, said Tract 2 being more particularly described by metes and bounds on Exhibit "A" attached hereto and made a part hereof;

Tract 3:

That certain 20 acres of land, more or less, out of Section No. 12, Cert. No. 86, H. & T.C. RR. Company Survey, Abstract No. 485, in Fort Bend County, Texas, said Tract 3 being more particularly described by metes and bounds on Exhibit "A" attached hereto and made a part hereof;

Tract 4:

A tract or parcel of land containing 115.22 acres, more or less, out of Section No. 12, Cert. No. 86, H. & T.C. RR. Company Survey, Abstract No. 485, in Fort Bend County, Texas, said Tract 4 being more particularly described by metes and bounds on Exhibit "A" attached hereto and made a part hereof.

This conveyance is made and accepted subject to any and all easements, rights-of-way, valid restrictions, mineral reservations of any kind, maintenance charges, building set-back lines, and governmental regulations, if any, to the extent, but only to the extent that they are reflected by the records of the Office of the County Clerk of the above-mentioned County and State.

TO HAVE AND TO HOLD the above-described premises, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Grantee, its successors and assigns, forever; and Grantor does hereby bind itself, and its successors and assigns to WARRANT and FOREVER DEFEND, all and singular the title to the said premises unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming, or to claim title to the same, or any part thereof, by, through, or under the undersigned, but not otherwise.

EXECUTED on this, the 5ᵗʰ day of April, 2004, effective as of and from _APRIL 6_, 2004..

VISION METALS, INC., a Delaware corporation

By: Robert T Bassman
Name: Robert T. Bassman
Title: Chief Restructuring Officer

EXHIBIT

THE STATE OF TEXAS    §
                      §
COUNTY OF HARRIS      §

    This instrument was acknowledged before me, on this, the 5ᵗʰ day of APRIL____, 2004, by ROBERT T. BASSMAN, Chief Restructuring Officer of VISION METALS, INC., a Delaware corporation, as the act and deed of said corporation.

_____
NOTARY PUBLIC, STATE OF TEXAS

JOHN H. EAKER
Notary Public, State of Texas
My Commission Expires
**August 31, 2004**

**GRANTEE'S MAILING ADDRESS:**

White Lion Holdings, L.L.C.
5100 San Felipe, Unit 78E
Houston, Texas 77056

**RETURN AFTER RECORDING TO:**

Morris, Lendais, Hollrah & Snowden
1980 Post Oak Blvd., Suite 700
Houston, Texas 77056
Attention: George W. Bamberg, Jr.

PREPARED IN THE LAW OFFICE OF

MORRIS, LENDAIS, HOLLRAH & SNOWDEN
1980 Post Oak Boulevard, Suite 700
Houston, Texas 77056
04/05/4
f:\george\misconv\Morello_VisionMetalsSWD1.wpd

  - 2 -

## EXHIBIT A

### TRACT 1:

That certain lot, tract or parcel of land lying and being situated in Fort Bend County, Texas, and out of and a part of the C.P. Osborne Survey, Abstract No. 691, and the Moses Merritt Survey, Abstract No. 287, and a part of Lot 81 of the Slavin and George Subdivision, and more particularly described by metes and bounds as follows, to-wit:

COMMENCING at the Southwest corner of the Henry Scott League, Abstract No. 83, Fort Bend County, Texas;

THENCE North along the West line of said Henry Scott League, at 1531.9 feet pass a 1-1/4 inch iron pipe, the South corner of the C.P. Osborne Survey, Abstract No. 691 and continuing North along said League line at 2214.7 feet pass the South corner of the Moses Merritt Survey, Abstract No. 287, at 2283.7 feet pass centerline of G.H. & S.A. RR. Co. R.O.W. and continuing a total distance of 2320.8 feet to a point;

THENCE West 34 feet to a 3/4 inch iron pipe in the Northwest right-of-way line of the G.H. & S.A. RR. Co. and a fence line, also being the West right-of-way of a County Road commonly known as Scott Road as the PLACE OF BEGINNING of this herein described tract of land;

THENCE South 55 deg. 41 min. West along the Northwest right-of-way line of the G.H. & S.A. RR. Co. 551.6 feet to a 3/4 inch iron pipe in the Southwest line of the C.P. Osborne Survey, for a corner;

THENCE North 21 deg. 58 min. 30 sec. West 2050.91 feet to a 3/4 inch iron pipe in a fence line also being the South right-of-way line of a County Road commonly known as Mueggs Road, which point is South 49 feet from the North line of the C.P. Osborne Survey, for a corner;

THENCE North 83 deg. 25 min. East along a fence line also being the South right-of-way line of said County Road commonly known as Mueggs Road and parallel to the North line of the C.P. Osborne Survey and the North line of the Moses Merritt Survey 1231.17 feet to a 3/4 inch iron pipe in a fence line also being the West right-of-way line of a County Road commonly known as Scott Road, for a corner;

THENCE South along a fence line also being the West right-of-way line of said Scott Road 1732.0 feet to the PLACE OF BEGINNING containing 37.00 acres of land, according to a survey on the ground made by S.A. Russell, Registered Professional Engineer on the 16th day of Jun, 1956 and being the same tract conveyed to Gulf States Tube Corporation by Deed dated July 12, 1956, recorded in Volume 352, Page 75, of the Deed Records of Fort Bend County, Texas.

0581782.01

## TRACT 2:

All that certain tract or parcel of land lying and being situated in the C.P. Osborne Survey, Abstract 691, in Fort Bend County, Texas, out of Lot 81 of the Slavin and George Subdivision and in the Moses Merritt Survey, Abstract 87, and in the Lester E. Cross Survey, Abstract 408, all in Fort Bend County, Texas, and more particularly described by metes and bounds as follows, to-wit:

BEGINNING at an iron pipe set for the West corner of the C.P. Osborne Survey, Abstract 691, same being the North corner of the Chas. N. Simpson Survey, Abstract 485 and in the Southeast line of the Lester E. Cross Survey, Abstract 408;

THENCE South 44 deg. 30 min. West, along the Southeast line of the Lester E. Cross Survey and the Northwest line of the Chas. N. Simpson Survey, 336.5 feet to an iron pipe for a corner;

THENCE North 06 deg. 35 min. West, 389.55 feet to an iron pipe in the Southerly line of Mueggs Road, for a corner;

THENCE North 83 deg. 25 min. East, along the Southerly line of Mueggs Road at 281.95 feet pass the point of intersection of the South line of Mueggs Road and the Southeast line of the Lester E. Cross Survey, and continuing North 83 deg. 25 min. East along the Southerly line of Mueggs Road for a total distance of 1175.65 feet to an iron pipe set for a corner; same being the Northwest corner of the Gulf States Tube Corporation 37.0 acre tract;

THENCE South 21 deg. 58 min. 30 sec. East along the Westerly line of the said 37.0 acre tract, 1874.91 feet to an iron pipe for a corner;

THENCE South 24 deg. 06 min. West 74.3 feet to an iron pipe for a corner; said point being in the Westerly line of the C.P. Osborne Survey, Abstract 691, for a corner;

THENCE North 45 deg. 30 min. West, 2181 feet along the West line of the C.P. Osborne Survey, Abstract 691 to the POINT AND PLACE OF BEGINNING, containing 25.322 acres of land, being 23.167 acres out of the C.P. Osborne Survey, Abstract 691 and Moses Merritt Survey, Abstract 87 and 2.155 acres out of the Lester E. Cross Survey, Abstract 408, and being the same tract conveyed to Gulf States Tube Corporation by Deed dated April 7, 1960, recorded in Volume 404, Page 134, and by Deed dated August 12, 1960, recorded in Volume 407, Page 139, both of the Deed Records of Fort Bend County, Texas.

Title Data   ST   10.87.141.151   FB   9778354.004

## TRACT 3:

That certain 20 acres of land, more or less, out of Section No. 12, Cert. No. 86, H. & T.C. RR. Company Survey, Abstract 485, Fort Bend County, Texas, described as follows, to-wit:

BEGINNING at a 1/2 inch iron pipe set in the North corner of Section 12, Charles N. Simpson Survey, Abstract 485, Fort Bend County, same being the most Westerly corner of the C.P. Osborne Survey, Abstract 691, and in the Southeast line of the Lester E. Cross Survey, Abstract 408;

THENCE South 45 deg. 30 min. East along the common lines of the Charles N. Simpson and the C.P. Osborne Survey, at 2157 feet cross power line, at 2181 feet pass a 3/4 inch iron pipe and the Northwest right-of-way of the G.H. & S.A. RR. (Victoria Division) for a corner; *continuing a total distance of 2316 feet to a 3/4" iron pipe in*

THENCE South 55 deg. 41 min. West along the Northwest right-of-way line of the G.H. & S.A. RR., 436.5 feet to a 1/2 inch iron pipe set for a corner;

THENCE North 43 deg. 09 min. West at 413 feet cross power line and continuing a total distance of 2233.3 feet to a 1/2 inch pipe set in the Northwest line of Section 12, Charles N. Simpson Survey, Abstract 485, and the Southeast line of the Lester E. Cross Survey, Abstract 408, for a corner;

THENCE North 44 deg. 30 min. East, along the common line of said Simpson and Cross Surveys, 336.5 feet to the POINT AND PLACE OF BEGINNING, containing 20 acres of land, and being the same tract conveyed to Gulf States Tube Corporation by Deed dated January 6, 1960, recorded in Volume 400, Page 171 of the Deed Records of Fort Bend County, Texas.

## TRACT 4:

That certain 115.22 acres of land, more or less, out of Section No. 12, Cert. No. 86, H. & T.C. RR. Company Survey, Abstract 485, Fort Bend County, Texas, described as follows, to-wit:

BEGINNING at a 1/2 inch iron pipe found marking the North corner of said Section No. 12 and of that certain 135.25 acre tract described in Deed from Joe Daily, et al to Sam Daily, et ux, recorded in Volume 258, Page 340, et seq., of the Deed Records of Fort Bend County, Texas, and of the North corner of that certain 20 acre tract conveyed by Sam Daily, et ux to Gulf States Tube Corporation by Deed recorded in Volume 400, Page 171, et seq., of the Deed Records of Fort Bend County, Texas;

THENCE South 45 deg. West, 336.5 feet to a 1/2 inch iron pipe found for the North corner of and PLACE OF BEGINNING for this tract;

THENCE South 42 deg. 38 min. East, along the Southwest line of said Gulf States Tube Corp. tract, at 1822.2 feet pass a power line, in all 2234.7 feet to an iron pipe

Title Data  ST  10.87.141.151  FB  9778354.005

found for the East corner of this tract; said corner bears South 56 deg. 14 min. West 436.5 feet from the East corner of said Gulf States Tube Corp. Tract;

THENCE South 56 deg. 14 min. West, 2648.67 feet along the Northwest line of the G.H. & S.A. Railroad (100 feet wide) to an iron pipe set for the South corner of this tract;

THENCE North 36 deg. 42 min. West, at 30.7 feet pass a 1/4 inch by 4 inch galvanized plate found, then along a fence line marking the Northeast line of the Leon Daily, et al 82.35 acre tract, at 1733.16 feet pass a post found, in all 1735.16 feet to an iron pipe set for the West corner of this tract;

THENCE North 45 deg. East, along the Northwest line of the said Section No. 12 at 128 feet pass said power line, in all 2439.9 feet to the PLACE OF BEGINNING and containing 115.22 acres of land, more or less and being the same tract conveyed to Gulf States Tube Corporation by Deed dated May 31, 1967, recorded in Volume 488, Page 853, of the Deed Records of Fort Bend County, Texas.

Title Data   ST   10.87.141.151   FB   9778354.006

THIS DOCUMENT WAS
FILED BY AND
RETURNED TO:
STEWART TITLE - HOLD

**FILED AND RECORDED**

OFFICIAL PUBLIC RECORDS

2004 Apr 12 05:13 PM          2004042731

AN $17.00

Dianne Wilson, Ph.D. COUNTY CLERK

FT BEND COUNTY TEXAS

# EXHIBIT F

**STATE OF TEXAS**

**COUNTY OF HARRIS**

Before me, the undersigned, on this day personally prepared David H. Heslep, who being duly sworn, deposed and said:

"I am David H. Heslep I am a licensed professional geologist in the State of Texas, license # 6414. Attached hereto are:

| Exhibit | Item | Date |
|---------|------|------|
| A | My qualifications | ---------- |
| B | Services Agreement between White Lion Holdings L.L.C. and WDIA | 12/15/14 |
| C | Draft Memorandum- Steps to Achieve Compliance | 12/15/14 |
| D | Emails between me and E. Wehner at TCEQ | 1/8/15 |
| E | Emails between me and Wehner | 2/11/15 |
| F | U.S. Geological Survey (Brazos River Alluvium Aquifer) | 2007 |

"The facts contained in this affidavit are true of my own personal knowledge.

"All of the exhibits are true and correct copies of the originals, and are incorporated herein by reference for all purposes. My qualifications are attached in Exhibit A.

"I have been hired by Bernard Morello on behalf of White Lion Holdings [WLH] to assess the status of the property formerly owned by Vision Metals, formulate a plan to modify

the existing Compliance Plan and Permit, and to implement that plan. See the attached Services Agreement, Exhibit B. My initial proposal is embodied in Exhibit C (Draft Memorandum-Steps to Achieve Compliance). I have been in communication with TCEQ as evidenced by Exhibits D and E. WLH has been moving forward to implement the plan and has plugged and abandoned old wells and installed new monitoring wells. I have personally been at the WLH site and scheduled and monitored the work that is being done.

"Part of my proposal included a proposed deep monitor well into the second groundwater unit on the south side of the monitoring area. See Exhibit E. However, TCEQ's Eleanor Wehner asked that this well be placed on the north side of the monitoring area because she said records showed that the water flow was to the north rather than the south. In Exhibit E in the Google earth Untitled Map, my proposed well to the south is shown by the white box in the center of the page with the words "Proposed Deep Well Location". Eleanor Wehner's proposed well to the north is shown by the hatched circle with the letters "MW 26" with an arrow pointing north.

"I became puzzled as to why the flow of the targeted aquifer was to the north, rather than the south, since the Upper Chicot aquifer which had been identified as the potentially affected aquifer, flows south.

"Based on my training and experiences, my knowledge of the WLH site, and my review of the Semi Annual Reports for the Vision Metals/White Lion Holdings facility, the 1999 permit renewal application, and a geologic study performed by the United States Geological Survey at the request of the Texas Water Development Board regarding the Brazos River Alluvium Aquifer, I came to the conclusion on April 11, 2015, that a major error had been made in the geological/hydrological analysis as it pertains to the former Vision Metals – White Lion Holdings, LLC site.

"I reviewed the 1999 permit renewal application and noticed it was incomplete.  Only "renewal" was checked, but at the back of the package are attachments labeled as Class 3 Modification to the permit pertaining to recovery wells thus changing the compliance plan.  It also appears the geologic assessment and description have been carried over from the initial permit.  After reviewing this and monitoring reports dated in 2003, they all show groundwater in the lower groundwater unit identified as Zone 2 flowing in a northerly direction.  The geology and aquifer is described in the renewal application as being part of the Upper Chicot aquifer.  It is widely published the Chicot flows in a south to southeast direction toward the Gulf of Mexico.  Since all the reports indicated a northerly flow at the Vision Metals site, this raised the question as to why?  Upon further research of the aquifers in Texas, the aquifer identified as the Brazos River Alluvium Aquifer was identified as being located in the vicinity of the property.  Further research revealed a study done by the USGS in cooperation with the Texas Water Development Board titled Hydrogeologic Characterization of the Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, TX [the report] that revealed that that aquifer had been identified many years before and numerous studies have been done on it.  The report provided detailed

figures and by using those figures with identifiable features of the Brazos River, it was determined the Vision Metals/White Lion property is situated on top of the Brazos River Alluvium aquifer, not the Upper Chicot aquifer. The report further documents groundwater flows in the Brazos River Alluvium aquifer to the north as it does on the Vision Metals/White Lion property. The report states the aquifer is primarily used for irrigation purposes with some domestic uses based on location and water quality. Given this information, it became apparent that further investigation was needed to accurately identify Zone 2.

"I also reviewed:

  1. the current compliance plan and permit for the White Lion facility, and

  2. the 1988 compliance plan.

"In reviewing everything, it is clear that the flow of the aquifer which was potentially subject to contact with the plume at the WLH facility was to the north. The flow of the Upper Chicot aquifer is to the south. This did not make sense so I re-reviewed the U.S. Geological Survey maps and Texas Water Development maps for the area in question. I also determined that the WLH site has intermittent sand lenses which is typical of the Brazos River Alluvial Aquifer, and not typical of the Chicot Aquifer. All things considered, it is my opinion that the reason the actual flow of the aquifer at the WLH facility was to the north was because it was the Brazos River Alluvial Aquifer, not the Upper Chicot Aquifer. I have shared my findings with Eleanor Wehner at TCEQ, and she indicated she agreed with my opinion regarding the identification of the Brazos River Alluvial Aquifer.

"The fact that the actual aquifer potentially affected is the Brazos River Alluvial Aquifer greatly reduces any risk from the WLH plume. It is my opinion that had the proper aquifer been identified by Vision Metals experts and the TCEQ experts when the permit came up for renewal in 1999, that the current pump and treat system required by the Compliance Plan would not have been necessary and that a monitored natural attenuation plan would have been appropriate for remediating the contamination at the WLH facility. This is a much lower level of remediation than the current plan and would have resulted in much lower financial assurance and much lower installation, operation, and maintenance costs. The pump and treat remediation plan continued in effect in 1999 was not necessary at that time to protect the public health and environment.

"At this time there is no way to know why this mistake was made, but the mistake was a major reason the pump and treat remediation plan remained in place in 1999. Both Vision Metals and TCEQ failed to detect the error. The error in the original geological analysis as to which aquifer was involved was carried over in the 1999 analyses. The result of the error is that a much more involved and stringent remediation system was put into place than was necessary.

"In essence, the Upper Chicot was erroneously identified as far back as 1988 as a potentially affected aquifer despite the fact that the Upper Chicot generally flows south/southeast, while the flow of the aquifer under the Vision Metals/White Lion facility is to the north. ==This error was carried forward thereafter in all reports and proposed plans and adopted by the TCEQ and its predecessor. The State failed to detect the error, and required the more stringent pump and treat system based on the error.== Had this error been detected by the State, a less stringent, less expensive monitored natural attenuation plan would have been appropriate. A monitored natural attenuation plan would have been much cheaper to install, maintain, and operate than the existing system.

"It is my opinion that a monitored natural attenuation plan would have been found appropriate for the site from the start of White Lion's ownership of the site, had the correct aquifer been identified by the State."


David H. Heslep


Sworn to and subscriber this ___13___ day of May 2015.



SARAH DELEON
Notary Public, State of Texas
My Commission Expires
June 16, 2018

Notary Public
State of Texas

# EXHIBIT A



# David H. Heslep, P.G.

I am a State of Texas, Licensed Professional Geoscientist, in the discipline of geology, with significant project management and technical experience in the environmental industry. My project experience has included performing over 100 environmental investigations, permitting, and assessments within the Gulf Coast, Midwest, and Northeast regions of the United States as well as Mexico. Management responsibilities have included client development and acting as a liaison for federal and state regulatory agencies.

I have over 17 years of experience in waste management, geology, petroleum geology, groundwater hydrology, and soil and groundwater remediation. I have managed and implemented numerous waste management plans, site characterizations, and geologic, hydrogeologic, and environmental assessment/remedial investigations.

My knowledge and experience includes dealing with a wide range of contaminants including but not limited to; hydrocarbons, chlorinated solvents, cyanide, metals, pesticides, herbicides, hydraulic oil, asphalt and tar, PCBs, dioxins and others. I am experienced in project management, work plan design, field investigation, risk assessments, and technical report preparation as well as budgeting and scheduling for environmental, geological, hydrogeological, and waste characterization projects.

**Credentials:**

M.S.; Texas A&M University Corpus Christi; Environmental Geology; course work completed
B.S.; Texas A&M University Corpus Christi; Geology; May 1999
B.S.: Texas A&M University Corpus Christi; Environmental Science with minor in Chemistry; May 1998
Texas Licensed Professional Geologist No. 6414
TCEQ LPST Project Manager PM0000116; expiration date: attached to P.G. license

**President, WDIA Environmental Solutions, LLC.** Responsibilities include managing and overseeing the day-to-day operations as well as business development. I develop, manage, and perform all aspects of field investigations and responsible for report preparation. I provide technical expertise and litigation support on projects involving previous, ongoing and potential future investigations.

**Senior Consultant, bge Environmental Services Group.** Responsibilities included business development and senior project management for local and national clients. I developed, managed, and performed all aspects of field investigations and was responsible for report preparation. I provided technical expertise and litigation support on projects involving previous, ongoing and potential future investigations.

**Business Unit Leader/Project Manager, MACTEC Engineering and Consulting, Inc.** Responsibilities included managing and overseeing the day-to-day operations of the Facilities Business group as well as business development. I managed and provided technical direction to employees in the group. Other responsibilities included the design, scheduling, and implementation of field investigations. I also managed

due diligence projects for several clients throughout the United States. I was involved in TxDOT Right-of-Way acquisition projects involving UST impact delineation and remediation along with general due diligence investigations.

**Project Manager, Shaw Environmental, Inc.** Provided project management services and filled project geoscientist roles for due diligence efforts for three national clients throughout Texas, Louisiana, and Oklahoma. Responsibilities included the management of numerous LPST sites in South Texas for a major retail gasoline corporation. I was also the assistant project manager for the Jones Road TCEQ Superfund Site. Other responsibilities included the managing of field technicians and junior staff geologists for various other projects including soil, groundwater and NAPL investigations.

**Field Geologist, Arcadis.** Performed and coordinated monthly, quarterly, semi-annual, and annual groundwater sampling events for several clients. Responsibilities included conducting remedial site assessments and installing groundwater monitor wells for remedial and investigative purposes in Ohio, Pennsylvania, Indiana and Michigan.

**Surveyor, Geosource, Inc,.** Performed down-hole geophysical surveys on land and off-shore oil drilling platforms. This job required the timing and detonation of explosives to log the lithology of oil and gas formations. Duties included the testing and development of geophones comparing hammer-truck technology versus vibrator-trucks, interpretation of geophysical logs, and wireline coordination.

**Description of Experience:**

**Due Diligence Assessments**
I have conducted numerous Phase I and Phase II Environmental Site Assessments (ESAs) at a variety of commercial and industrial properties in Ohio, Pennsylvania, Mexico and Texas. These assessments included a variety of vacant lands, commercial businesses, power plants, pipelines and proposed pipeline routes, asphalt plants, and health care facilities. I have performed historical data review and interpretation, regulatory data review, and site walk-throughs. Furthermore, I am experienced in the development and implementation of numerous surface and subsurface investigations based on the results of Phase I ESAs. I have been and currently am responsible for the preparation and final review of site investigation reports presenting findings and recommendations.

**Soil/Groundwater Contamination Investigation and Analysis**
I have been involved with numerous soil and groundwater remediation projects at sites regulated under CERCLA, RCRA, voluntary clean-up/action programs, underground storage tank regulation divisions, Michigan DEQ, Ohio EPA, Louisiana DEQ, and TCEQ which have involved the use of different sampling techniques, including low flow groundwater sampling, submersible pumps, time weighted composite, and disposable bailers. I am experienced with various drilling techniques including direct push technology, cone penetration technology (CPT), hollow-stem auger, mud rotary, air rotary, and cable tool methods.

In addition, I am experienced in conducting investigations at Superfund, railway, chemical facilities, and landfills. My involvement included sampling and reporting, technical support, and project management. Investigations and monitoring for these sites were performed in Ohio, Pennsylvania, Illinois, Indiana, and Texas.

Recently I was involved in the Jones Road USEPA Superfund groundwater recovery and remediation project in Texas. The project consisted of the installation of monitoring and recovery wells and the completion of pump tests to estimate expected groundwater yields and flow rates for feasibility of remedial options. Monitoring wells were sampled for chemicals of concern (i.e., chlorinated solvents) to track movement of the plume potentially impacting the private residential water supply.

**Hydrocarbon Assessment and Remediation**

I have experience in the implementation of numerous subsurface investigations for the removal of underground storage tank (UST) systems, suspected chemically impacted sites, and emergency spill response activities. I have completed field investigations to delineate soil and groundwater impacts from various hydrocarbon sources, and have managed the installation and operation of several remediation technologies including air sparging systems, soil vapor extraction, mobile dual phase extraction, vacuum truck removal, and carbon injection operations.

Additionally, I was responsible for the management of numerous retail gas facilities throughout south Texas and the gulf coast. Responsibilities included reporting, installing soil borings and monitor wells, and implementing mobile dual phase extraction events.

**Remediation and Disposal**

I have implemented chlorinated hydrocarbon remediation plans at chemical manufacturing facilities and other sites impacted by chlorinated solvents in Louisiana, Pennsylvania and Texas. The plan involved the introduction of a hydrogen-carbon source or oxidizing agents into groundwater in an effort to drive chemical reactions toward anaerobic conditions establishing a reducing environment.

I have performed work in the United States (Illinois, Indiana, Louisiana, Michigan, Ohio, Oklahoma, Pennsylvania, and Texas) and Mexico in accordance with the respective regulatory agencies.

I am currently or have been recognized as:
- 2002 to present - Geologist under TCEQ PST State Lead contract;
- 2004 to 2005 - Assistant Project Manager for the Jones Road Superfund Project under the RIRS contract;
- 2001 - Senior geologist at a former US Air Force base in Ohio for the investigation of lead, mercury, and mercury vapor impacts from landfill activities for the US Army Corps of Engineers;
- 2000 to 2001 – Site project manager for coal tar remediation under USEPA Consent Order.

In addition, I have also been involved in the investigation and remediation efforts for three (3) USEPA Superfund sites:
- 2000 to 2002 – Groundwater remediation efforts at Millcreek Superfund Site;
- 2000 to 2002 – Groundwater monitoring at Seymour Trust Superfund Site; and
- 2004 to 2005 – Groundwater monitoring at Jones Road Superfund Site.

# EXHIBIT B



# WDIA

*Environmental Solutions*

## SERVICES AGREEMENT
## WITH
White Lion Holdings, LLC

This Services Agreement is entered into as of the __15__ day of December, 2014 by and between White Lion Holdings, LLC , and its subsidiaries, a Texas Limited Liability Company ("CLIENT") and **WDIA Environmental Solutions, LLC**, a Texas Limited Liability Company, having its principal place of business in Fulshear, Texas ("CONTRACTOR"). CLIENT and CONTRACTOR are hereinafter sometimes referred to individually as a "Party" or collectively as the "Parties."

### WITNESSETH:

WHEREAS, **CLIENT** may desire to engage **CONTRACTOR** to provide certain services (the "Services") in order to facilitate **CLIENT'S** business or business interests; and

WHEREAS, **CONTRACTOR** has agreed to furnish the Services in accordance with the terms and conditions set forth in this Services Agreement.

NOW, Therefore, for and in consideration of the premises and the mutual covenants contained herein, the Parties hereto agree as follows:

### ARTICLE 1 - OBLIGATIONS OF CONTRACTOR

1.1     Scope of Services.  **CLIENT** hereby engages **CONTRACTOR**, and **CONTRACTOR** hereby agrees to perform the Services designated by individual Purchase Orders, letter proposals, or electronic communication (e.g., emails), as more specifically described in Attachment A.

1.2     Standard of Performance. **CONTRACTOR** shall perform the Services with a standard of care consistent with that degree of care and skill ordinarily exercised by members of the same profession currently practicing under similar circumstances. **CONTRACTOR** shall perform the Services as an independent **CONTRACTOR**. Notwithstanding anything to the contrary herein in this Services Agreement or any other documentation between **CONTRACTOR** and **CLIENT**, **CONTRACTOR'S** liability for its work product shall be limited to correcting, at its own expense, Services which are: (i) deficient because of **CONTRACTOR'S** failure to perform said Services in accordance with above standard of skill and judgment, and (ii) reported in writing to **CONTRACTOR** within a reasonable time, not to exceed fifteen (15) days, from discovery thereof, but in no event more than thirty (30) days from completion of the relevant Services.  The Parties agree that there are no standards of performance, guarantees or warranties extending beyond those expressed in this Paragraph.

1.3     Commencement and Completion of the Services.  **CONTRACTOR** shall make reasonable efforts to complete performance of the Services within the mutually agreed schedule set forth in each Purchase Order and/or agreed to proposal letter.

1.4     Ownership of Materials, Equipment and Other Items. All reports, designs, CADD and other electronic files, sketches, working drawings and other tangible evidence of **CONTRACTOR'S** work product except computer software programs prepared hereunder for **CLIENT** shall be the property of **CLIENT**. **CONTRACTOR** may retain a record copy of its work product. Materials, equipment and other items, if any, furnished to **CONTRACTOR** by **CLIENT** or purchased at **CLIENT'S** expense shall be and remain the property of **CLIENT** and shall be marked and regarded as such by **CONTRACTOR**. Upon the completion of the Services or termination of this Services Agreement, any remaining materials, equipment and other items of **CLIENT** property shall be delivered to **CLIENT** by **CONTRACTOR**.

## ARTICLE II - COMMERCIAL TERMS

2.1     Compensation for the Services, Invoicing and Payment. Compensation, Invoicing and Payments for performance of the Services shall be paid according to **CONTRACTOR'S** Schedule of Fees which is attached hereto as Attachment "B". Each Party shall be responsible for its own tax obligations.

2.2     Confidentiality. All confidential data and information acquired by **CONTRACTOR** from the **CLIENT** during the performance of Services shall be kept confidential and shall not be disclosed to third parties without the prior consent of the **CLIENT**, unless such disclosure is required by law or court order. In any event, **CONTRACTOR** shall give written notice to CLIENT of **CONTRACTOR'S** intent to disclose documents pursuant to a law or court order at least five (5) business days prior to the disclosure. Data and information obtained by either Party from third parties without restriction, or which is in the public domain through no wrongful act of the receiving Party, shall not be considered confidential. All data and information, which is confidential, shall be conspicuously marked as such.

2.3     Indemnity. CONTRACTOR, TO THE EXTENT CAUSED BY CONTRACTOR, AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS CLIENT, AND THEIR RESPECTIVE CO-VENTURERS, AFFILIATES, DIRECTORS, OFFICERS, SHAREHOLDERS, AGENTS AND EMPLOYEES (THE "CLIENT INDEMNIFIED PARTIES"), FROM AND AGAINST ANY AND ALL DAMAGE TO CLIENT'S PROPERTY, AND/OR INJURY TO OR DEATH OF CLIENT'S PERSONNEL. CONTRACTOR, TO THE EXTENT CAUSED BY CONTRACTOR, FURTHER AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS THE CLIENT INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES OR DAMAGES TO PERSONS OR PROPERTY [INCLUDING, WITHOUT LIMITATION, FOR ATTORNEYS' FEES AND COSTS] RELATED TO (I) THE NEGLIGENT OR OTHERWISE DEFICIENT PERFORMANCE OF THE SERVICES, AND/OR (II) ANY ACT OR OMISSION OF THE CONTRACTOR, AND/OR ITS EMPLOYEES, AGENTS, SUB-SUBCONTRACTORS OR REPRESENTATIVES, THAT FAILS TO MEET THE STANDARD OF DUE CARE UNDER THE CIRCUMSTANCES. CLIENT SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY SUCH SUIT OR PROCEEDING, BUT SUCH PARTICIPATION SHALL NOT AFFECT THE LIABILITY OF CONTRACTOR FOR ANY JUDGMENT THEREIN, OR OTHERWISE OPERATE TO RELEASE CONTRACTOR FROM ITS OBLIGATIONS UNDER THIS INDEMNITY. NOTWITHSTANDING ANYTHING HEREIN THIS ARTICLE 2.3, THIS SERVICES AGREEMENT AND/OR ANY SUBSEQUENT STATEMENTS (WRITTEN, ORAL OR OTHERWISE) TO THE CONTRARY, IN NO EVENT SHALL CONTRACTOR'S LIABLITY AND/OR INDEMNITY OBLIGATIONS TO CLIENT OR ANY THIRD PARTY EXCEED THE AMOUNT OF INSURANCE PROVIDED FOR IN ARTICLE 2.4 "INSURANCE" OF THIS SERVICES AGREEMENT.

CLIENT, TO THE EXTENT CAUSED BY CLIENT, AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS CONTRACTOR, AND THEIR RESPECTIVE CO-VENTURERS, AFFILIATES, DIRECTORS, OFFICERS, SHAREHOLDERS, AGENTS AND EMPLOYEES (THE "CONTRACTOR INDEMNIFIED PARTIES"), FROM AND AGAINST ANY AND ALL DAMAGE TO CONTRACTOR'S PROPERTY, AND/OR INJURY TO OR DEATH OF CONTRACTOR'S PERSONNEL. CLIENT, TO THE EXTENT CAUSED BY CLIENT, FURTHER AGREES TO INDEMNIFY, DEFEND AND HOLD HARMLESS THE CONTRACTOR INDEMNIFIED PARTIES FROM AND AGAINST ANY AND ALL CLAIMS, LIABILITIES, LOSSES OR DAMAGES TO PERSONS OR PROPERTY [INCLUDING, WITHOUT LIMITATION, FOR ATTORNEYS' FEES AND COSTS] RELATED TO (I) THE NEGLIGENT OR OTHERWISE DEFICIENT PERFORMANCE OF THIS SERVICES AGREEMENT BY CLIENT AND/OR (II) ANY ACT OR OMISSION OF THE CLIENT AND/OR ITS EMPLOYEES, AGENTS, SUB-SUBCONTRACTORS OR REPRESENTATIVES, THAT FAILS TO MEET THE STANDARD OF DUE CARE UNDER THE CIRCUMSTANCES. CONTRACTOR SHALL HAVE THE RIGHT TO PARTICIPATE IN THE DEFENSE OF ANY SUCH SUIT OR PROCEEDING, BUT SUCH PARTICIPATION SHALL NOT AFFECT THE LIABILITY OF CLIENT FOR ANY JUDGMENT THEREIN, OR OTHERWISE OPERATE TO RELEASE CLIENT FROM ITS OBLIGATIONS UNDER THIS INDEMNITY. NOTWITHSTANDING ANYTHING HEREIN THIS ARTICLE 2.3 AND/OR ANY SUBSEQUENT STATEMENTS (WRITTEN, ORAL OR OTHERWISE) TO THE CONTRARY, IN NO EVENT SHALL CLIENT'S LIABLITY AND/OR INDEMNITY OBLIGATIONS TO CLIENT OR ANY THIRD PARTY EXCEED THE AMOUNT OF INSURANCE PROVIDED FOR IN ARTICLE 2.7 "INSURANCE" OF THIS SERVICES AGREEMENT.

2.4   Insurance. **CONTRACTOR** and **CLIENT** shall carry and maintain during the performance of Services: (a) *employers liability* with a total limit of at least $500,000 each accident for bodily injury by accident and $500,000 each employee for bodily injury by disease; (c) *commercial general liability* insurance with a total limit of at least $500,000 per occurrence (occurrence form policy) and such insurance shall include, but not be limited to, specific coverage for: (i) contractual liability encompassing the Article entitled Indemnity, (ii) personal injury and property damage liability, (iii) products/completed operations liability, and (iv) where applicable, explosion, structure and ground collapse, and underground hazards coverage; and (d) *automobile liability* insurance covering bodily injury and property damage with a total limit of at least $500,000 per accident. The amount of coverage required may be satisfied, at each Party's respective option, through a separate excess umbrella liability policy together with lower limit primary underlying insurance.

## ARTICLE III –TERMINATION

3.1   <u>Termination</u>.   (a) Either Party shall have the right to terminate this Agreement for its own convenience upon thirty (30) days written notice to the other Party. In the event of termination, **CONTRACTOR** shall be paid for all (i) approved Services rendered up to the termination date and (ii) in case of termination at **CLIENT'S** convenience, costs incurred by **CONTRACTOR** for an orderly discontinuance of Services.

## ARTICLE IV - GENERAL PROVISIONS

4.1   <u>Force Majeure</u>. Except for payment of money when due, if either Party is unable to perform any of its obligations under this Services Agreement by reason of force majeure, such Party shall be excused from performance to the extent it is affected by such force majeure. The Party affected by force majeure shall endeavor to remedy the impediment to its performance with all reasonable dispatch. The term "force majeure" shall mean any cause beyond the control of the Party claiming force majeure and which is recognized as such under the Principal Contract.

4.2   <u>Governing Law</u>. This Services Agreement shall be governed by and construed in accordance with the laws of the State of Texas notwithstanding any conflict of laws provision which would refer to the law of another jurisdiction. Any and all actions, disputes, claims, or controversies arising out of or relating to this Services Agreement, or the breach thereof, and not resolved amicably shall be finally settled, brought and tried only in stated court located in Richmond, Texas, in the County of Fort Bend.

4.3   <u>Assignments and Transfers</u>. This Services Agreement shall inure to the benefit of and be binding upon Parties and their successors and permitted assigns. Neither Party shall assign all or any part of this Services Agreement, except to an affiliate, without the prior written consent of the other Party. The Parties agree and understand that **CONTRACTOR** shall have the right to subcontract components of the Services to subcontractors.

4.4   <u>Amendments and Integration</u>. This Services Agreement and the Exhibits attached hereto shall constitute the complete and entire agreement between the Parties with respect to the subject matter hereof. No prior or contemporaneous statement or agreement, or course of performance shall vary or modify the terms hereof. This Services Agreement may be amended only by a written document signed by both Parties.

4.5   <u>Notices</u>. All notices, requests, demands and other communications required or permitted to be given by either **CLIENT** or **CONTRACTOR** hereunder shall be in writing and shall be deemed to have been given if delivered in person or by e mail or facsimile or by first class certified mail, postage and fees prepaid, to the address of the intended recipient as set forth below. All such notices, requests, demands and other communications shall be deemed to have been received by the addressee, if by mail, three (3) days following mailing; if by e mail or facsimile, twenty-four (24) hours following transmission; or if by personal delivery, upon such delivery.

**TO CLIENT:**      White Lion Holdings, LLC.   (CLIENT Name)

5100 San Felipe, No. 78 (Address)

Houston, TX  77056   (City/State/Zip)

Attention:            Mr. Bernard Morello

Telephone:            (713) 850-8669

Facsimile:      _____

Email:      _____

**TO CONTRACTOR:**   WDIA Environmental Solutions
Attention: David Heslep
3514 Wellspring Lake Dr.
Fulshear, Texas 77441
Telephone:      281.533.0172
Email:            david@wdiaenv.com

The foregoing addresses may be changed by either Party by giving notice to the other party as provided above.

    4.6      Limitation of Liability. Notwithstanding anything to the contrary herein this Services Agreement, attachments hereto and/or any subsequent written or verbal communication or agreement between the Parties, in no event (1) shall either Party be responsible, one to the other, for any indirect, special, incidental or consequential damages and (2) shall **CONTRACTOR'S** liability of any kind whatsoever to **CLIENT** or any third party exceed the amount of compensation **CONTRACTOR** actually received from **CLIENT** for the Services, or performance thereof, at issue.

    4.7      Exercise of Rights and Waiver. The failure of either Party to exercise any right under this Services Agreement shall not be deemed a waiver thereof. No waiver by either Party of any provisions hereof shall be deemed a waiver of any future compliance therewith, and such provisions shall remain in full force and effect.

    4.8      Severability. In the event that any clause or provision in this Services Agreement shall for any reason be deemed invalid or unenforceable, the remaining provisions and clauses shall not be affected or invalidated and shall remain in full force and effect.

    4.9      Headings. The headings contained in this Services Agreement are for ease of reference only and shall not limit or otherwise affect the meaning hereof.

    In Witness Whereof, the Parties hereto have caused this Services Agreement to be executed by their duly authorized representatives as of the date first written above. Furthermore, the Parties hereto agree and attest to the fact this Services Agreement has duly signed and/or executed in the City of Rosenberg, Fort Bend County, Texas.

    [remainder of this page intentionally left blank; the next page, 5 of 7, is the signature page]

"CONTRACTOR"                                    "CLIENT"

**WDIA Environmental Solutions, LLC**          White Lion Holdings. LLC.

                                               (Name of CLIENT)

By:  _David H. Heslep (signature)_             By:  _BERNARD MORELLO_

Name:   David H. Heslep, P.G.                  Name:  _Bernard Morello_

Title:   President                             Title:  _Manager_

## ATTACHMENT A

### Scope of Services, Schedule and Compensation

**CONTRACTOR** shall provide the Services requested by **CLIENT** from time to time, such requests to be in the form of a Purchase Order or other written form (e.g., letter proposal, email, verbal) ("Request for Services". Each Request for Services shall become effective upon the signature of both parties and shall constitute a supplement to this Agreement generally and the Scope of Services specifically.

Each Request for Services shall state the scope of services agreed to by the Parties, as well as the time for performance and cost estimate.

## ATTACHMENT B
## RATE SCHEDULE (2014)

Services provided by personnel in various labor categories will be billed at the following hourly rates (inclusive of salary and benefits):

| Labor Category | Hourly Rate (Plus ODC) |
| --- | --- |
| Principal | $175 |
| Project Manager/Senior Consultant | $130 |
| Project Engineer / Project Scientist | $100 |
| Staff Engineer/Staff Scientist | $70 |
| CADD/Drafter | $100 |
| Technician/Project Assistant | $60 |

1. WDIA invoices for services rendered, on a semi-monthly (twice per month) basis. Payment terms shall be net thirty (30) days from date of invoice. Invoices paid after the thirty (30) days shall incur a penalty of 1.5% interest per month. Invoice periods shall be as follows:
    - *1st Invoice for Month: Services from 1st through 15th*
    - *2nd Invoice for Month: Services from 16th through end of month*
2. Other direct costs (ODC), including typical reproduction, computer usage, direct mail service, office supplies, local, long distance and cellular telephone calls) will be billed to Client at $7.50 per billable labor hour.
3. Out-of-town automobile travel will be charged at the higher of the then current IRS mileage rate or 75 cents/mile. Mileage and other project related expenses will be billed at cost plus 15%. Local destinations will be charged $75 / day vehicle charge.
4. Field supplies, rental equipment, and field subcontractors will be billed at cost plus 15%.
5. Expert witness or litigation testimony will be charged at two (2) times the current rate schedule.
6. To the extent that Client has access to information relating to the Services to be performed, Client shall provide such information as is reasonably available and appropriate for the efficient performance of the Services. Such Information may include, but is not limited to: emissions, hazardous substances, operating processes, operating temperatures, operating pressures, volumes, etc. WDIA shall be entitled to rely upon the Information provided by clients, client's agents, or from generally accepted sources, without independent verification and shall bear no liability arising from such reasonable reliance.

# EXHIBIT C



# WDIA

## *Environmental Solutions*

3514 Wellspring Lake Drive
Weston Lakes, Texas 77441
Office: 281.533.0172

DRAFT          DRAFT          DRAFT

# MEMORANDUM

---

**To:**      Mr. Travis Lucas
            The Lucas Law Firm

**From:**    David H. Heslep

**Date:**    December 15, 2014

**Re:**      White Lion Holdings (Former Vision Metals) – Attorney Client Communication Attorney Work Product Privileged and Confidential

---

Per our discussion Monday, December 15, 2014, WDIA Environmental Solutions (WDIA) has prepared this memorandum to summarize a proposed path forward to achieve environmental compliance.

## A.  BACKGROUND

The Former Vision Metals property is located at 2010 Spur 529 @ Scott Street and is developed as a commercial/industrial property. The property is currently permitted as an Industrial Solid Waste Management Site under Permit No. HW-50129-001 and under Compliance Plan for Industrial Solid Waste Management Site under Permit No. CP-50129. The site in no longer in operation and no longer operates as a treatment, storage and disposal facility (TSDF). However, groundwater at the site remains impacted by metals above the established corrective action limits in and around Waste Management Area I. WDIA has reviewed all documents made available to determine a path forward to bring the site back into compliance under the above referenced permits.

## B.  PROPOSED PATH FORWARD

### 1.  Monitor Well Assessment

Confirm locations and assess conditions of all monitoring wells that have been previously located. Monitoring wells that are deemed in good condition and are expected to provide technically sound data will be surged, scrubbed and re-developed and properly sealed. All missing monitoring wells we be searched for using a spade fork and shovel based on information provided in historic reports. All non-repairable monitor wells will be marked using wood survey

stakes and a global positioning system (GPS) unit. The information will be used to obtain bids for proper plugging and abandonment in accordance with all regulations.

### 2. Monitor Well Protection

All monitor wells located and determined to be technically sound will be properly secured and protected utilizing surface completions and man way vaults in accordance with provisions outlined in the permit and current Texas Department of Licensing and Regulations (TDLR). Each monitor well will be permanently marked by etching the ID in the concrete surface completion.

### 3. Plug and Abandonment – Drilling Monitor Wells

All monitor wells located in the initial assessment and deemed as damaged beyond repair or not technically sound will be plugged and abandoned in accordance with the guidelines set forth in the permit and in accordance with the current rules established by the TDLR. The number of new/replacement monitoring wells will be determined based on the findings and field determinations. New monitoring wells will be installed in the upper groundwater bearing unit (Zone 1). All new monitoring wells will be installed in accordance with the guidelines set forth in the permit and in accordance with the current rules established by the TDLR. The monitoring wells will be sampled at this time for the metals and other constituents of concern identified in the permit.

### 4. Affected Property Assessment Report (APAR)

The data collected from the field investigation and sampling will be used to develop and prepare the APAR for submittal to TCEQ. Based on the APAR and TCEQ's questions, comments, and/ or concerns, the final APAR will be used to develop and prepare the Response Action Plan (RAP).

### 5. Response Action Plan (RAP)

The RAP will be developed utilizing the acquired data to set up a path forward for continued monitoring, inspections, record keeping, and reporting acceptable to TCEQ and OAG.

### 6. Permit Modifications

Given the site no longer operates as a TSDF, it is hoped this permit can be closed and modifications to the Compliance Action Permit will set the site on the path to compliance and ultimately achieving closure under the rules.

### 7. Implementation

Based on the approved permit modifications, the requirements set forth in the permit will be implemented and maintained until conditions change that warrant additional modifications or the site meets the requirements for closure. This memorandum is not intended to be a complete and detailed assessment of our findings.

Please let us know if you have any questions or require any additional information regarding this memorandum.

If I have left anything out, or if you need additional information, please do not hesitate to contact me.

Thanks,
**David H. Heslep, P.G. #6414**
**President** .
**WDIA** *Environmental Solutions*
*Direct: 281.533.0172*
*Cell:    361.774.5876*
email: david@wdiaenv.com

# EXHIBIT D

## David Heslep

**From:** Eleanor Wehner [Eleanor.Wehner@tceq.texas.gov]
**Sent:** Thursday, January 8, 2015 1:20 PM
**To:** David Heslep
**Subject:** RE: White Lion Holdings

Yes (we are clear to communicate). Mary Talley (w/IHW Permits) and I have reviewed and provided a few comments to a draft memo (this had a date of the memo as March 11, 2014?but discussion on 12/15) prepared by you to Mr. Lucas. This information is still under review on our end but we have provided our comments to the AG's office. What I can say is that overall I like the progression/sequencing of the tasks referenced in the memo. A few technical comments to the memo that may be eventually be conveyed to you:

-3. cc TCEQ Remediation Division on any copies of the P&A well reports provided to TDLR.

-3. Memo proposes the additional installation of wells in Zone 1. In the back of the my mind...Zone 2 will need to be monitored to support assessment/response actions and to verify and continue to confirm no impacts to the next lower water bearing unit. I am not certain if the existing wells screened in Zone 2? are correctly screened/viable...if not, additional/replacement wells may be needed in Zone 2 (this is to be considered a contingent item).

-6. The draft AFJ may be revised by the AG's office and TCEQ a bit more (to flow with the progression of report submittal tasks referenced in the memo). The AFJ is currently worded to submit the entire Modification package (A/B application) +APAR/RAP within 75 days of effective date of the AFJ (and as a Class 2 mod). [If this case was not with the AG's office, the TCEQ Remediation Division would conduct a complete review of and provide conditional approval of the APAR/RAP prior to directing a permitee to submit the APAR/RAP/SAP materials as a Class 3/major amendment permit amendment application package to the TCEQ IHW Permit's Section. AG's office holds the reigns at this point on the specified timing issues and language in the AFJ to provide more flexibility.]

Just an FYI.

**From:** David Heslep [mailto:david@wdiaenv.com]
**Sent:** Thursday, January 08, 2015 12:29 PM
**To:** Eleanor Wehner
**Subject:** White Lion Holdings

Eleanor,
I have been told by Mr. Morello that we have been cleared to communicate.

I have been working on the Permit Modifications (both Parts A&B as directed in the Judgment) and gathering maps/figures for the submittal.

If all stays as planned and weather permitting, we plan to Plug and Abandon (P&A) all wells already located mid to late next week (1/12/15), plus all additional monitoring wells that might be able to be located using survey data from initial field activities. The located wells have been damaged and deemed as not technically sound for repair and use. The P&A activities will be performed by a licensed well driller and all reports will be submitted per regulations and provided to TCEQ.

The plan is to install 2 additional monitoring wells within the plume area for a total of 3, and 5 additional monitoring wells around the plume (2 upgradient, 3 downgradient) to monitor any migration beyond the identified plume zone. All new monitoring wells will be installed by a licensed well driller and in accordance with the existing permit and current regulations. Immediately following installation, the wells will be developed, allowed to recover for a minimum of 24 hours and sampled for the previously identified parameters using the Low Flow method. All data will be used for the preparation of an APAR and results will be included in the Permit Modification, Sampling Analysis Plan (SAP), and Response Action Plan (RAP).

# EXHIBIT E



# Fwd: RE: Former Vision Metals - White Lion Holdings - Rosenberg

2 messages

---

**david** <david@wdiaenv.com>                     Wed, Feb 11, 2015 at 6:05 PM
To: office@doggett-law.com

Please see below

Sent via the Samsung GALAXY S®4 Active™, an AT&T 4G LTE smartphone

———— Original message ————
From: Eleanor Wehner
Date:02/11/2015 3:53 PM (GMT-06:00)
To: David Heslep
Subject: RE: Former Vision Metals - White Lion Holdings - Rosenberg

Thanks for the update David. I like the Zone 1 well installation plan. For 2nd water bearing unit; however, I would prefer to locate the deep well within the general area of MW-26 (...attached) to provide the most representative evaluation of COC migration potential for Zone 2. (GW flow in this unit had a consistent NE component.)

---

**From:** David Heslep [mailto:david@wdiaenv.com]
**Sent:** Wednesday, February 11, 2015 3:09 PM
**To:** Eleanor Wehner
**Subject:** RE: Former Vision Metals - White Lion Holdings - Rosenberg

We mobilized on the 27th to begin. Upon arriving and driving out to the first location, my truck almost got stuck and had to be put in 4-wheel drive to get back to the pavement. We were able to P&A P-3. The site has been mowed so the sun and wind could help dry it out. We met at the site this morning with the driller to assess the conditions. It was determined the site is dry enough to safely get the rig to the well locations. We will restart field activities tomorrow morning at 8:00am. We will begin with the plugging and abandoning of the monitor wells. Based on the extent of the plume identified in the Tetra Tech report dated July 2003, I have chosen locations for the 7 new monitor wells (2 more in the plume and 5 outside) and have attached an image showing these locations. Please feel free to comment on the locations.

I have contacted Charles Kalkomey, the original surveyor, to come back out to the site and re-survey the wells that have not been located using the original survey. I expect this to take place next week. Upon identifying the locations, I will dig and probe in those locations in an effort to locate the missing wells. All discovered will be properly plugged and abandoned.

Also, we had discussed installing a monitor well into the second groundwater bearing unit to assess if the deeper zone had any impacts from downward migration. We have that planned but before drilling that monitor well, I wanted to run this by you. Please let me know your thoughts.

Thanks,

*David H. Heslep, P.G.*   *#6414*

*President*

**WDIA** *Environmental Solutions*

*Direct: 281.533.0172*

*Cell:*     *361.774.5876*

email: david@wdiaenv.com

---

**2 attachments**



**image001.gif**
4K

**irgw55@tceq.state.tx.us_20150211_170251.pdf**
3073K

---

**david** <david@wdiaenv.com>
To: Stephen Dogget <office@doggett-law.com>

Wed, Feb 11, 2015 at 6:12 PM

[Quoted text hidden]

---

**2 attachments**



**image001.gif**
4K

**irgw55@tceq.state.tx.us_20150211_170251.pdf**
3073K



## Untitled Map

Write a description for your map.

**Legend**

Site

Site

Proposed Deep
Well Location

## Untitled Map

Write a description for your map.

**Legend**

Site

N

Site

Proposed Deep Well Location

Proposed Location

Google earth

# EXHIBIT F

**≋USGS**
*science for a changing world*

U.S. DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

IN COOPERATION WITH THE
TEXAS WATER DEVELOPMENT BOARD

SCIENTIFIC INVESTIGATIONS MAP 2989
SHEET 1 OF 5

Shah, S.D., Houston, N.A., and Braun, C.L., 2007, Hydrogeologic Characterization of the
Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas

## Introduction

The Brazos River alluvium aquifer underlies the Brazos River in Texas from Bosque County to Fort Bend County. The aquifer, one of 21 minor aquifers in the State (Texas Water Development Board, 2007), supplies water for irrigation, domestic, stock, and commercial use. The Brazos River alluvium aquifer likely will become more important in the future as demand for water increases statewide. A thorough understanding of the hydrogeology of the alluvium aquifer will be the foundation for future studies in the area.

During October 2006–April 2007, the U.S. Geological Survey (USGS), in cooperation with the Texas Water Development Board (TWDB), conducted a study to delineate the altitude of the top, altitude of the base, and thickness of the Brazos River alluvium aquifer, and to compile and summarize available hydraulic property (specific capacity, transmissivity, and hydraulic conductivity) data. A digital elevation model (DEM) was used as the altitude of the top of the aquifer. The altitude of the base of the aquifer was generated using data from wells (drillers' logs and borehole geophysical logs). The study area encompasses the Brazos River alluvium aquifer in parts of Bosque, Hill, McLennan, Falls, Robertson, Milam, Brazos, Burleson, Grimes, Washington, Waller, Austin, and Fort Bend Counties (fig. 1) and a 1.5-mile-wide lateral buffer adjacent to the aquifer. The results of this study will be used by TWDB for input into a ground-water availability model (GAM) (Texas Water Development Board, 2006a).

### Purpose and Scope

The purpose of this report is to describe the hydrogeologic characteristics of the Brazos River alluvium aquifer. Hydrogeologic characterization primarily refers to presentation of maps of altitudes of the top and base, thickness, and areal distribution of hydraulic properties of the Brazos River alluvium aquifer. The report also presents summary statistics of the hydraulic properties. The data used to generate the maps and summary statistics are in Shah and Houston (2007).

### Previous Studies

Several previous studies involving all or parts of the Brazos River alluvium aquifer study area have been published. Cronin and Wilson (1967) completed the first comprehensive study of the Brazos river alluvium from Bosque County to Fort Bend County. That report describes the extent and thickness of the aquifer, the amounts and distribution of withdrawals and recharge, and the quantity and quality of ground water available. It also includes descriptions of the hydrologic relations between the alluvium and the underlying bedrock and ground-water/surface-water interaction in the Brazos River alluvium aquifer. Cronin and Wilson (1967) obtained hydrogeologic data from test holes drilled as a part of the study. From 1937 to 1943, nine reports were published documenting inventoried water wells in the following counties: Austin (May, 1938), Burleson (Clark, 1937a), Fort Bend (Elledge, 1937, and Livingston and Turner, 1939), Grimes (Turner, 1939), Milam (Clark, 1937b), Robertson (Davis, 1942), Waller (Turner and Livingston, 1939), and Washington (Follet, 1943). Cronin and Follet (1963) published the first reconnaissance investigation of the ground-water resources of the entire Brazos River Basin in 69 counties from the New Mexico-Texas boundary to the Gulf Coast, including the 13 counties of this report. Additionally, Fluellen and Goines (1952) reported on the water resources of Waller County, and Hughes and Magee (1962) summarized the ground-water withdrawals of irrigation wells in the aquifer.

More recently, Naftel and others (1976) documented well drillers' logs, water-level measurements, and chemical analyses of ground water in Brazoria, Fort Bend, and Waller Counties. Harlan (1990) assessed the hydrogeology of the Brazos River alluvium aquifer from Waco to Marlin, Tex. Wrobleski (1996) characterized the Brazos River alluvium aquifer at a hydrogeologic field site in Burleson County using aquifer-test data to estimate hydraulic conductivity. HDR Engineering, Inc. (2001), developed a ground-water-flow model for the Brazos River combined with a conjunctive-use analysis to quantify the amount of surface and ground water along the Brazos River.

### Brief Description of Brazos River Alluvium Aquifer

The Brazos River alluvium aquifer is as wide as 7 miles and extends along 350 river miles from southern Bosque County to eastern Fort Bend County (Ashworth and Hopkins, 1995, p. 35) (fig. 1). Alluvial sediments in the study area occur in floodplain and terrace deposits of the Brazos River (Cronin and Wilson, 1967). The Brazos River alluvium aquifer for this report comprises floodplain alluvium that consists of fine to coarse sand, gravel, silt, and clay. The adjacent terrace alluvium is not an appreciable source of water and thus not considered part of the aquifer. Cronin and Wilson (1967) describe the composition of the floodplain alluvium as varying from place to place, with beds or lenses of sand and gravel that pinch out or grade laterally into vertically finer or coarser material. In general, the finer material is in the upper part of the aquifer, and the coarser material is in the lower part. The aquifer is under water-table conditions in most places and is used mainly for irrigation (HDR Engineering, Inc., 2001). The water table generally slopes toward the Brazos River, indicating that the river is a gaining stream in most places. Recharge to the aquifer occurs primarily from rainfall on the aquifer and subsequent downward leakage to the saturated zone, which (in the late 1960s) ranged from less than 10 to nearly 50 feet below land surface (Cronin and Wilson, 1967, p. 2). Discharge from the aquifer occurs primarily through evapotranspiration, discharge to the Brazos River, and withdrawals from wells. Some wells can yield as much as 1,000 gallons per minute, but the majority of wells yield from 250 to 500 gallons per minute (Ashworth and Hopkins, 1995, p. 35).

The Brazos River alluvium aquifer in the study area is underlain by marine sedimentary rocks, the geologic units of which (Shah and Houston, 2007) crop out in bands roughly parallel to the coast. Many of the geologic units, either individually or in groups, compose major and minor aquifers in the study area (fig. 1). The aquifers dip gently (gradients slightly greater than the land-surface gradient) from their outcrops toward the coast.

## Methods of Hydrogeologic Characterization

Geologic and hydrogeologic information on the Brazos River alluvium aquifer from published reports by the TWDB, Texas Commission on Environmental Quality, various universities, and ground-water conservation districts incorporated into a TWDB GAM-formatted geodatabase (Shah and Houston, 2007) was used for the hydrogeologic characterization of this report.

### Altitude of the Top of the Brazos River Alluvium Aquifer

A USGS 30-meter (98-foot) DEM resampled to 0.125 mile was used as the top of the Brazos River alluvium aquifer for the study area. The DEM is a digital file consisting of terrain altitudes for land-surface positions at regularly spaced horizontal intervals from which an accurate depiction of surface topography can be generated. The DEMs for each individual county were obtained from the USGS Seamless Data Distribution System (SDDS) (U.S. Geological Survey, 2007). The SDDS provides DEMs with a resolution of 1 arc-second (about 30 meters) for the United States. The DEMs for each county then were merged to create a single DEM for the Brazos River alluvium aquifer study area.

### Altitude of the Base of the Brazos River Alluvium Aquifer

The contact between the alluvium and the underlying rocks at well sites based on lithologic or geologic units was picked from drillers' or geophysical logs or published geologic sections. Many areas lacked sufficient log data (control points) to create a continuous surface for the altitude of the base. For these areas, depth data from wells known to be completed in the Brazos River alluvium aquifer without an associated drillers' or geophysical log were used as control points. Using the log control points and well-depth control points, a surface was generated using the topo-to-raster method in the geographic information system (GIS) software ArcGIS 9.2 (ESRI, 2007). Topo-to-raster is a spline interpolation method specifically designed for the creation of altitude surfaces. The method honors the data without altering the data values and also accepts contours as input (ESRI, 2007).

Despite the use of well-depth control points to supplement the log control points, data gaps exist in parts of the study area. For example, for wells in some areas drillers could not or did not distinguish the alluvium from the underlying unit where both units were of similar lithology, which precluded identification of the base of the aquifer in places. Data gaps also occur in areas where the alluvium is too thin to yield adequate amounts of water, and therefore no wells exist in those areas.

After generating a preliminary raster surface for the base, contours then were generated at 10-foot intervals using GIS software. The preliminary surface, contours generated from the surface, and the input control points were assessed to identify discrepancies, particularly in areas where both log and well-depth control points were used. For log control points, the base pick for each well was compared with picks for nearby wells. If the altitude was unrealistically high or low relative to altitudes from nearby wells, the log was re-examined to determine whether a pick more consistent with the nearby picks might be reasonable. In areas where there was substantial difference in altitude between log control points and well-depth control points, altitudes from log picks were used preferentially over those from well depths; well-depth control points were discarded if there was a difference of more than 5 feet. After assessment and revision, the process thus described was repeated several times. Contours generated from ArcMap (about 500 acres) then were evaluated and modified manually where necessary. The final surface representing the altitude of the base was generated using both points and contours concurrently and the topo-to-raster interpolator. For the final map, a total of 1,364 control points were used: 386 from drillers' logs, 13 from geophysical logs, 955 from well depths, and 10 from geologic sections.

### Thickness of the Brazos River Alluvium Aquifer

The thickness of the Brazos River alluvium aquifer was created by subtracting the raster surface of the base of the aquifer from the raster surface of the top of the aquifer using the raster calculator in Spatial Analyst in ArcGIS 9.2 (ESRI, 2007). Subtraction of the raster surfaces in a GIS can provide an objective and unbiased rendition of differences between the two surfaces. Thicknesses in areas where the number of control points for one surface differ substantially from the other surface should be used with caution.

### Hydraulic Properties

Two-hundred fifty-six of 358 specific capacity values (Shah and Houston, 2007) were obtained from specific capacity or aquifer tests done by USGS in 1963 and 1964. The other 102 values were obtained from the online TWDB ground-water database Well-Site Remarks Table (Texas Water Development Board, 2006b).

Two-hundred fifty-eight of 371 transmissivity values (Shah and Houston, 2007) were obtained from the specific capacity or aquifer tests done by the USGS in 1963 and 1964, four were obtained from published reports, and seven were computed from hydraulic conductivity values (Wrobleski, 1996). One-hundred two transmissivity values were computed from the 102 TWDB specific capacity values noted above using an empirical equation for unconfined aquifers developed from the modified nonequilibrium (Jacob) equation (Driscoll, 1986, p. 1,021). The modified nonequilibrium equation is

$$Q/s = T/264(log[0.3Tt/r^2S]),$$

where $Q$ is the yield of the well in gallons per minute, $s$ is the drawdown in the well in feet, $T$ is the transmissivity of the aquifer in foot squared per day, $t$ is time, and $S$ is the storage coefficient of the aquifer. The empirical equation is

$$Q/s = T/1500.$$

This equation is derived by assuming "typical" values for the variables in the modified nonequilibrium equation. $T$ is assumed to be 30,000 feet squared per day, $t$ is assumed to be 1 day, $r$ is assumed to be 0.5 foot, and $S$ is assumed to be 0.075. The empirical equation was used because few wells with specific capacity data had values for all of the variables necessary to apply the modified nonequilibrium equation.



**Figure 1.** Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas, and underlying aquifers (outcrops only) (modified from Texas Water Development Board, 2007).

EXPLANATION

[ ] Brazos River alluvium aquifer

Base from U.S. Geological Survey
Digital data, 1:100,000
Universal Transverse Mercator projection
Zone 15

Information regarding water resources in
Texas is available at
http://tx.usgs.gov/

# Hydrogeologic Characterization of the Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas

By
Sachin D. Shah, Natalie A. Houston, and Christopher L. Braun
2007



U.S. DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

IN COOPERATION WITH THE
TEXAS WATER DEVELOPMENT BOARD

SCIENTIFIC INVESTIGATIONS MAP 2989
SHEET 2 OF 5

Shah, S.D., Houston, N.A., and Braun, C.L., 2007, Hydrogeologic Characterization of the
Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas

Seven hydraulic conductivity values (Shah and Houston, 2007) were compiled for closely adjacent sites in Burleson County from the Texas A&M University Brazos River Hydrologic Field Site (Wrobleski, 1996). Transmissivity values were not computed from these hydraulic conductivity values because saturated thickness at the sites was unknown.

## Hydrogeologic Characterization

### Altitude of the Top of the Brazos River Alluvium Aquifer

Altitudes of the top of the Brazos River alluvium aquifer (land surface) (fig. 2) range from about 580 feet above NAVD 88 at the northwestern end in Bosque County to about 17 feet above NAVD 88 at the southeastern end in Fort Bend County. The top of the aquifer slopes from northwest to southeast at a fairly consistent rate of about 2.5–3 feet per mile.

### Altitude of the Base of the Brazos River Alluvium Aquifer

The altitude of the base of the Brazos River alluvium aquifer (fig. 3) ranges from about 480 feet above NAVD 88 at the northwestern end in Bosque County to about 18 feet below NAVD 88 at the southeastern end in Fort Bend County. The altitude of the base is an uneven or undulating surface that, like the altitude of the top, decreases from northwest to southeast but not as consistently as the altitude of the top. There are small areas, for example in Brazos County, where the altitude of the base increases or decreases about 10 feet over short (tens of feet) distances. The largest change in base altitude occurs in Fort Bend County where the altitude decreases about 40 feet. Fort Bend County is an area where the altitude of the base is potentially less reliable than other areas. There, drillers' logs do not always clearly differentiate the sand and gravel of the alluvium aquifer from that of the underlying Gulf Coast aquifer (Chicot, Evangeline, or Jasper aquifer locally, not shown in fig. 1). Because the lithologies of the alluvium aquifer and the Gulf Coast aquifer are so similar, a distinct pick is not easy to make. The control points used in Fort Bend County are those for which base picks could be made with reasonable confidence.

### Thickness of the Brazos River Alluvium Aquifer

The thickness of the Brazos River alluvium aquifer (fig. 4) ranges from negligible to 168 feet. Mapped thicknesses are less reliable in areas where few or no control points exist, such as near the aquifer boundary. Such areas occur west of the Brazos River in northwest Milam County, west of the Brazos River in northwest Burleson County, east of the Brazos River in Brazos County, east of the Brazos River in Grimes County, and east of the Brazos River in Waller County. In areas of few or no control points, the algorithm used by the GIS interpolator tends to yield anomalously large thicknesses. Thus in some areas near the aquifer boundary, thicknesses greater than about 100 feet might be anomalous. Another area where thicknesses potentially are less reliable is Fort Bend County because of the difficulty in identifying the base of the aquifer from logs as described in the previous section.



Figure 2. Altitude of the top of the Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.



EXPLANATION

Altitude of top of Brazos River alluvium aquifer, in feet above NAVD 88

- 17–100
- 100–150
- 150–200
- 200–250
- 250–300
- 300–350
- 350–400
- 400–583

········· Boundary of Brazos River alluvium aquifer

—— Boundary of Brazos River alluvium aquifer 1.5-mile buffer

## Datums

Vertical coordinate information is referenced to the North American Vertical Datum of 1988 (NAVD 88).

Horizontal coordinate information is referenced to the North American Datum of 1983 (NAD 83).

**Table 1.** Summary statistics of hydraulic properties, Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

[All values rounded to three significant figures; (gal/min)/ft, gallons per minute per foot; ft²/day, foot squared per day; ft/d, foot per day; --, not computed]

| Hydraulic property | Number of wells | Minimum | First quartile | Median | Mean | Third quartile | Maximum |
|---|---|---|---|---|---|---|---|
| Specific capacity ((gal/min)/ft) | 358 | 1.44 | 15.9 | 23.5 | 28.4 | 33.9 | 134 |
| Transmissivity (ft²/d) | 371 | 289 | 2,980 | 4,550 | 5,590 | 6,800 | 27,800 |
| Hydraulic conductivity (ft/d) | 7 | 179 | -- | 217 | 241 | -- | 447 |

Base from U.S. Geological Survey
Digital data, 1:100,000
Universal Transverse Mercator projection
Zone 15

# Hydrogeologic Characterization of the Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas
By
Sachin D. Shah, Natalie A. Houston, and Christopher L. Braun
2007

Information regarding water resources in
Texas is available at
http://tx.usgs.gov/



U.S. DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

IN COOPERATION WITH THE
TEXAS WATER DEVELOPMENT BOARD

SCIENTIFIC INVESTIGATIONS MAP 2989
SHEET 3 OF 5

Shah, S.D., Houston, N.A., and Braun, C.L., 2007, Hydrogeologic Characterization of the
Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas



**EXPLANATION**

Altitude of base of Brazos River alluvium aquifer, in feet above NAVD 88

- -18–50
- 50–100
- 100–150
- 150–200
- 200–250
- 250–300
- 300–350
- 350–483

—— Boundary of Brazos River alluvium aquifer 1.6-mile buffer

## Distribution of Hydraulic Properties

The areal distribution of hydraulic properties in the Brazos River alluvium aquifer (fig. 5) shows that most of the data are concentrated in the central part (Milam, Robertson, Burleson, and Brazos Counties) of the aquifer; few data exist for the northwestern and southeastern parts of the aquifer. The largest and smallest specific capacities (table 1), respectively, are 134 gallons per minute per foot (Burleson County) and 1.44 gallons per minute per foot (Falls County); the median is 23.5 gallons per minute per foot. A histogram of specific capacity values (fig. 6) shows that the most frequent range (about 82 percent of the values) is 0–40 gallons per minute per foot.

The largest and smallest transmissivity values (table 1), respectively, are about 28,000 feet squared per day (Brazos County) and about 300 feet squared per day (Falls County); the median is 4,550 feet squared per day. A histogram of transmissivity values (fig. 7) shows that the most frequent range (42 percent of the values) is 0–4,000 feet squared per day. Among the seven hydraulic conductivity values in Burleson County (table 1), the largest and smallest are 447 and 179 feet per day.

## References

Ashworth, J.B., and Hopkins, Jamie, 1995, Aquifers of Texas: Texas Water Development Board Report 345, 69 p.

Clark, W.L., 1937a, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells in Burleson County, Texas: Texas Board of Water Engineers duplicated report, 46 p.

Clark, W.L., 1937b, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells in Milam County, Texas: Texas Board of Water Engineers duplicated report, 57 p.

Cronin, J.G., and Follett, C.R., 1963, Reconnaissance investigation of the ground-water resources of the Brazos River Basin, Texas: Texas Water Commission Bulletin 6310, 152 p.

Cronin J.G., and Wilson, C.A., 1967, Ground water in the flood-plain alluvium of the Brazos River, Whitney Dam to vicinity of Richmond, Texas: Texas Water Development Board Report 41, 206 p.

Davis, L.G., 1942, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells and springs in Robertson County, Texas: Texas Board of Water Engineers duplicated report, 61 p.

Driscoll, F.G., 1986, Groundwater and wells (2d ed.): St. Paul, Minn., Johnson Filtration Systems, Inc., 1,089 p.

Elledge, G.A., 1937, Records of wells, drillers' logs, water analyses, and maps showing locations of wells in Fort Bend County, Texas: Texas Board of Engineers duplicated report, 91 p.

ESRI, 2007, GIS and mapping software: accessed June 10, 2007, at http://www.esri.com/.

Fluellen, T.R., and Goines, W.H., 1952, Water resources of Waller County, Texas: Texas Board of Engineers Bulletin 5208, 57 p.

Follet, C.R., 1943, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells and springs in Washington County, Texas: Texas Board of Water Engineers duplicated report, 45 p.

Harlan S.K., 1990, Hydrogeologic assessment of the Brazos River alluvium aquifer, Waco to Marlin, Texas: Waco, Tex., Baylor University, Masters thesis, 124 p.

Figure 3. Altitude of the base of the Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

Base from U.S. Geological Survey
Digital data, 1:100,000
Universal Transverse Mercator projection
Zone 15

Information regarding water resources in
Texas is available at
http://tx.usgs.gov/

# Hydrogeologic Characterization of the
## Brazos River Alluvium Aquifer, Bosque County
## to Fort Bend County, Texas

By
Sachin D. Shah, Natalie A. Houston, and Christopher L. Braun
2007


U.S. DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

IN COOPERATION WITH THE
TEXAS WATER DEVELOPMENT BOARD

SCIENTIFIC INVESTIGATIONS MAP 2989
SHEET 4 OF 5

Shah, S.D., Houston, N.A., and Braun, C.L., 2007, Hydrogeologic Characterization of the
Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas



Figure 4. Thickness of the Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

## References—Continued

Harlan S.K., 1990, Hydrogeologic assessment of the Brazos River alluvium aquifer, Waco to Marlin, Texas: Waco, Tex., Baylor University, Masters thesis, 124 p.

HDR Engineering, Inc., 2001, Brazos River alluvium groundwater model and conjunctive use analysis: HDR Engineering, Inc., File Copy 2002–0152, 27 p.

Hughes, W.F., and Magee, A.C., 1962, An economic analysis of irrigated cotton production, middle Brazos River Valley, 1955–58: Texas Agricultural and Mechanical College MP–580, 12 p.

Livingston, Penn, and Turner, S.F., 1939, Records of wells, drillers' logs, water analyses, and map showing wells in Fort Bend County, Texas: Texas Board of Water Engineers duplicated report, 11 p.

May, R.E., 1938, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells and springs in Austin County, Texas: Texas Board of Water Engineers duplicated report, 36 p.

Naftel, W.L., Vaught, Kenneth, and Flemming, Bobbie, 1976, Records of wells, drillers' logs, water-level measurements, and chemical analyses of ground water in Brazoria, Fort Bend, and Waller Counties, Texas, 1966–74: Texas Water Development Board Report 201, 90 p.

Shah, S.D., and Houston, N.A., 2007, Geologic and hydrogeologic information for a geodatabase for the Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas: U.S. Geological Survey Open-File Report 2007–1031, 10 p.

Texas Water Development Board, 2006a, Groundwater availability modeling (GAM), GAM documents, technical memos: GAM technical memo 06–01, accessed November 1, 2006, at http://www.twdb.state.tx.us/gam/GAM_documents/GAM_Memo_06-01.pdf

Texas Water Development Board, 2006b, Well site remarks table: accessed November 1, 2006, at http://www.twdb.state.tx.us/publications/reports/GroundWaterReports/GWDatabaseReports/GWdatabaserpt.htm

Texas Water Development Board, 2007, Minor aquifers of Texas: Texas Water Development Board, Mapping, accessed September 6, 2007, at http://www.twdb.state.tx.us/mapping/.

Turner, S.F., 1939, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells in Grimes County, Texas: Texas Board of Water Engineers duplicated report, 5 p.

Turner, S.F., and Livingston, Penn, 1939, Records of wells and springs, drillers' logs, water analyses, and map showing locations of wells and springs in Waller County, Texas: Texas Board of Water Engineers duplicated report, 20 p.

U.S. Geological Survey, 2007, Seamless Data Distribution System: Earth Resources Observation and Science (EROS), accessed July 2007, at http://seamless.usgs.gov/.

Wrobleski, C. L., 1996, An aquifer characterization at the Texas A&M University Brazos River Hydrogeologic Field Site, Burleson County, Texas: College Station, Tex., Texas A&M University, Masters thesis, 127 p.

### EXPLANATION

Thickness of Brazos River alluvium aquifer, in feet

Negligible–20

21–36

37–49

50–59

60–68

69–77

78–92

93–168

Boundary of Brazos River alluvium aquifer 1.6-mile buffer

0    10    20    30    40    50 MILES

0    10    20    30    40    50 KILOMETERS

Base from U.S. Geological Survey
Digital data, 1:100,000
Universal Transverse Mercator projection
Zone 15

# Hydrogeologic Characterization of the
## Brazos River Alluvium Aquifer, Bosque County
### to Fort Bend County, Texas
By
Sachin D. Shah, Natalie A. Houston, and Christopher L. Braun
2007

Information regarding water resources in
Texas is available at
http://tx.usgs.gov/


U.S. DEPARTMENT OF THE INTERIOR
U.S. GEOLOGICAL SURVEY

IN COOPERATION WITH THE
TEXAS WATER DEVELOPMENT BOARD

SCIENTIFIC INVESTIGATIONS MAP 2989
SHEET 5 OF 5

Shah, S.D., Houston, N.A., and Braun, C.L., 2007, Hydrogeologic Characterization of the
Brazos River Alluvium Aquifer, Bosque County to Fort Bend County, Texas



**EXPLANATION**

——————  Boundary of Brazos River alluvium aquifer 1.5-mile buffer

——————  Boundary of Brazos River alluvium aquifer

— — — —  County boundary

Well site from which hydraulic property obtained

▲  Transmissivity

○  Specific capacity

■  Hydraulic conductivity—Represents seven values (all in Burleson County)

Figure 6. Histogram of specific capacity, Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

Figure 7. Histogram of transmissivity, Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

Figure 5. Areal distribution of the hydraulic properties of the Brazos River alluvium aquifer, Bosque County to Fort Bend County, Texas.

Base from U.S. Geological Survey
Digital data, 1:100,000
Universal Transverse Mercator projection
Zone 15

Information regarding water resources in
Texas is available at
http://tx.usgs.gov/

# Hydrogeologic Characterization of the
## Brazos River Alluvium Aquifer, Bosque County
## to Fort Bend County, Texas

By
Sachin D. Shah, Natalie A. Houston, and Christopher L. Braun
2007

# EXHIBIT G

REPORTER'S RECORD

VOLUME 1 OF 1

CAUSE NO. D-1-GV-06-000627

STATE OF TEXAS                    )    IN THE 353RD JUDICIAL
                                  )
VS.                               )
                                  )
WHITE LION HOLDINGS, LLC AND)
BERNARD MORELLO                   )
                                  )    DISTRICT COURT OF
                                  )
                                  )
                                  )
                                  )    TRAVIS COUNTY, TEXAS

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REPORTER'S RECORD

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

BE IT REMEMBERED, on the 19th day of February, 2015, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable Rhonda Hurley, Judge presiding, held in Austin, Travis County, Texas.

Proceedings reported by machine shorthand.

*PATRICIA A. DAY, CSR, RPR, RMR*
*(512) 854-9629*

EXHIBIT

APPEARANCES

FOR THE PLAINTIFF:

MR. CRAIG PRITZLAFF
Assistant Attorney General
P. O. Box 12548
Austin, Texas   78711-2548
Phone No. 512-475-4138
Fax No. 512-320-0911

FOR THE DEFENDANT:

MR. KEITH LAPEZE AND
MR. STEPHEN A. DOGGETT
(Lapeze & Jones, PLLC)
601 Sawyer
Suite 650
Houston, Texas   77007
Phone No. 713-739-1010
Fax No. 713-739-1015


ALSO PRESENT:

MR. DAVID TERRY
Staff Attorney for TCEQ

**INDEX**

**VOLUME 1**

**HEARING**

| **FEBRUARY 19, 2015** | **Page** | **Vol.** |
|---|---|---|
| Argument by the Plaintiff---------------- | 4 | 1 |
| Argument by the Defendant---------------- | 20 | 1 |
| Rebuttal Argument by the Plaintiff-------- | 33 | 1 |
| Reporter's Certificate-------------------- | 37 | 1 |

P R O C E E D I N G S

February 19, 2015

THE COURT: All right, this is cause number GV-06-000627. Would you state your appearances, please, for the record.

MR. PRITZLAFF: Your Honor, Craig Pritzlaff with the State of Texas and the Attorney General's Office.

MR. TERRY: David Terry, staff attorney for the Texas Commission on Environmental Quality.

MR. LAPEZE: Keith Lapeze and Stephen Doggett for Mr. Morello and Mr. Morello is personally here as well.

THE COURT: All right and this is the state's motion for summary judgment.

MR. PRITZLAFF: Yes, Your Honor. We're here on the state's motion for summary judgment. This is an environmental enforcement case involving the sole owner, sole manager, sole employee and sole director, who through deliberate inaction and deliberate actions caused, allowed, or permitted his company to blatantly violate laws governing --

THE COURT REPORTER: Please slow down. I'm not understanding your words.

THE COURT: And would that company be White

Lion Holdings?

MR. PRITZLAFF: White Lion Holdings, LLC.

THE COURT: Okay, go ahead.

MR. PRITZLAFF: Under Mr. Morello's watch and after suit was filed in this case the entire groundwater treatment and monitoring system at the facility was removed. This is a blatant violation of TCEQ laws, and especially the Compliance Plan pertaining to this site.

For over a decade now Mr. Morello has refused to accept the law, he's refused to accept the requirements to comply, and refused to address the contaminated groundwater on his property.

In short, his goal when he acquired this property, which is a former heavy manufacturing facility, was to clean it up. And by clean it up, I don't mean clean up the environmental issues, but clean it up to make it more enticing for prospective purchasers and/or lessors.

The presence of a large groundwater mediation system on the property was not enticing and was also costly and expensive to maintain.

In the end by avoiding his obligations for so long, by not taking one single drop of groundwater out of the ground, by not sampling a single drop of

groundwater for almost 10 years, by not repairing a single groundwater monitoring well, by not repairing a single groundwater monitoring well, by failing to report anything to the State of Texas for almost a decade, he's avoided those costs of compliance for almost a decade.

As we will discuss today, in this kind of case when you have a corporate representative, the only corporate representative that participates in, directs, and with knowledge and assents to, agrees to, that corporate individual casts aside his corporate shield and could be held individually liable.

The state has already obtained final judgment against its company White Lion, LLC back in September on summary judgment. And we believe summary judgment is appropriate in this case, Your Honor.

Now, it may be apparent from the briefing, which is voluminous, that it appears that this is a very complex case. And to some extent it is. But I think I can simplify things today for you.

I offer to you the following road map. Of course you can -- I'll drive you wherever you need me to go in this case, but I thought I would first discuss the site and the regulations that apply to the site. And then discuss Mr. Morello's role in why the state believes he should be held personally liable.

I would also like to finally address his primary defense, which is third party interference, and with that we'll turn to the facility and its background.

This facility is a heavy manufacturing facility that operated for nearly four decades in Fort Bend County in the small town of Rosenberg, which is just west of Houston, Texas.

As part of the manufacturing process the facility generated a hazardous wastewater stream consisting of acid waste and heavy metal runoff, wastewater. That acid waste was run through a series of huge impoundments on the facility.

Those impoundments collected this hazardous wastewater and became hazardous themselves because it stored hazardous waste. The facility changed its operations and proceeded to close those units. There's a federal law in place called the Resource Conservation and Recovery Act, RCRA, which governs cradle-to-grave management of hazardous waste.

Texas was delegated authority to implement that program in the state of Texas and it requires, among other things, when hazardous waste units are closed they obtain a permit.

Former owner and operator obtained a permit to close those units. And contemporaneous with that

closure they discovered the groundwater beneath those units was contaminated.

The TCEQ then issued a Compliance Plan. That Compliance Plan addressed investigation of that groundwater, and then later after a treatment protocol was set in place, it also addressed treatment and monitoring that groundwater. It is this Compliance Plan that's the subject of this suit.

Can you see this? Should I move it up further?

THE COURT: Yeah. Okay, that's good. You can come on up.

MR. LAPEZE: That's fine. I just wanted to see what it was. Thanks, Judge.

MR. PRITZLAFF: So here's the facility in general. It may be difficult -- do you want me to bring it up closer to you?

THE COURT: I can see pretty well. If you are going to point it out I'm fine.

MR. PRITZLAFF: If you see these dots, what the Compliance Plan contemplated is drilling a series of 21 monitoring wells all over the facility. Those monitoring wells are intended for the owner and operator to be able to sample the groundwater regularly.

There's also five wells here in the

impoundment that allow for the recovery of groundwater. That's treated onsite. There's an onsite treatment system called the ANTS, Acid Neutralization Treatment System. There's five of those recovery wells on the site as well.

As you can see, they're located all over the facility. The plan also requires regular monitoring and maintenance of those wells. Bi-annual groundwater samples must be taken and reports filed with the state on at least a semiannual basis.

The permittee under the Compliance Plan is also required to provide financial assurance in the amount of $574,000. That's to guarantee performance of the remedy through the life of the plan, which is set for at least 30 years, but it could go on longer if contamination remains at the facility.

Former owners and operators of the site went bankrupt in 2000, declared Chapter 11 bankruptcy and then this facility was spun out. The last groundwater samples taken of the former owners and operators was in 2003.

THE COURT: What do you mean by spun off?

MR. PRITZLAFF: The asset was sold.

THE COURT: Okay.

MR. PRITZLAFF: And the last groundwater

report filed with the state was in 2004, which is the year Mr. Morello came in and purchased the facility.

It's February 2004 that Mr. Morello entered into a purchase and sale agreement. He initially agreed to purchase the facility for $650,000. Later negotiated an amendment to that plan, which dropped the purchase price down to $150,000 for, among other reasons, assuming all the other liabilities at the facility.

He then formed White Lion Holdings, LLC and transferred his rights and obligations under the purchase and sale agreement to White Lion, and then the property was deeded to White Lion.

Let's discuss Mr. Morello's role at the facility at White Lion. Quite simple, he is White Lion. He's the only employee. He's the only decision maker, the only person responsible for making environmental compliance decisions, and most importantly, the only person that could direct and ensure White Lion would comply and manage the groundwater.

In the beginning things were good. Mr. Morello applied for and transferred the Compliance Plan over to his company. That was approved on July 23rd, 2004. That's one of the dates that's important here.

For counsel's benefit, I'm writing the date.

Later that month he wrote a letter to TCEQ requesting more time to address maintenance issues with some of the recovery wells that were already present at the facility.

He requested more time to conduct the latest round of groundwater samples, and more time to study whether another remedy may be applicable at the facility.

Would you like to see a copy of that letter?

THE COURT: It's up to you.

MR. PRITZLAFF: This is in Exhibit L of the state's motion. His words, "Due to the property transfer and the permit transfer, the first half of 2004 semiannual sampling event was not performed. These extenuating circumstances precluded submission of the semiannual Compliance Plan report. However, the next scheduled report due January 20th, 2005 will be submitted. The laboratory of QA/QC issues you raised in your April 27th, 2004 letter will be addressed in the January 2005 report submittal. I'm presently exploring other authorized handling methods for the recovered groundwater as an alternative to the handling methods specified in the existing Compliance Plan. I'm respectfully requesting TCEQ initially provide an

additional 120 days to comply."

TCEQ granted an extension. Mr. Morello thereafter ignored his own words. In late August in one of his last acts to engage with the TCEQ, Mr. Morello also asked for a delay to provide financial assurance until January 12th, 2005 because the former owner and operator already had a financial assurance policy in place.

However the TCEQ's rules required that the new owner must independently provide financial assurance within six months of acquiring ownership. And this is the TCEQ response which I believe is Exhibit N.

30 Texas Administrative Code, Section 305.64(g) is very clear that a new owner must independently provide its own financial assurance within six months, no later than six months after acquiring the facility.

Mr. Morello was explained this, and he failed to respond. So that's the other key date. That was the date by which I believe White Lion obtained the facility by a meeting on April 6th. Six months after that was October 6th. That was the date by which financial assurance had to be provided.

The reasons were multi why the rule was expressed. The reasons for the rule are sound. One, the

prior owner and operator is no longer at the facility. Two, in this case, the prior owner and operator his bankrupt.

There are also no assurances that Mr. Morello's plans to revise the Compliance Plan would comport with the rules, and he was explained that in that correspondence, and told in the interim he still needed to comply with the Compliance Plan.

Mr. Morello didn't like those responses and he ignored them. In fact, ignore, ignore, ignore is this case, and that's what the company did thereafter.

In his deposition Mr. Morello admitted -- that was September 19th, 2014 -- that the facility was in complete noncompliance with the Compliance Plan, and had not provided financial assurance, September 19th.

We have two counts in this case. One, complete total violation of the Compliance Plan as a whole. And two, failure to provide financial assurance. 3,710 days for the first count times the minimum penalty established in Section 7.102 of the Water Code, there's a penalty for that count of $185,500.00.

The second count regarding financial assurance, that's 3,653 days, times a minimum penalty set in Section 7.102 of the Water Code, $50 per day. It's $181,750.00.

The state's also seeking its attorney's fees in the amount of $26,844.00.

Let's now look and examine further why Mr. Morello, himself, should be held personally responsible in this case.

To be clear the state's not seeking to pierce the corporate veil. It's seeking civil penalties for Mr. Morello's actions to cause, allow, and permit the violations as set forth in 7.102 of the Water Code.

Here's the full text of the statute, Your Honor. I've also included Section 7.101, which is policy description that we cited in our brief, primarily because defense counsel in their response objected to our citation to that. But the operative cause of action is 7.102 for the civil penalty.

In the case of personal participation of a corporate representative, courts will disregard the usual corporate shield when an individual directs, participates in, or has knowledge of and assents to the wrongful acts. In this case the wrongful act is a violation of the statute.

As the court held in Malone Services, a case involving corporate representatives were held liable for directing or participating in violations of a permit prohibiting disposal of waste into an on-site

impoundment.

The Court held the proper mechanism for courts to look at are the actions of the individuals, not as defendants have purported, to see whether they're acting within the scope of their employment. That's already presumed.

But the actions are viewed in the context of whether to determine such actions constitute separate violations by that individual.

The statutes are structured with, among other things, this in mind. A person includes an individual. That's true in DTPA cases and was true in Malone Services, the statute issued there.

And here the issue or the evidence is overwhelming Mr. Morello caused, allowed, or permitted violation of the Compliance Plan and the financial assurance requirements.

As the sole decision maker, employee and person responsible, Mr. Morello was the only person that could cause his company to comply.

Mr. Morello instead made affirmative decisions to ensure White Lion ignored the law. He took affirmative personal actions to remove certain components of the treatment plan and monitoring system required.

These egregious actions took place after

the state filed suit in this matter, after the TCEQ initiated an enforcement.

Let's look at his affirmative actions. I'm going to focus on two here. His testimony, he said -- Mr. Morello explained that he was out at that site 60 to 80 hours a week, everyday. Incredibly, in 2006, so this -- backing up a second.

So after the correspondence with TCEQ that we discussed earlier, and Mr. Morello failed to comply, TCEQ inspected the facility in late 2004; more engagement with Mr. Morello to get him to comply, more letters. He continued to ignore it. TCEQ got to the end of the line and could not take any further action and referred the matter to the Attorney General for enforcement.

In 2006 this case was initially filed, and Mr. Morello was added in 2007 as a defendant.

In late 2006, and early 2007, and this is from a deposition in another case, Mr. Morello, with respect to the ANTS system, which is the system that would treat the contaminated groundwater, he removed it. He didn't notify the state.

He said I was going to remove it anyway. It was not broken. This had nothing to do with any third party damages at the facility. This eliminated any possibility of treating the groundwater at the facility.

Then sometime between 2008 and 2013, every single groundwater well at that site was removed. They're not hard to see. Every single one of those wells is protected by a large yellow metal housing. You can see, it's fairly thick steel. These pictures are from 2008. If you recall the picture, they were dotted all over the site.

Mr. Morello's testimony when we asked him what happened to those wells, he said that mowers at the site destroyed them, that he would pick up these pieces and throw them away.

When our inspector was out there last time in mid 2013, that's all that's left. Green fields and open holes into the ground, which that's a whole host of issues for additional contaminate migration.

These actions, these direct actions taken by Morello allowed -- he allowed them to be taken under his watch, or he took them personally himself, caused, allowed, and permitted White Lion to violate the Compliance Plan.

Mr. Morello also did a lot of inaction, made a lot of decisions to not do anything, to not repair, notify TCEQ, notify removal of equipment, file reports. These decisions to not act constitute affirmative action.

I think about it as perhaps we should ask the question of what Morello did to comply, and it would be nothing. That inaction warrants penalties in this case.

One last point, you are going to hear most likely Mr. Morello talk about third party involvement at the facility. When he purchased the facility from the bankruptcy, apparently other parties came in and removed equipment, and he said those third parties eliminated any possibility of his complying.

However, he testified that those third parties never prevented him from taking samples from the groundwater. Those wells are in place, they require no power.

Furthermore, with respect to the recovery wells, these aren't high yield wells that are coming out of the ground. A few gallons per minute, if that. The power required to power a small pump at those recovery wells would be minimal.

Irregardless, even if this defense were applicable, it doesn't apply. The question here is Mr. Morello's personal actions. It's not the third party's obligations to comply; it's Mr. Morello.

Mr. Morello never notified the TCEQ of these issues. By his own testimony, he said that work

was completed in August 2004.

Tellingly, in one of Mr. Morello's voluminous response exhibits, there are letters to insurers. Here's an example of one of them, and they're all dated around the same time; July 2005 in this case, July 16th, 2004. That's actually the one I really wanted, which is letters to the insurers to some of these third parties with respect to potential damages at the facility.

He then sent a letter, remember, in July 2009 -- or July 29th, 2004, later that month, asking for more time to comply and giving assurances to TCEQ. But he never ever notified TCEQ or alerted them that there were some problems at the facility caused by other parties.

If that defense even were applicable it would have been waived.

The evidence here is so overwhelming that Mr. Morello personally participated in, directed and had knowledge of and assented to causing, suffering, and allowing violation of the Compliance Plan.

Summary judgment is proper here, and civil penalties should be assessed. This matter has been pending for a very long time, and the facts and evidence here are so very clear. Summary judgment is the proper

means to resolve this now.

I would like to reserve the balance of my time for rebuttal.

THE COURT: All right, thank you. Not much.

Mr. Lapeze?

MR. LAPEZE: Thank you for pronouncing my name right. Do the best you can. We're taking this record for other reasons so I have that.

Your Honor, just an introduction, TCEQ is seeking nearly $400,000 in civil penalties against my client, Mr. Morello, individually when he never personally owned, never personally operated, and never held a permit personally regarding this property at issue.

The owner, operator, and permit holder in this case, and of this property is and has always been White Lion. I'll call it White Lion, like the '80s band. That is undisputed.

They make -- the state makes lots of arguments in their motion for summary judgment that Mr. Morello owned the property. That's false. He never owned it, ever.

Yes, he went to -- I'll explain the facts in a minute. He went to a bankruptcy auction and got a

purchase agreement. That's like a contract to sell. He never owned it, and I'll explain that in a minute, Judge.

The state leaves a lot of the facts out, and I think these are the most facts I've ever heard discussed at a summary judgment hearing, which is good for us, because you know the burden of proof, Judge, but let me talk about the facts for just a second. I've kind of jotted them down.

This is what the state left out for the most part. The property was owned and contaminated by Vision Metals. Vision Metals entered into Compliance Plan and permits for the TNRCC, now the TCEQ as you know, in 1988.

Vision filed for bankruptcy in 2000. Mr. Morello attended the bankruptcy auction, which he read about in the newspaper in 2004. Decided to bid on this property. And lo and behold he won the bid.

So he entered into a contract to sell, a purchase agreement for this property that he could assign it to anyone. But there are certain limitations and criteria before he closed; approval by the bankruptcy court, approval by the TCEQ. I think it was actually approval by the bankruptcy court.

Before closing, Mr. Morello assigned everything he had to White Lion. So White Lion is the

one who bought the property. White Lion's the one that negotiated with the TCEQ to enter into the permit, into the Compliance Plan.

Now, the bankruptcy trustee not only sold the real property to White Lion, it sold all of the equipment on the property to other third parties.

Remember, they're trying to get all this money for the corpus of the bankruptcy. So they sold the pipe making equipment, the metal rolls, and all these other things to 38 individual buyers.

These buyers were like vultures on a dead carcass. They went into this facility after the facility was -- after they bought it, and they tore it to pieces; removed the transformers.

There's no electricity on this property. There has not been since 2004. They destroyed the utilities. They destroyed many things. Despite the state's factual statements to the contrary, they damaged dramatically the remediation system that was out there.

These are fact issues. They caused approximately 1.4 million dollars in damages. White Lion's sole asset was this property.

When Mr. Morello purchased -- when he got White Lion to purchase this property, there was no debt. Immediately after all these vultures came in, third

parties came in and destroyed the property, it's immediately 1.4 million dollars in debt.

This happened after the Compliance Plan was entered into by White Lion. So this is what White Lion is facing, immediate debt.

Now, what did White Lion do? Well, as any lawyer would instruct White Lion to do, they started suing people, started suing these third parties, saying, look, you damaged the property. And the state pointed this out with these exhibits.

So White Lion could get the money to start complying with the remediation plan. 10 years of litigation plus, this case is still in litigation, White Lion's recovered approximately a third of the 1.4 million dollars.

A lot of that money has gone to paying lawyer's fees and whatnot on this. That's the background of all this. So you have Mr. Morello as the sole officer, sole employee of White Lion having to triage decisions. You have a patient dying on the table trying to figure out how to best handle all this.

None of this was expected when he bought it. That's the source of our affirmative defenses in this case, which we're going to talk about in a minute.

Now I want to go to the case's primary

argument at hand. And I could not have developed a better exhibit than the exhibits they did. This is what Mr. Pritzlaff said when he put this before you. Morello is White Lion. That's his quote.

I agree with that. His actions were White Lion's. The statute that they're talking about, 7.102 and 7.101, basically the same thing, talks about the actions of a person.

Of course, a person can be defined as a corporation. So the question is what is a person.

Well, when we look at a person we go back decades of Texas case law starting in 1907 where it says, the acts of a person as an agent or employee of a company are the acts of the company.

When we look into LLC law and everything else that's been cited for you in the briefing, employees, officers, whatnot cannot be held individually responsible for the obligations unless you start piercing the corporate veil.

What are the exceptions to this? Exceptions to this are -- and there's lots of case law that we've cited to you and the state in particular has cited to you -- the employee has individually committed a tort, fraud, slander, libel.

Another situation, and those are all the

cases cited, and we'll talk about Malone Services in a second because that case is really good for our side of this summary judgment. In the Holloway case, you are talking about the terms of a contract. This is more of a contract than a tort, because we're talking about things that he didn't do or was obligated to do under the Compliance Plan.

The Holloway case is great. Where it said that you can't hold an individual employee liable for the breach of a contract. The law doesn't allow that unless you prove that employee acted in bad faith or against the best interest of the company.

Again these are fact issues. Was it in bad faith? Did he commit a tort? They didn't make any allegation in their petition, we can read it, that he was fraudulent, wrongful, tortious, nothing in the petition. There's no allegations.

What their case is is that Mr. Morello, just because White Lion did it, he did it.

Now, in the background of all this, White Lion has already been held responsible in a summary judgment. Granted it's on appeal, and I know you don't want to talk about the specifics, it's a little bit outside the record, and I'm talking about some of the things they said that were outside of the record, but

there are reasons they are going after this man individually.

Now, looking at this law, this decades old law, to win summary judgment, the state must prove as a matter of law that Mr. Morello directed or participated in tortious acts, or that his actions were not in good faith or against the best interest of White Lion. That is their burden. That's the case law. That's how they separate Mr. Morello from White Lion.

Now, let's talk about the Malone Services case just briefly. Malone Services, you had employees -- first of all, it doesn't deal with 7.102 or 7.101. It's a completely different statute.

There are no cases interpreting 7.101 or 7.102 in a person. Yet employees that fraudulently sent reports to the State of Texas were dumping illegally, cutting tarps -- you know, these reports were fraudulent. And the statute said, thou shall not dump.

So it's clearly distinguishable. They were committing fraud. It's a tort.

And the Court said quote, this is tortious activity, so it falls within the elements of tort.

What's more important is that that case was after a jury trial. The jury found those people to be responsible, to be liable for their tortious acts. It

wasn't a summary judgment.

Now, the state's theory is really wrong. Let me just twist this hypothetical just a bit. If we listen to the state, how they want to interpret this, any person that causes, suffers, allows, permits, let's say I'm a shareholder, and I read my 10-Qs and 10-Ks in this small independent oil and gas company that I've invested in. They have obligations with the TCEQ that they report on and know about it.

This company then puts in a 10-Q; Hey, money is short because of the way oil is, and we can't afford to pay for these things, so we're going to let these obligations go. Just letting you know that, shareholder, that we expect in a couple quarters we'll have the money to start our obligations up again, which is a technical violation of the law if you don't do your reports or whatnot.

I'm a shareholder. I didn't come in with my own money to help the company out. Well, technically then, I caused, suffered, allowed, or permitted.

That's the question they asked him in his deposition. His deposition is attached as an exhibit. Why didn't you personally go in with your own money, Mr. Morello, and pay for these things? You should have done that. That's their argument.

This would change decades of Texas law if this argument, this strict liability argument was to be adopted. That's not the law in Texas.

In fact, the law in Texas is that for penal statutes -- and this is Footnote 58 I described this in detail in the response brief, for penal statutes, which this is, it's strict construction.

If the Legislature wants to change the law with penal statutes, then it has to make it very clear and explicit in the terms. This is not very clear that a person -- decades of law on agency law in Texas is overrun by this. And the consequences would be dire.

What the state has done in this case is effectively ignored these arguments and these issues. There is no allegation of tortious activity, fraudulent, wrongful, like I said earlier. And again, this is similar to a contract.

There are genuine issues of material fact all through these issues. Was he acting as an agent or not? All we want is our day in court on that issue, Your Honor.

Now, let's talk about the affirmative defenses. We've pled in this case affirmative defenses, third party interference, force majeure, several of these other defenses, and their inability to comply, things

like that.

As you know, Judge, and you know the law, they not only have to prove their case as a matter of law they have to disapprove the affirmative defenses as a matter of law to win.

Now, their argument in this case is, well, for force majeure in this third party interference causing you not to be able to comply because there is no money, et cetera, et cetera, you had a separate obligation under the Compliance Plan to let us know about this, and you failed to do that. So that in and of itself is a violation of the Compliance Plan.

Well, they make two causes of action in this case. Your Honor, may I approach?

THE COURT: Uh-huh.

MR. LAPEZE: And I just want to show it to you briefly. I've highlighted the relevant portions for you.

The first claim is failure to operate the complete corrective action plan. We've been calling it the Compliance Plan. And the second claim is failure to provide for financial assurance.

The specific violation rule that they claim with the corrective action plan is 30 TAC, 335.166(6). The financial assurance is a completely different

statute, and it's an independent obligation of a Compliance Plan to provide for financial assurance, 30 TAC 305.64(g).

The reason why I bring that up to Your Honor, and the reason why it's important is this. Is that financial assurance, not providing that, they have not even addressed our affirmative defenses with any argument that they have made.

Therefore, on the financial assurance piece of their argument, they lose as a matter of law. Their only argument about our affirmative defenses is regarding the Compliance Plan.

So for their Count 1 they say, okay, their affirmative defenses don't count, and this is why. They never address our affirmative defenses for Count 2 because it's separate and apart from the Compliance Plan.

Now, regarding that, they never make one allegation until their summary judgment that there's this force majeure provision in the Compliance Plan. Not one.

So because they didn't plead it, they never argued it before, they've waived it. They can't do it. We've timely objected to that in our summary judgment response.

Now, I just want to talk about some misstatements of fact, and I talked about those briefly.

All throughout the summary judgment they talk about 7.101. That's not even mentioned in their pleadings. 7.102 is. So it's very confusing about whether or not -- what they're arguing here. But 7.101 is not a policy. It is a specific statute, "thou shall not" statute.

Again, Morello never personally owned the property. He was never personally the operator. White Lion was. The notices of violation, the notices of enforcement were never issued to Morello personally. He was never put on notice that we're going to hold you personally responsible for this.

The cases cited by the state, Your Honor, I'd invite you to read them, they're all after bench trials or jury trials.

The one summary judgment is where the defendant got a summary judgment. No way there's a fact issue on whether or not he was an agent. So we're sending that back down.

And if you just read through the reply, this case is replete with fact issues. This is a serious summary judgment, Your Honor. We're talking about holding my client responsible in a summary proceeding for almost $400,000 after the state has received a summary judgment against White Lion.

And these are just for fines. The state

states in their motion for summary judgment that the only way -- and I don't understand this exactly, but I think it's worth bringing up. The only way for Mr. Morello to defeat it, if he shows that he is somehow starting to comply with this, or he's complying with this or trying to comply with the Compliance Plan.

Well, we did that. We added some exhibits to show you, Your Honor, that environmental consultants have been hired and have been working for quite awhile now on this site.

The state doesn't mention that. As a matter of fact, they try to strike those exhibits. Long story short, Your Honor, all my client wants is his day in court, be able to argue his points and defend himself in front of a jury.

And last, and I received a note from my co-counsel, last, but certainly not least, there are arguments the state made regarding how the wells work and power to operate the wells. There's nothing in the proof about that. The state doesn't have any of that in their proof in their summary judgment.

Your Honor, unless you have any questions, that is all I have, and I thank you for your time and your attention. I appreciate it.

THE COURT: Thank you, sir. All right,

briefly, very brief.

MR. PRITZLAFF: Yes. With respect to ownership, we present that not to prove up ownership. It's merely contextual to show his involvement early on.

With respect that the contamination was caused by another party, that's irrelevant. The issue here and the cause of action here is for the Compliance Plan which is in White Lion's name, and the rampant violation of that plan. Company debt is irrelevant to compliance.

The actions here of Mr. Morello constitute affirmative action to destroy that treatment unit, all the monitoring wells, taking affirmative inaction to not do anything.

Most importantly, I need to correct a very important point here. The Compliance Plan, that is not a contract. It's a creature of statutory and regulatory law. This is addressed in our response brief, our reply brief.

It is a statutorily required obligation. The state doesn't -- is not entering into an arms-length negotiation with the defendant or with the permittee to enter into that Compliance Plan. It's statutorily required.

There's no damages action. Civil penalties

is the remedy for violation. The state does not need to prove tort causes of action elements, bad faith, fraud. The elements are set forth in Section 7.102 of the Water Code. And it's not strict joint and several liability. I don't know if he said that.

It is his individual actions, whether they amount to violations of the law, and the evidence is clear that they do. He participated in, directed, and with knowledge assented to those violations.

With respect to the affirmative defenses, we've addressed those in the response brief.

And with respect to force majeure, which was just added in their most recent answer filed a week ago, it's irrelevant. It's inapplicable. Look at Section 11 of the Compliance Plan, or Section 12 of -- Section 13 of the Compliance Plan.

It specifically speaks to force majeure, and it's just not relevant here. It's a red herring. Even if it was applicable, he never filed any kind of paperwork to that effect to raise that as an issue.

With respect to the consultant hired, they were hired after the fact. And as admitted in his deposition, the facility is in complete noncompliance as of September 19th, 2014, and honestly to this day, we could seek additional 151 additional days of penalty if

Your Honor so chose to add those on.

That brings us up to the last point. I don't know if you wanted to address objections to those affidavits now.

THE COURT: I'll carry those with it under advisement.

MR. PRITZLAFF: Okay. We have two proposed orders. One for the objections and one for the --

THE COURT: Okay.

MR. LAPEZE: Your Honor, we have an order as well. May I approach?

THE COURT: Yes.

MR. PRITZLAFF: Unless you have any further questions, Your Honor.

THE COURT: I don't. Are there any deadlines coming up?

MR. PRITZLAFF: Oh, Malone Services. May I make one more point?

THE COURT: Yes, sir.

MR. PRITZLAFF: On Malone Services, he is correct, Malone Services is the key case. The statutory provision there is very similar to here. Any person who violates a provision of a permit, and I've highlighted that for you. The same definition of person as applies here.

THE COURT: Okay.

MR. PRITZLAFF: And in the Court's own words, when a corporate officer who participates in or directs the commission of a tort may be held personally liable.

And it's equating the statutory violation to the tort case law because this was a unique case at the time. Liability is based on the agent's own actions, not his status as an agent. It cites federal court case law regarding personal participation which has been adopted.

THE COURT: Thank you, sir. Okay, you-all are excused. I'll send a letter ruling.

(Hearing concluded.)

REPORTER'S CERTIFICATE

THE STATE OF TEXAS    )

COUNTY OF TRAVIS      )

I, Patricia A. Day, Official Court Reporter for the 98th Judicial District Court of Travis County, Texas, do hereby certify the foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that the Reporter's Record truly and correctly reflects the exhibits, if any, admitted by the respective parties.

WITNESS MY OFFICIAL HAND this the 10th day of March, 2015.

_/s/ Patricia A. Day
Patricia A. Day, CSR, RPR, RMR
Official Court Reporter
98th Judicial District Court
P.O. Box 1748, Austin, Texas  78767
(512) 854-9629
Certification No. 967
Date of Expiration of Current
Certification:  12/31/16

# EXHIBIT H

**STATE OF TEXAS**           §

**COUNTY OF FORT BEND**      §

Before me, the undersigned, on this day personally appeared Bernard Morello, who being duly sworn, deposed and said:

1.     I am Bernard Morello.  I am the authorized representative of White Lion Holdings, L.L.C. [WLH].  The facts stated herein are true and correct and based on my own personal knowledge.  All exhibits attached to this affidavit are true and correct copies.

2.     I have no education or practical experience with environmental compliance issues, and I had no reason to question any of the underlying geological or hydrological bases for the compliance plan. I learned on April 11, 2015 from Mr. Heslep that he recently discovered that there was a fundamental error made in the 1980's regarding analysis of the aquifers under the facility. That error has been carried forward and is one of the key underpinnings for the State's requirement of a pump and treat system under the Compliance Plan. The error misidentifies a potentially affected aquifer as the Upper Chicot. In fact, Mr. Heslep says the aquifer under the facility is not the Upper Chicot; it is the Brazos River Alluvial Aquifer.

3.     My understanding is that had the State properly identified the aquifer, it would not have been necessary to pump and treat, and a monitored natural attenuation plan would have been an appropriate management response.  White Lion's failure to comply with CP-50129's remediation and monitoring requirements was due to financial inability.  Heslep previously provided me with a close estimate of the costs of a monitored natural attenuation plan (as would have been proper had Plaintiff identified the proper aquifer at issue).  White Lion could have afforded these costs and would thus have been able to comply with CP-50129.

EXHIBIT

4.     I am requesting that the Court grant me a new trial based on the newly discovered evidence that Mr. Heslep found. This evidence came to light after the hearing on the motion for summary judgment against me and well after the Court had announced its ruling for Plaintiff. It was not due to lack of diligence that it was not produced sooner. In fact, the State was aware of information (the northern flow of the groundwater) which should have caused it to realize the wrong aquifer had been identified. The evidence is not cumulative. The new evidence shows that the wrong aquifer was identified and this misidentification has wrongly been used to require a pump and treat system which is not necessary. Had this information been known, it probably would have produced a different result in the outcome of the trial."

Further Affiant sayeth not."



_____
Bernard Morello

Sworn to and subscribed this __14__ day of May 2015.

SARAH DELEON
Notary Public, State of Texas
My Commission Expires
June 16, 2018

_____
Notary Public, State of Texas

# EXHIBIT I

No. D-1-GV-06-000627

| | | |
|---|---|---|
| STATE OF TEXAS,<br>Plaintiff, | §<br>§<br>§<br>§ | IN THE DISTRICT COURT OF |
| v. | §<br>§ | TRAVIS COUNTY, TEXAS |
| WHITE LION HOLDINGS, L.L.C.,<br>and BERNARD MORELLO<br>Defendants. | §<br>§<br>§<br>§ | 353rd JUDICIAL DISTRICT |

## FINAL SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND ORDER OF SEVERANCE

The Court having considered the State's Motion for Summary Judgment and Motion for Severance, the Defendant's reply thereto, the argument of counsel, the evidence on file, and the pleadings, the Court GRANTS the Motion.

The Court hereby RENDERS FINAL JUDGMENT for the State of Texas. Therefore, the Court ORDERS:

### I. PAYMENT OF CIVIL PENALTIES

The State of Texas shall recover civil penalties from White Lion Holdings, L.L.C. in the amount of $325,600.00

### II. PAYMENT OF UNPAID HAZARDOUS WASTE FACILITY FEES

The State of Texas shall recover from White Lion Holdings, L.L.C. outstanding hazardous waste facility fees outstanding to the Texas Commission on Environmental Quality in the amount of $129,464.15, together with an award of pre-judgment interest.

### III. PAYMENT OF ATTORNEY'S FEES AND COSTS

The State of Texas shall recover attorney's fees from White Lion Holdings, L.L.C. in the amount of $40,800.00.

The State of Texas shall recover its costs of court from White Lion Holdings, L.L.C.


EXHIBIT

614

## IV.   POST-JUDGMENT INTEREST

The State of Texas shall recover pre-judgment interest on all amounts awarded in this judgment at the annual rate of 5.00%.

## V.   PERMANENT INJUNCTION

The State of Texas' request for permanent injunctive relief is granted.   Defendant, White Lion Holdings, L.L.C., and its officers, directors, managers, principals, partners, owners, employees, agents, servants, and all persons in active concert or participation with them, on their behalf, or under their control, whether directly or indirectly who receive notice of this Injunction are permanently enjoined as follows:

### A. Words and Terms for this Injunction

As used in this injunction, the words and terms set forth below shall have the following meanings:

1. "White Lion" shall mean White Lion Holdings, L.L.C.
2. "Effective Date" shall mean the date the Court grants summary judgment.
3. "Property" shall mean the (1) land, buildings and substation located at Spur 529 and Scott Road and consisting of 38.5 +/- acres which includes 1.522 +/- acres that comprises the substation; (2) farmland consisting of 133.69 +/- acres; and (3) vacant property consisting of 25.32 +/- acres, also described as located at or about 2010 Spur 529 at Scott Road in Rosenberg, Fort Bend County, Texas; owned by White Lion.
4. "TCEQ" shall mean the Texas Commission on Environmental Quality.
5. "Compliance Plan" shall mean Compliance Plan No. 50129, transferred to White Lion on July 23, 2004.
6. "Groundwater Protection Standard"   shall be the concentration specified in Table I, Column B of the Compliance Plan (cadmium, 0.10 mg/L; cobalt, 2.2 mg/L; lead, 0.05 mg/L; barium, 2.0 mg/L; chromium, 0.10 mg/L; nickel, 0.73 mg/L; silver, 0.18 mg/L; zinc, 11.0 mg/L).
7. "Corrective Action System" shall have the meaning set forth in Section II of the Compliance Plan.

## B. Ordering Provisions of this Injunction

1. Subject to the provisions of this Injunction, immediately after the Effective Date, White Lion shall comply with each limitation, requirement, and condition of the Compliance Plan.

2. Within 10 days after the Effective Date, White Lion must provide financial assurance for the Property in accordance with Section XI. of the Compliance Plan in a form acceptable to the TCEQ and in an amount not less than $574,000, and must submit to TCEQ an originally signed version of the financial assurance mechanism obtained.

3. Within 15 days after the Effective Date, White Lion must inspect and evaluate each monitoring well, point of compliance well, corrective action system recovery wells, and corrective action observation wells that are part of the Corrective Action Program and Ground Water Monitoring Program set forth in the Compliance Plan, including, but not limited to, the following wells identified in Table II of the Compliance Plan:

    a. Monitoring Wells (MW): MW-1; MW-2; MW-3; MW-4; MW-5; MW-6; MW-7; MW-8; MW-9; MW-10; MW-11; MW-12; MW-13; MW-14; MW-15; MW-16; MW-17; MW-18A; MW-18B; MW-18C; MW-19A; MW-19B; MW-19C; MW-20A; MW-20B; MW-20C; MW-21A; MW-21B; MW-21C.

    b. Recovery Wells (RW): RW-22; RW-23; RW-24; RW-25; RW-26.

    c. Piezometer Well (P): P-1; P-2; P-3.

    White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

4. Within 20 days after the Effective Date, if the conditions of any of the wells identified in Paragraph B.3. of this Injunction "no longer enable the well to yield samples representative of groundwater quality" (see Compliance Plan at Section III.D.3), White Lion must submit to the TCEQ a proposal for replacement of such well(s). Any new well must be designed and constructed in accordance with Attachment B, Well Design and Construction Specifications, of the Compliance Plan. Any well that is to be abandoned or plugged, shall be abandoned and plugged in accordance with Paragraph 14 of Attachment B of the Compliance Plan.

5. Within 60 days after the Effective Date, White Lion must repair, redevelop, replace, or take other necessary action to fully restore to full operating condition each of the wells identified in Paragraph B.3. of this Injunction. White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

6. Within 75 days after the Effective Date, as set forth in Section VI.C of the Compliance Plan, White Lion must obtain a groundwater sample from each of the wells identified in Paragraph B.3. of this Injunction and shall have each collected groundwater sample individually analyzed for the constituents listed in Table I, Columns A and C of the Compliance Plan (including cadmium, cobalt, lead, barium, chromium, nickel, silver, zinc, pH, conductivity, total dissolved solids, iron, and sulfate). White Lion shall have each of the collected groundwater samples analyzed in accordance with the current edition of U.S. EPA Publication SW-846, Test Methods for Evaluating Solid Waste and American Society for Testing and Materials (ASTM) Standard Test Methods or any other methods accepted by the TCEQ, and the groundwater analysis shall be conducted at a facility capable of measuring the concentration of each constituent at a concentration equal to or less than the corresponding Groundwater Protection Standard. See Compliance Plan Section VI.B. In each background well, point of compliance well, and corrective action system well, White Lion shall also measure and record water level measurements relative to mean sea level measured to within 0.01 feet, the total depth of each well, and descriptions of the appearance of the groundwater collected (clarity, color, odor). See Compliance Plan Section VI.C.4. White Lion must notify the TCEQ in writing immediately upon completion of the requirements stated in this paragraph.

7. Within 90 days after the Effective Date, White Lion shall submit to the TCEQ a proposal for activation of the Recovery Wells and Corrective Action System at the Property. In accordance with Section III.B. of the Compliance Plan, such proposal must include a proposed method for management of groundwater recovered from each Recovery Well (including any purge water from any other well).

8. Within 90 days of the Effective Date, White Lion shall submit to the TCEQ a report in accordance with Section VII.B of the Compliance Plan, including the following information:

   a. A narrative summary of the evaluations made following restoration of the wells as set forth in Paragraph B.3. of this Injunction and the sampling/analysis conducted as set forth in Paragraph B.6. of this Injunction;

   b. Water table maps prepared from the ground-water data collected as per Paragraph B.6. of this Injunction, and shall include directions of ground-water flow and estimation of the rate and direction of groundwater contamination migration;

   c. An updated table and map of all monitoring and corrective action system wells, including all records, well logs, borings, and related documents for each monitoring well, point of compliance well, corrective action system recovery wells, and corrective action observation wells that are part of the Corrective Action Program and Ground Water Monitoring Program;

d. Results of the chemical analysis, submitted in a tabular format acceptable to the TCEQ, which clearly indicates each parameter that exceeds the Groundwater Protection Standard, including copies of the original laboratory report for chemical analyses showing detection limits and quality control and quality assurance data;

e. Tabulation of all water level elevations, depth to water measurements, and total depth of well measurements collected;

f. Potentiometric surface maps showing the elevation of the water table at the time of sampling conducted as per Paragraph B.6. of this Injunction, delineation of the radius of influence of the Corrective Action System, and the direction of groundwater flow gradients outside any radius of influence;

g. Tabulation of all data evaluations conducted pursuant to Section VI.D. of the Compliance Plan and the status of each well with regard to compliance with the Corrective Action objectives and compliance with the Groundwater Protection Standards;

h. Maps of the contaminated area depicting concentrations of constituents exceeding the Groundwater Protection Standards as isopleth contours or discrete concentrations if isopleth contours cannot be inferred;

i. An updated schedule summary of all activities required by the Compliance Plan as required by Section X of the Compliance Plan;

j. Summary of any changes made to the monitoring/corrective action program and a summary of activities conducted as set forth in Paragraphs B.1. to B.6. of this Injunction, including all documents obtained from performance of those activities;

k. Tabulation of well casing elevations in accordance with Attachment B of the Compliance Plan; and

l. A corrective measures implementation report as set forth in Section VIII.F. of the Compliance Plan, if determined to be necessary.

9. White Lion shall address each report, proposal, or notice required to be submitted by the Injunction to:

Order Compliance Team
Texas Commission on Environmental Quality
MC-224
P.O. Box 13087
Austin, Texas 78711-3087

**With copies to:**

Craig J. Pritzlaff
Case, AG#052198322
Office of the Attorney General
Environmental Protection Division
(MC-066)
P.O. Box 12548
Austin, Texas 78711-2548

618

## VI. ORDER OF SEVERANCE

The Clerk will file a copy of this Final Summary Judgment and Permanent Injunction and Order of Severance under a separate docket number, to wit, _____ D-1-GV-13-C01Cu8/984h

THE COURT FURTHER ORDERS that the Clerk of this Court shall issue a writ of permanent injunction against White Lion as set forth in Section V. of this ORDER AND FINAL JUDGMENT.

THE COURT FURTHER ORDERS that execution to issue for this FINAL JUDGMENT.

THE COURT FURTHER ORDERS that the State shall be allowed such writs and processes as may be necessary to enforce this FINAL JUDGMENT.

This FINAL JUDGMENT finally disposes of all parties and all claims, and is appealable. All relief not expressly granted is denied.

SIGNED this ___19TH___ day of ___SEPTEMBER___ 2013.

_____
JUDGE PRESIDING
TIM SULAK

# EXHIBIT J



## 98TH DISTRICT COURT

**RHONDA HURLEY**
**Judge**
(512) 854-9384

**MICHELLE ROCHE**
Staff Attorney
(512) 854-7839
michelle.roche@traviscountytx.gov

**DORINA COCKMAN**
Court Operations Officer
(512) 854-9384

HEMAN MARION SWEATT
TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX (512) 854-9338

**KELLY DAVIS**
Court Clerk
(512) 854-5887

**PATTY DAY**
Official Court Reporter
(512) 854-9629

March 9, 2015

Craig J. Pritzlaff
ASSISTANT ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
*Via Facsimile: (512) 320-0911*

Keith W. Lapeze
Taylor L. Shipman
LAPEZE & JOHNS, PLLC
601 Sawyer Street, Suite 650
Houston, Texas 77077
*Via Facsimile: (713) 739-1015*

Stephen A. Doggett
ATTORNEY AT LAW
201 South 11th Street
Richmond, Texas 77469
*Via Facsimile: (281) 342-8458*

Re: Cause No. D-1-GV-06-000627; *State of Texas v. Bernard Morello*; in the 353rd Judicial District Court, Travis County, Texas

Dear Counsel:

The State of Texas' Motion for Summary Judgment came on for hearing on February 19, 2015. Having considered the motion, response, summary judgment evidence and arguments of counsel, the court grants the motion. The Court sustains the State's objections to the affidavits of Mr. Heslep and Mr. Crouch.

Counsel should prepare an appropriate order, circulate to opposing counsel for approval as to form and submit to the court for signature.

Yours very truly,

RHONDA HURLEY
Judge, 98th District Court
Travis County, Texas

cc: Velva L. Price, District Clerk

EXHIBIT

# EXHIBIT K



## 98TH DISTRICT COURT

**RHONDA HURLEY**
**Judge**
(512) 854-9384

**MICHELLE ROCHE**
Staff Attorney
(512) 854-7839
michelle.roche@traviscountytx.gov

**DORINA COCKMAN**
Court Operations Officer
(512) 854-9384

HEMAN MARION SWEATT
TRAVIS COUNTY COURTHOUSE
P. O. BOX 1748
AUSTIN, TEXAS 78767
FAX (512) 854-9338

**KELLY DAVIS**
Court Clerk
(512) 854-5887

**PATTY DAY**
Official Court Reporter
(512) 854-9629

April 6, 2015

Craig J. Pritzlaff
ASSISTANT ATTORNEY GENERAL
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
*Via Facsimile: (512) 320-0911*

Keith W. Lapeze
Taylor L. Shipman
LAPEZE & JOHNS, PLLC
601 Sawyer Street, Suite 650
Houston, Texas 77077
*Via Facsimile: (713) 739-1015*

Stephen A. Doggett
ATTORNEY AT LAW
201 South 11th Street
Richmond, Texas 77469
*Via Facsimile: (281) 342-8458*

Re: Cause No. D-1-GV-06-000627; *State of Texas v. Bernard Morello*; in the 353rd Judicial District Court, Travis County, Texas

Dear Counsel:

The State of Texas' Motion for Summary Judgment came on for hearing on February 19, 2015. On March 30, 2015, the court conducted a hearing on the State's Motion to Enter and Morello's Objections to Court's Rulings on State's Objections to Admission of Affidavits of Heslep and Crouch. Upon reconsideration, the Court overrules the State's objections to the affidavits of Mr. Heslep and Mr. Crouch; however, this does not change the Court's decision on the motion for summary judgment. The State of Texas' Motion for Summary Judgment is granted.

Counsel should prepare an appropriate order, circulate to opposing counsel for approval as to form and submit to the court for signature.

Yours very truly,

RHONDA HURLEY
Judge, 98th District Court
Travis County, Texas

cc: Velva L. Price, District Clerk

EXHIBIT